**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| ANDREW SLABON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-08965 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ANGELO R. SANCHEZ, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Andrew Slabon called 911 when he discovered that his mother had passed away in his Chicago home. That call started a chain of events that culminated in his criminal conviction for kicking a nurse in the emergency room of a local hospital. Slabon eventually sued the City of Chicago and the hospital, plus a large collection of police officers, paramedics, and medical personnel, complaining about how he was treated along the way. He alleges that he was handcuffed, hospitalized, drugged, interrogated, and incarcerated for no reason.

Several Defendants moved to dismiss the Sixth Amended Complaint. For the reasons stated below, the motion to dismiss by the City of Chicago and its employees (the "City Defendants") is granted in part and denied in part. The motion to dismiss by the hospital, Defendant Presence Our Lady of the Resurrection Medical Center, is granted in part and denied in part. The Court grants Defendant David DiLoreto's motion to dismiss.

**Background**

At the motion to dismiss stage, the Court must accept the well-pleaded allegations of the complaint as true. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). But "well-

pleaded" is an important limitation. *Id.* The Court does not need to accept conclusions, boilerplate, buzzwords, or legalese. Mouthing the magic words adds air, but no weight.

Before summarizing the allegations, the reader should know that the storytelling in the complaint is a bit out of the ordinary. The complaint does not merely tell Slabon's side of the story. That is, the complaint does not merely say what happened, from his perspective. Instead, the complaint also summarizes evidence gathered in discovery so far – such as testimony from the Defendant police officers – and then offers Slabon's response. The complaint is part affirmative story-telling, and part response to the Defendants. And the complaint is less linear than one might hope, so it can be a challenge to wade through. Still, the Court reads the complaint in the light most favorable to Slabon, both because of the procedural posture (on a motion to dismiss) and because he is a pro se litigant.

On January 27, 2014, Plaintiff Andrew Slabon made a terrible discovery: he found his mother deceased in his Chicago home. *See* Sixth Am. Cplt. ¶ 12 (Dckt. No. 247). He called 911. *Id.* Officers from the Chicago Police Department arrived on the scene, including Defendants Sanchez and Mackin. *Id.* at ¶¶ 13–14. That's when things went from bad to worse.

Officers Sanchez and Mackin entered the home – the complaint alleges that they entered "without permission" (despite a 911 call about a death). *Id.* at ¶ 13. "Shortly after" they arrived, the officers detained Slabon and put him in handcuffs "without cause or justification." *Id.* The officers ordered Slabon to be taken to the hospital by ambulance, even though he was not injured. *Id.* at ¶¶ 14–15. They did so "without medical justification of any kind and not so much as consulting with [a] medical professional already on scene." *Id.* at ¶ 15.

The complaint then responds to the officers' side of the story. The officers testified that Slabon "did not want to live anymore and threatened to kill himself." *Id.* at ¶ 17. But the

complaint undercuts the notion that Slabon was suicidal. The report from Officer Sanchez never mentioned that Slabon was suicidal (*id.* at ¶ 18), and neither did the report from the Chicago Fire Department (*id.* at ¶ 20). Fire and medical personnel were on scene, and they did not claim that Slabon was suicidal. *Id.* at ¶ 19. Defendant Barrick, a doctor at the Hospital, did not recall Slabon being suicidal, either. *Id.* at ¶ 24.

The gist appears to be that there was no reason to involuntarily commit Slabon because he wasn't suicidal. Even so, the Fire Department's records don't exactly exonerate Slabon. "Records show CFD [Chicago Fire Department] made a request for CPD [Chicago Police Department] assistance for an 'unruly person.'" *Id.* at ¶ 21. At his eventual criminal trial (more on that later), the prosecutor described Slabon as "so aggressive" and "so uncontrollable" that the paramedics were forced to call the police to restrain him.[1] *See* Dckt. No. 235-6, at 12 of 110 (citing the trial transcript).

According to Slabon, the officers gave false reasons for shipping him to the hospital. *Id.* at ¶¶ 29–34. Defendants Bishop and Strong from the Chicago Fire Department "conspired with CPD" by filing a false report stating that Slabon had a spine issue. *Id.* at ¶ 29.

Off to the hospital Slabon went. Slabon "was taken from his home and forcibly placed into [an] emergency CFD vehicle ambulance." *Id.* at ¶ 28. The complaint alleges that the officers ran afoul of the Chicago Police Department's procedures for how to handle a person needing involuntary mental health treatment. *Id.* at ¶¶ 25–27.

---

[1] Slabon attached the transcript from his criminal trial to his civil complaint. An opening statement is not evidence, and the Court views the complaint and its exhibits in the light most favorable to Slabon as the non-moving party. Slabon did not admit all of the facts in the exhibits simply by attaching them to the complaint. *See N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455 (7th Cir. 1998) (noting that "[w]hen the exhibit [in question] is not the subject of the claim," the rules do "not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached"). Still, the Court provides this snippet from the criminal trial as background only – without relying on it – to give the reader a better sense of the overall case.

The ambulance took Slabon to the emergency room of Defendant Presence Our Lady of the Resurrection Hospital ("the Hospital"), where he was "involuntarily admitted." *Id.* at ¶ 31. Our Lady of the Resurrection is "not a designated mental health intake facility." *Id.*

Once admitted, Slabon met with Dr. Barrick. *Id.* at ¶ 32. As Slabon tells it, Dr. Barrick is a medical doctor, but he is not a psychologist. *Id.* Slabon did not receive a psychological exam. *Id.* at ¶ 33.

Slabon refused medical treatment, telling Dr. Barrick that there was "no medical emergency" and that "he was not injured in any way." *Id.* at ¶ 35. According to the complaint, the paramedics testified that Slabon was responsive and answered their questions. *Id.* at ¶ 34. Slabon asked to be released and repeatedly told the doctor, "I don't want to be here." *Id.* He was ignored. *Id.*

Instead of releasing him, the Hospital transferred Slabon to a different room of the ER, apparently still in handcuffs. *Id.* at ¶ 36. The handcuffs were removed in the second room, but he wasn't free for long. *Id.* Slabon was "handcuffed to a gurney." *Id.* Defendant Benjamin, a nurse, then entered the room and announced that Slabon needed to be "fully restrained." *Id.*

It became rough and tumble. Two officers, the nurse, and a security guard physically restrained him. Defendants Cummens (Chicago Police Department), Adamski (same), and Nurse Benjamin – plus an unknown security guard – grabbed Slabon by the ankles. *Id.* at ¶ 37. Defendant Cummens "placed his left forearm on Plaintiff[']s throat preventing Plaintiff from breathing." *Id.*

After Slabon was "fully restrained" physically, he was restrained chemically, too. *Id.* at ¶ 38. Defendant Benjamin injected him with drugs – twice – within five minutes. *Id.* They worked. Slabon fell unconscious. *Id.*

4

The complaint doesn't offer a lot of details about what precipitated the scuffle or the restraints. But the exhibits to the complaint fill in the gaps.[2] Apparently, Slabon was "aggressive" when he arrived at the hospital, and "kicked a nurse [Benjamin] into the wall." *See* Our Lady of the Resurrection Hospital Records, at 2 of 14 (Dckt. No. 235-17). The police report explains that when Nurse Benjamin attempted to put an oxygen mask on Slabon, he "pivoted his lower body" toward her and "kicked [her] in the chest pushing her back into a wall and causing an oxygen tank to fall off the wall onto the floor." *See* Chicago Police Dep't Incident Rep., at 1–2 (Dckt. No. 235-14).

When Slabon came to, he realized that someone had removed his clothes and inserted a catheter. *See* Sixth Am. Cplt. ¶ 39 (Dckt. No. 247). He saw that Officer Cummens "was holding in his hand a tube that lead [sic] into Plaintiff[']s bladder." *Id.* at ¶ 40. Cummens began "tugging and pulling this tube deliberately causing excruciating pain and suffering." *Id.* As he tugged and pulled, Cummens asked Slabon, "[H]ow does this feel tough guy[?]" *Id.* Defendant Adamski was in the room, too, but did nothing. *Id.* at ¶ 41.

Slabon "began screaming in pain," alerting ER staff. *Id.* at ¶ 42. Nurse Benjamin returned to the room, and someone (apparently Slabon, but the complaint is ambiguous) requested security. *Id.* But Benjamin refused the request for security and "denied the attack ever occurred." *Id.* at ¶ 43.

---

[2] Plaintiff filed two versions of the Sixth Amended Complaint. *See* Dckt. No. 235 (filed July 11, 2019); Dckt. No. 247 (filed August 8, 2019). They are similar, but not quite identical. For the sake of clarity, this Court ruled that the later-filed version of the Sixth Amended Complaint is the governing complaint. *See* 11/27/19 Order (Dckt. No. 281). Plaintiff filed exhibits (Dckt. No. 235) with his first-filed Sixth Amended Complaint, but he did not refile those exhibits with his second-filed Sixth Amended Complaint. Still, there is no indication that Plaintiff intended to jettison those exhibits, either. So, this Court construes the exhibits as if they were part of the operative Sixth Amended Complaint (meaning the version filed as Docket No. 247).

Meanwhile, Slabon continually requested his clothes, but he was ignored. *Id.* at ¶ 44. He was discharged from Our Lady of the Resurrection into the "record freezing temperature" in just a "paper thin hospital gown." *Id.* at ¶ 45. Nurse Benjamin watched the discharge, but did nothing. *Id.* at ¶ 46.

Slabon was not simply released into society on a cold January night, wearing nothing but a hospital gown. He remained in custody. Slabon was arrested and charged ("falsely") with attacking Nurse Benjamin. *Id.* at ¶ 47; *see also id.* at ¶¶ 48–52 (alleging that Benjamin wasn't injured, and giving a number of reasons why Slabon didn't assault her).

Instead of going home, Slabon was shipped to a police station a few miles away. *Id.* at ¶ 56. It was January in Chicago, so it was "subzero weather." *Id.* He lacked clothes while en route, except for the gown, despite repeated requests. *Id.* at ¶ 57. At the station, the police placed Slabon in an uncomfortable holding cell, hungry and cold. *Id.* at ¶ 58. Slabon was "not given any food or means . . . to protect himself from cold temperatures." *Id.*

He didn't stay there long. Slabon was transferred to another police facility (about 6 miles away) "in the middle of the night," once again clad only in the hospital gown in "minus zero temperatures via a transport vehicle 39." *Id.* at ¶ 59. An unknown transport officer noticed Slabon shaking from the cold, laughed, and told him "[D]on't worry, we'll crank the heat up for you." *Id.* Slabon "begged" not to be taken outside into the cold. *Id.* at ¶ 60. One of the officers laughed in response, telling him: "[Y]ou're a tough guy, you can handle it." *Id.*

The cold wasn't the only uncomfortable part of the ride. The officers never secured Slabon in the van. *Id.* at ¶ 61. So, when he stood up to avoid the freezing metal seats, Slabon fell several times in the back of the van due to "erratic driving," causing injuries. *Id.* at ¶ 64.

6

After arriving at the police station, detectives O'Brien and O'Donnell interviewed Slabon about the death of his mother. *Id.* at ¶¶ 65, 67. As Slabon tells it, he was in "extreme anguish" during the interview, caused by "extreme cold and sleep depravation [sic]." *Id.* at ¶ 65. The entire time in police custody was actually "torture," because "it was obvious Plaintiff was in need of additional protection from the extreme cold." *Id.* at ¶ 70.

Several hours later, Slabon was on the move again. *Id.* at ¶ 66. For the second time, officers transported him without seatbelts or other restraints. *Id.* During the ride, he sustained injuries and lost consciousness. *Id.* He eventually woke up in a holding cell, "disoriented and in shock." *Id.* The complaint does not identify who transported him.

At some point, it became clear that Slabon needed medical treatment for "exposure to the extreme cold." *Id.* at ¶ 69. But he didn't receive medical attention for two days. *Id.* at ¶ 75. Finally, after 48 hours in police custody, Slabon was transported to a hospital, where he was treated for exposure to cold and malnourishment. *Id.*

Sometime during the incarceration, Officers O'Brien and O'Donnell told Slabon that, based on a post-mortem examination, his mother had suffered a "subdurmal hematoma." *Id.* at ¶ 71. That's a type of bleeding associated with a traumatic brain injury. The (supposed) medical finding prompted the officers to remove Slabon's keys and search his home. *Id.* Officers O'Brien and O'Donnell later entered Slabon's home without a warrant, stayed several hours, and swiped $2,100 in hidden cash. *Id.* at ¶ 72. The keys were later destroyed. *Id.* at ¶ 73.

Eventually, the Cook County medical examiner conducted an autopsy, found no subdurmal hematoma, and concluded that Slabon's mother had died of natural causes. *Id.* at ¶ 74.

The State of Illinois ultimately charged Slabon with aggravated battery for kicking Nurse

Benjamin. *Id.* at ¶ 76. A jury found him guilty. *Id.*; *see also* Dckt. No. 235-18, at 122 of 126.

He appealed to the Illinois Appellate Court, which affirmed the conviction. *See* Sixth Am. Cplt.

¶ 78 (Dckt. No. 247). The Illinois Supreme Court declined to hear his appeal. *Id.*

### Procedural History

This case has a long, winding procedural history. Slabon filed suit almost five years ago.

*See* Original Cplt. (Dckt. No. 1) (filed October 8, 2015). Since then, he has amended his

complaint at least six times (and more, if you count versions of the complaint that the Court has

not credited). A revolving door of Defendants has whirled around, with parties coming and

going. The Court has dismissed some along the way, only to have them reenter the fray in an

amended complaint. There are 337 docket entries, and counting.

Judge Kendall, this Court's predecessor before reassignment, did the heavy lifting. Judge

Kendall screened and dismissed Plaintiff's original Complaint, First Amended Complaint, and

proposed Second Amended Complaint. *See* Dckt. Nos. 6, 12. Judge Kendall granted Slabon

leave to file a Third Amended Complaint, too. *See* Dckt. No. 45. He then filed a Third

Amended Complaint (Dckt. No. 63), followed by a Fourth Amended Complaint (Dckt. No. 65).

The complaints were thick with claims and defendants. For example, the Fourth

Amended Complaint advanced 16 counts against 15 individual Defendants, plus seven "John

Does." *Id.* He sued the City of Chicago and Our Lady of the Resurrection Medical Center, as

well.

On December 20, 2016, the Court screened Slabon's Fourth Amended Complaint and

allowed him to proceed on certain claims. *See* 12/20/16 Order (Dckt. No. 64). Judge Kendall

ruled that the complaint alleged state law claims for false imprisonment and medical battery

against Our Lady of the Resurrection employees Dr. Barrick and Nurse Benjamin. *Id.* The Court also concluded that Our Lady of the Resurrection should remain in the case for *respondeat superior* and indemnification purposes. *Id.*

Slabon failed to serve Nurse Benjamin with process, so she was ultimately dismissed. *See* 2/26/18 Order (Dckt. No. 138); *see also* 7/2/19 Order (Dckt. No. 233); 11/12/19 Order (Dckt. No. 271). Slabon later tried to bring Benjamin back in the case, by naming her as a defendant in the Sixth Amended Complaint. *See* Sixth Am. Cplt. (Dckt. No. 247). To this day, Slabon has not served Benjamin with process. *See* Fed. R. Civ. P. 4(m) (requiring service of process "within 90 days after the complaint is filed"). Defendant Benjamin is dismissed.

Plaintiff later filed a Fifth Amended Complaint. *See* Dckt. No. 152. Judge Kendall dismissed it as improperly filed, and gave Slabon one "FINAL chance to file a Fifth Amended Complaint for the sole purpose of re-pleading the claims for medical battery based on treatment without medical justification (Count VII) and for false imprisonment (Count XV) against Defendant POLR [Presence Our Lady of the Resurrection Medical Center] that the Court dismissed without prejudice in its March 21 Order (Dkt. 142)." *See* 6/6/18 Order (Dckt. No. 158) (all caps in original). The Court ordered Slabon to include affidavits from a medical professional about the legitimacy of the malpractice claims, as required by Illinois law. *Id.* The Court noted that failure to file a Fifth Amended Complaint that complied with the Court's Order would "result in dismissal of those claims with prejudice." *Id.* But Slabon never filed the medical affidavits as the Court ordered.

Meanwhile, Slabon had a string of Court-appointed lawyers come and go. Judge Kendall appointed several attorneys, only to see them file motions to withdraw. *See* Dckt. Nos. 13, 20,

162, 207, 214, 216, 224.  In mid-2019, the Court ruled that it would not appoint a new attorney. *See* 6/19/19 Order (Dckt. No. 226).

Before his departure, Slabon's last lawyer requested leave to file a Sixth Amended Complaint.  *See* Dckt. No. 223.  The Court granted that request, and Slabon filed his Sixth Amended Complaint on July 11, 2019.  *See* Dckt. No. 235.  Then, after his lawyer withdrew, Slabon filed an *Amended* Sixth Amended Complaint (*see* Dckt. No. 247), which included an additional claim for intentional infliction of emotional distress.  Soon after, the case was reassigned, and Judge Kendall handed over the reins.  *See* Dckt. No. 260.

In light of the Sixth Amended Complaint and the Amended Sixth Amended Complaint, Defendants sought clarification from the Court about the ever-changing pleadings.  *See* Dckt. No. 267.  For the sake of clarity, the Court ruled that the operative complaint is the later-filed Amended Sixth Amended Complaint, meaning the pleading filed on August 8, 2019 (Dckt. No. 247).  *See* 11/12/19 Order (Dckt. No. 271).

This Court also gave Slabon one last chance to amend, granting him leave to file a Seventh Amended Complaint and assert any other claim for intentional infliction of emotional distress by November 18, 2019.  *Id.*  The Court warned Slabon:  "If Plaintiff does not file a Seventh Amended Complaint by Monday, November 18, 2019, then the later version of the Sixth Amended Complaint [Dckt. No. 247] will be the operative complaint in this matter, and there will be no claim in this case for the intentional infliction of emotional distress."[3]  *Id.*

---

[3]  The last part of that sentence was a bit strong.  Unbeknownst to the Court, the amended Sixth Amended Complaint (Dckt. No. 247) already included a claim of intentional infliction of emotional distress (Count XII).  It would have been more accurate for this Court's Order dated November 12, 2019 to say that there will be no *new* claim for intentional infliction of emotional distress.  The punchline is that there is no claim for intentional infliction of emotional distress in this case, *except* the claim in the amended Sixth Amended Complaint.  *See* Dckt. No. 247.

10

Slabon missed the November 18 deadline, and filed his Seventh Amended Complaint on November 24, 2019. *See* Dckt. No. 277. The Court ruled that the later-filed Sixth Amended Complaint (Dckt. No. 247) is the operative complaint because Slabon missed the deadline to file a Seventh Amended Complaint, and did not request or receive permission to file a late pleading. *See* 11/27/19 Order (Dckt. No. 279). At some point, orderly litigation requires a plaintiff to commit to a complaint, so that the claims are not an ever-changing moving target. All good things must come to an end, and litigation must come to an end, too.

That backstory brings us to the current motions. Several Defendants moved to dismiss some or all of the claims in the Sixth Amended Complaint. In particular, Presence Our Lady of the Resurrection Medical Center filed a motion to dismiss, as did Defendant David DiLoreto (the Chief Medical Officer at the Hospital). *See* Our Lady of the Resurrection Mtn. to Dismiss (Dckt. No. 288); DiLoreto Mtn. to Dismiss (Dckt. No. 290). The City and its employees – including Officers Sanchez, Cummens, Adamski, O'Brien, and O'Donnell from the Chicago Police Department, and Bishop and Strong from the Chicago Fire Department – also moved to dismiss. *See* City Defs.' Mtn. to Dismiss (Dckt. No. 287).

The punchline is that there are three pending motions to dismiss.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.3d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Discussion

The Sixth Amended Complaint advances 12 claims against 11 (or possibly 13 or 15)[4] named individuals, plus "John Doe" police officers, the City of Chicago, and Our Lady of the Resurrection Hospital. *See* Sixth Am. Cplt. (Dckt. No. 247). Pinning down what claims are pending against which Defendants takes a bit of work. Some claims are against some Defendants, and some claims are against all Defendants. *Id.* at ¶¶ 88–174. Oftentimes, Slabon asserts claims against "Defendants," without more, which the Court construes as claims against all Defendants.

Slabon filed eight claims against the Hospital, including claims for unreasonable seizure under the Fourth Amendment (Count I), conspiracy to violate constitutional rights (Count II),

---

[4] The list of Defendants in the case caption does not match the list of Defendants in the first paragraph of the complaint. The case caption includes 11 Defendants, but the first paragraph includes 13 Defendants. There is substantial overlap, but it is not complete. Nine individual Defendants appear in both the caption and the opening paragraph: Sanchez, Cummens, Adamski, O'Brien, O'Donnell, Bishop, Strong, Barrick, and Benjamin. Two Defendants appear in the case caption but not the first paragraph, and four Defendants appear in the first paragraph but not the case caption. Taken together, the universe of potential individual Defendants is 15 (that is, nine plus two plus four).

Specifically, the caption includes two Defendants (Gonzalez and DiLoreto) who are not listed in the first paragraph. The complaint alleges nothing against Defendant Gonzalez, so that Defendant is dismissed. The complaint includes a few allegations about DiLoreto (but only a few). So, for now, before the Court begins its analysis, DiLoreto is a Defendant. On the flipside, the opening paragraph lists four individual Defendants (Mullany, Delderfield, Oppedisano, and Gregory) who do not appear in the case caption. But once again, the complaint includes no allegations against them. So Defendants Mullany, Delderfield, Oppedisano, and Gregory are dismissed, too. After that initial round of housecleaning, there are ten individual Defendants (before reviewing the claims, that is): Sanchez, Cummens, Adamski, O'Brien, O'Donnell, Bishop, Strong, Barrick, and Benjamin (that is, the Defendants who appear both in the caption and the first paragraph), plus DiLoreto.

substantive due process (Count III), excessive force (Count IV), unconstitutional conditions of confinement (Count VII), *respondeat superior* (Count IX), false imprisonment (Count XI), and intentional infliction of emotional distress (Count XII). The Hospital moved to dismiss all of the claims except Count XII.

Slabon also filed six claims against Defendant DiLoreto (the Chief Medical Officer), including conspiracy to violate constitutional rights (Count II), substantive due process (Count III), assault and battery (Count VI), unconstitutional conditions of confinement (Count VII), false imprisonment (Count XI), and intentional infliction of emotional distress (Count XII). DiLoreto moved to dismiss all of the claims except Count XII.

Finally, Slabon advanced eleven claims against the City of Chicago and various police officers and paramedics, including unreasonable seizure under the Fourth Amendment (Count I), conspiracy to commit constitutional violations (Count II), substantive due process (Count III), excessive force (Count IV), assault and battery (Count V), medical battery (Count VI), unconstitutional conditions of confinement (Count VII), a *Monell* claim (Count VIII), indemnification (Count X), false imprisonment (Count XI), and intentional infliction of emotional distress (Count XII).

The City Defendants – including the City and its employees – moved to dismiss some of the claims. Specifically, the City Defendants moved to dismiss the claims of conspiracy to commit constitutional violations (Count II), substantive due process (Count III), assault and battery (Count V), and unconstitutional conditions of confinement (Count VII). The City Defendants also moved to dismiss the unreasonable seizure claims against Officers O'Brien and O'Donnell (Count I), the unreasonable force claims against Officers O'Brien, O'Donnell, and Sanchez (Count IV), the battery claims against Officers O'Brien and O'Donnell (Count V), the

medical battery claims against Officers Bishop and Strong (Count VI), the false imprisonment claims against Officers O'Brien and O'Donnell (Count XI), and the intentional infliction of emotional distress claims against Sanchez, Adamski, O'Brien, O'Donnell, Bishop, and Strong (Count XII). Finally, the City moved to dismiss the *Monell* claim (Count VIII).

So, there are quite a few arguments about quite a few claims against quite a few Defendants. Some of the arguments apply to multiple claims. For example, some of the *Monell* arguments apply to more than one claim. Some of the arguments apply to multiple Defendants, too. For the sake of simplicity, the Court will consider the claims in the order that they appear in the complaint.

## I.     Unreasonable Seizure (Count I)

Count I is an unreasonable seizure claim under the Fourth Amendment. Slabon brings this claim, like the rest of the constitutional claims, under 42 U.S.C. § 1983. The Hospital and two of the police officers moved to dismiss.

### A.     The Hospital

Count I focuses almost entirely on the City of Chicago and its police officers. It contains more than 20 paragraphs, and there are only a few scattered references to the Hospital. *See* Sixth Am. Cplt. ¶¶ 89, 91. Still, as the Hospital reads the complaint, Count I is directed at the Hospital, so the Court reads it the same way. *See* Our Lady of the Resurrection Mtn. to Dismiss, at ¶¶ 50, 55 (Dckt. No. 288).

The Hospital advances two arguments. *Id.* at ¶¶ 56–61. The Hospital argues that Slabon failed to allege that it was acting under color of state law, as required by section 1983. It also argues that the complaint fails to state a *Monell* claim. That is, the Hospital contends that the

complaint does not allege that the Hospital itself (as opposed to its employees) committed a constitutional violation.

Section 1983 authorizes a claim against a person acting under color of state law who deprived the plaintiff of a right under the Constitution or federal law. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009) (citing *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)). Two basic principles guide the Court's analysis. First, "[w]hen a plaintiff brings a section 1983 claim against a defendant who is not a government official or employee, the plaintiff must show that the private entity acted under the color of state law." *Id.* Second, there is no *respondeat superior* liability in section 1983 cases, so a municipality (or corporation) may be liable only if its policies or practices caused the violation. *Id.*

State action requires such a "'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" *Id.* at 823 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Often, the actor is a state employee or officer, so it is "easy to conclude that the person's actions are fairly attributable to the state." *Id.* But the inquiry is more delicate when, as here, the actor is a private party. Some acts by private parties are "fairly attributable to the state because the party has acted in concert with state actors." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170 (1970)). It is a fact-specific enterprise.

The Supreme Court has applied various tests to evaluate the "range of circumstances" that constitute state action. *See Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001). The Seventh Circuit has described them as (1) the "symbiotic relationship test;" (2) the "state command and encouragement test;" (3) the "joint participation doctrine;" and (4) the "public function test." *See Rodriguez*, 577 F.3d at 823–24. It can be tricky to determine

15

whether a private entity, like Our Lady of the Resurrection, acted under color of state law. *Id.* at 823 (noting that the Second Circuit has called the determination "one of the more slippery and troublesome areas of civil rights litigation") (quoting *Int'l Soc'y for Krishna Consciousness v. Air Canada*, 727 F.2d 253, 255 (2d Cir. 1984)).

*Rodriguez* analyzed whether nongovernmental health workers who provide medical care to prisoners can be considered state actors. *Id.* at 824. As the Seventh Circuit explained, the "function of the physician" within the state system – more specifically, the relationship "among the State, the physician, and the prisoner" – determines whether the doctor is a state actor. *Id.* at 825 (quoting *West v. Atkins*, 487 U.S. 42, 55–56 (1988)).

*Rodriguez* answered the state action question three different ways for three different private actors. *Id.* at 830–31. Each private actor played a different role in plaintiff Rodriguez's medical emergency. Plymouth Ambulance Services and its EMTs transported Rodriguez from the jail to the hospital. St. Agnes, a private hospital, cared for Rodriguez for about an hour. And Waupun Memorial hosted and cared for Rodriguez for several days.

For the ambulance service and the EMTs, the Seventh Circuit held that the pleadings were too inconclusive to determine their relationship with the state. *Id.* at 830. Faced with murky pleadings, the court ordered "limited discovery." *Id.* at 830 (noting the need for limited discovery to determine the "trilateral relationship" between the medical providers, the prison system, and the plaintiff). The *Rodriguez* court noted that the transport involved a custodial atmosphere, where a correctional officer was present and the ambulance was escorted by a prison vehicle. Still, the Court of Appeals could not tell "on the face of the complaint alone, the relationship of Plymouth, and through it, the EMTs, to the prison system or to Mr. Rodriguez." *Id.* That is, it was unclear whether the ambulance service "rendered this service by contract with

16

the prison system or as part of a municipal service available to all persons needing emergency medical care in the area." *Id.*

The Seventh Circuit reached different conclusions for the two hospitals. The Court of Appeals concluded that St. Agnes Hospital was not a state actor. Rodriguez spent only an hour there. During that uneventful hour, a nurse performed blood work and injected him with pain medication. *Id.* The nurse refused to perform any additional services because the hospital did not have an active medical account with the prison. *Id.*

But the Seventh Circuit found that Waupun Memorial Hospital, on the other hand, was a state actor. Unlike St. Agnes, Waupun had an ongoing relationship with the prison – it even had a prison ward – and it provided care for Rodriguez over a multiple-day stay. *Id.* at 831. The Court of Appeals explained that the complaint adequately alleged that Waupun Memorial's treatment was "tied to the state's responsibility for his overall medical care." *Id.* (citing *Skelton v. Pri–Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991)).

Slabon's allegations against Our Lady of the Resurrection are weaker than Rodriguez's allegations about Waupun Memorial Hospital. Nothing suggests that Our Lady of the Resurrection has an ongoing contract with the state. And the complaint alleges that he spent only a few hours at the Hospital – much less than Rodriguez's multi-day stay at Waupun. *See* Sixth Am. Cplt. ¶¶ 32, 45, 56, 59 (alleging that Slabon met with a doctor at 7:45 p.m., but was later discharged and was at a police station "in the middle of the night"); *see also* Our Lady of the Resurrection Medical Records, at 1 of 14 (Dckt. No. 235-17) (noting intake time on January 27, 2014 at 7:40 p.m. and discharge time on January 28, 2014 at 3:35 a.m.). In light of Slabon's brief stay at the Hospital, and the absence of any alleged relationship between the Hospital and

17

the government, the complaint offers little support for a finding that the Hospital was a state actor.

Instead, Slabon's stint at Our Lady of the Resurrection falls somewhere between Rodriguez's experience with the Plymouth EMTs (which required additional discovery) and St. Agnes Hospital (which did not constitute state action). Our Lady of the Resurrection was more involved in Slabon's care than St. Agnes was in Rodriguez's. Indeed, Our Lady of the Resurrection provided more medical care than merely bloodwork: its medical staff rendered Slabon unconscious via injections. There was a custodial atmosphere, too (*e.g.*, the handcuffs).

There aren't definitive allegations that Our Lady of the Resurrection was a state actor. The complaint doesn't allege that Our Lady of the Resurrection acted in concert with the state. It doesn't allege an ongoing relationship with the government, or that it was a go-to provider of care for people in police custody. Instead, the complaint merely alleges that the paramedics took Slabon to the Hospital to receive care. That allegation, without more, is not enough to support the notion that Our Lady of the Resurrection is a state actor. But it does not foreclose the possibility that the Hospital was a state actor, either.

Ordinarily, the Court might allow "limited discovery," as the Seventh Circuit suggested in *Rodriguez*, so that the facts could illuminate murky pleadings. *See Rodriguez*, 577 F.3d at 530. But Slabon's constitutional claims against Our Lady of the Resurrection fail for a separate reason. Even if the Hospital could be considered a state actor, Slabon fails to allege a *Monell* claim against it.

The *Monell* theory of liability applies to private entities that act under color of state law. *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789–96 (7th Cir. 2014); *see also Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016). Under *Monell*, a municipality

18

or corporation may be liable for a constitutional violation under section 1983 only if it was caused by: "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citations omitted).

The critical question is "whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658 (1978)). The "municipal policy or practice must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal citations and quotation marks omitted). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 405 (1997).

Slabon's complaint does not satisfy those "rigorous standards." *Id.* The complaint is too general and conclusory to state an unreasonable seizure claim against the Hospital itself. The complaint is long on conclusions and short on facts.

Count I starts with a generic assertion: Hospital employees committed constitutional violations that "were and are directly and proximately caused by policies, practices and/or customs developed, implemented, enforced, encouraged and sanctioned by Defendant . . . Our Lady of [the] Resurrection Hospital." *See* Sixth Am. Cplt. ¶ 89 (Dckt. No. 247). But the complaint does not drill down with specifics. The remaining allegations are equally generic.

The Hospital failed to "supervise and train" its employees, failed to "adequately discourage constitutional violations," and failed to "adequately monitor and discipline" its staff. *See* Sixth Am. Cplt. ¶ 89(a), (b).

A complaint must offer "enough facts to state a claim to relief that is plausible on its face," so that the complaint crosses the "line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007). The Federal Rules require "more than labels and conclusions," and a "formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *see also McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) ("[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth."). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The bar is not lower for *Monell* claims. Facts add value; conclusions do not. *See, e.g.*, *Jordan v. Klamenrus*, 2020 WL 4547879, at *5 (N.D. Ill. 2020) ("Rather than citing similar instances of misconduct, Jordan merely recites the elements of a *Monell* claim in conclusory fashion. That is not enough to survive a motion to dismiss."); *Bridgeforth v. City of Glenwood*, 2020 WL 1922907, at *6 (N.D. Ill. 2020) ("Plaintiff does not mention any final policymaker or express policy, and to assert a *Monell* claim based on a widespread practice, plaintiff must plausibly allege, by way of at least 'some specific facts,' rather than purely conclusory allegations that . . . the Village had a genuinely widespread practice.") (internal citation omitted); *Carmona v. City of Chicago*, 2018 WL 1468995, at *3 (N.D. Ill. 2018) (dismissing a *Monell* claim because a plausible pleading "necessarily requires more than bare factual allegations and conclusory recitals").

Slabon's complaint does not successfully drive down any of the three lanes for stating a *Monell* claim. Again, a municipality or corporate entity is liable only if the constitutional deprivation is caused by (1) an official policy; (2) a widespread practice; or (3) an official with policymaking authority. *See Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).

First, Slabon doesn't allege that the Hospital has an express policy to harm, restrain, or detain patients for no reason. In fact, the complaint contains no allegation about the Hospital's policies at all. The only exception is a conclusory reference to a "policy," which counts for nothing. *See* Sixth Am. Cplt. ¶ 89 (Dckt. No. 247).

Second, the complaint does not allege that there is a "widespread custom or practice" of violating constitutional rights. *See Thomas*, 604 F.3d at 303. There is no hard-and-fast line about how many violations it takes to make a practice. But "one instance" is not enough. *Id.* Neither is "three." *Id.*; *see also Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002). It must be "persistent and widespread," *Gable*, 296 F.3d at 538, not "random" or "isolated," *Thomas*, 604 F.3d at 303. An isolated incident is not a practice.

Here, Slabon alleges nothing more than a one-off set of events. The complaint alleges what happened to him, but does not describe any practice that applied more generally to other patients. True, the complaint does not need to identify another specific person who suffered the same fate. *See White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) ("White was not required to identify every other or even one other individual who had been arrested pursuant to a warrant obtained through the complained-of process."). Even so, the complaint must contain some facts "'plausibly suggesting (not merely consistent with)' an entitlement to relief."

*McCauley*, 672 F.3d at 616 (quoting *Twombly*, 550 U.S. at 557). After removing conclusory labels, the complaint lacks a description of a widespread practice to violate the rights of patients.

Third, the complaint does not allege that "any one individual with policymaking authority has caused the deprivation." *See League of Women Voters of Chicago v. City of Chicago*, 757 F.3d 722, 727 (7th Cir. 2014). He does bring a claim against DiLoreto, the Chief Medical Officer of the Hospital. But the complaint does not allege that DiLoreto caused any constitutional violation. It simply alleges his job title, without more.

The complaint "merely describes the factual circumstances of his arrest and tacks on boilerplate allegations that trace the legal requirements of a *Monell* claim." *See Gallagher v. O'Connor*, 664 F. App'x 565, 569 (7th Cir. 2016). He does not allege that Our Lady of the Resurrection maintains a policy or practice that is "so permanent and well settled as to constitute a custom or usage with the force of law." *See League of Women Voters of Chicago*, 757 F.3d at 728 (quoting *Baskin v. City of Des Plaines*, 138 F.3d 701, 704–05 (7th Cir. 1998)).

The allegations against the Hospital do not state a *Monell* claim. Slabon's claim against the Hospital under section 1983 in Count I is dismissed. As explained below, the remaining *Monell*-related claims against the Hospital fail, too.

### B. The City Defendants

Slabon also alleges that the City of Chicago and its police officers and paramedics – Defendants Sanchez, Cummens, Adamski, O'Brien, O'Donnell, Bishop, and Strong – violated his Fourth Amendment right to be free from unreasonable seizure. *See* Sixth Am. Cplt. ¶¶ 88–109, 118–33 (Dckt. No. 247). Two of the officers, O'Brien and O'Donnell, moved to dismiss. *See* City Defs.' Mtn. to Dismiss, at 1 (Dckt. No. 287). They're the detectives who interviewed Slabon and later searched his home.

According to the complaint, the two detectives investigated the death of Slabon's mother. *Id.* at ¶ 67. O'Brien and O'Donnell interviewed Slabon, and during the interview, Slabon "was in extreme anguish from the extreme cold and sleep depravation [sic]." *See* Sixth Am. Cplt. ¶ 65 (Dckt. No. 247). Later, the officers used Slabon's keys and entered his home "without a warrant, remained several hours and removed $2,100 in hidden cash[.]" *Id.* at ¶ 72. After the search, the officers destroyed his keys. *Id.* at ¶ 73.

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The elements flow directly from the text. To state a claim for an "unreasonable . . . seizure[]," a plaintiff must allege that (1) the officers seized the plaintiff or plaintiff's belongings; and (2) the seizure was "unreasonable." *See Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994).

Officers O'Brien and O'Donnell argue that the complaint does not allege any facts that could give rise to an unreasonable seizure claim. *See* City Defs.' Mtn. to Dismiss, at 8–9 (Dckt. No. 287). There are two parts to the claim: a theft, and an interview.

The motion to dismiss barely addresses (if at all) the alleged theft of Slabon's money. Defendants muster only a few sentences saying that the complaint doesn't include enough facts. Conclusions aren't good enough in a complaint, and they aren't good enough in a motion to dismiss, either. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.").

To the extent that Slabon advances a Fourth Amendment claim about the theft of his property, that claim survives for a simple reason: Defendants mustered no argument against it.

*See also Lipford v. City of Chicago*, 2018 WL 3474534, at *2 (N.D. Ill. 2018) ("Absent consent or another recognized exception to the warrant requirement, warrantless seizures of property violate the Fourth Amendment. Under that standard, police officers would plainly violate the Fourth Amendment if they stole money from someone's home while acting under color of state law.") (internal citations omitted).

Count I also alleges that there was an unreasonable seizure during the interview about his mother's death. A seizure occurs when there is a "governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989). Traditionally, the key question is whether the individual believed he was free to leave. *See Carlson*, 621 F.3d at 618–19. The standard is an objective one based on the "totality of the circumstances" around the encounter. *Id.* (quoting *United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997)).

Slabon was under arrest (for kicking the nurse) during the interview by O'Brien and O'Donnell. The timing is a bit up in the air, but the complaint alleges that he was "informed at some point he was under arrest," and he was "falsely charged with attacking" Benjamin. *See* Sixth Am. Cplt. ¶ 47. Exhibits attached to Slabon's complaint corroborate his arrest, and suggest that he was arrested after he kicked the nurse. *See, e.g.*, Our Lady of the Resurrection Medical Records, at 2 of 14 (Dckt. No. 235-17) (noting that Slabon was chemically sedated and "placed under arrest" after he "kicked a nurse into a wall"); Chicago Police Dep't Incident Rep., at 1–2 (Dckt. No. 235-14) (noting Slabon – "Suspect 1" – was "in custody," and explaining that when Nurse Benjamin attempted to put an oxygen mask on Slabon, he "pivoted his lower body" toward her and "kicked [her] in the chest"). Slabon never alleges who placed him under arrest. *See generally* Sixth Am. Cplt. Maybe it was a Defendant, or maybe it was someone else.

An arrest is the "quintessential seizure of the person" under the Fourth Amendment. *See California v. Hodari D.*, 499 U.S. 621, 624 (1991); *Abbott v. Sangamon County*, 705 F.3d 706, 719 (7th Cir. 2013). The complaint confirms that Slabon was arrested and was not free to leave. He was restrained in the Hospital, transported from holding cell to holding cell, and eventually held in an interrogation room with O'Brien and O'Donnell. He wasn't free to go, so he was seized within the meaning of the Fourth Amendment.

Because he was under arrest, Slabon's claim for unreasonable seizure under the Fourth Amendment is really a false arrest claim. *See Gonzalez v. Village of West Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012) ("'False arrest' is shorthand for an unreasonable seizure prohibited by the Fourth Amendment.") (quoting *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005)); *Barrow v. Blouin*, 38 F. Supp. 3d 916, 920 (N.D. Ill. 2014) (noting that, because plaintiff alleged he was arrested and detained for several hours, a false arrest claim was more appropriate than an unreasonable seizure claim; also finding that the unreasonable seizure claim was duplicative of the false arrest claim).

The existence of probable cause is an "absolute defense to a Section 1983 false arrest claim." *See Gardunio v. Town of Cicero*, 674 F. Supp. 2d 976, 984 (N.D. Ill. 2009) (citing *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)). An officer has probable cause to arrest "if he has reason to believe, in light of the facts known at the time, that the suspect has committed or is about to commit a crime." *See Gonzalez v. Village of West Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012) (citing *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)) (additional citation omitted). Probable cause is a "'practical, nontechnical conception' that affords the best compromise between the interests of individual liberty and effective law enforcement." *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (quoting *Illinois v.*

25

*Gates*, 462 U.S. 213, 231 (1983)). The time to determine probable cause is at the moment of arrest. *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) ("A police officer has probable cause to arrest a person if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'") (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

But Slabon doesn't allege that either O'Brien or O'Donnell actually arrested him. In fact, the complaint doesn't reveal who put him under arrest. Even reading the complaint in Slabon's favor, and giving him the benefit of the doubt, the complaint reads as if someone else placed Slabon under arrest. O'Brien and O'Donnell had nothing to do with the incident that led to the arrest (kicking the nurse). They interviewed Slabon about a different incident (the death of his mother), at a different place (the police station, not the Hospital), at a different time (late that night). Nothing suggests that O'Brien and O'Donnell put Slabon under arrest for kicking the nurse when they interviewed him about something else (the fatality).

So, the complaint does not allege a false arrest claim against O'Brien or O'Donnell because Slabon doesn't allege that they put him under arrest. *See Wilbon v. Plovanich*, 67 F. Supp. 3d 927, 943 (N.D. Ill. 2014) (granting summary judgment motion in favor of defendants, finding they were not liable for false arrest where the defendants arrived at the station after plaintiff's arrest, even though they signed a criminal complaint against him for aggravated assault of a police officer); *see also Jenkins v. Keating*, 147 F.3d 577, 583–84 (7th Cir. 1998) (granting summary judgment to defendant officer who filled out criminal complaint against plaintiff but did not participate in her arrest). "The moment for determining probable cause in the context of a false arrest is 'at the time of the initial arrest,' *i.e.*, when the handcuffs are placed

26

on the plaintiff, and not after that point." *Wilbon*, 67 F. Supp. 3d at 943 (citing *Gonzalez*, 579 F.3d at 537).

A defendant cannot be liable under section 1983 for another's actions – he must have "caused or participated in" the alleged constitutional deprivation. *Jenkins*, 147 F.3d at 583. Section 1983 liability "is premised on the wrongdoer's personal responsibility." *Kuhn v. Goodlow*, 678 F.3d 552, 555–56 (7th Cir. 2012). A complaint must connect the dots by "connect[ing] individual defendants to particular actions." *Griffin v. Board of Regents of Univ. of Wis. Sys.*, 818 F. App'x 558, 561 (7th Cir. 2020). The complaint does not allege that O'Brien or O'Donnell arrested Slabon, so it does not state a false arrest claim against them. *See Wilbon*, 67 F. Supp. 3d at 943 ("Plaintiffs' argument that an arrest extends from when a person is not free to leave until the person is taken before a court and the judicial process takes over is incorrect.").

Even if O'Brien and O'Donnell could be held responsible for continuing to hold Slabon after his arrest, his claim would still fail. The parties do not address the elephant in the room: Slabon's criminal conviction.

A civil claim that is inconsistent with a criminal conviction is barred under *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). *See Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003); *see also Williams v. Hefel*, 2016 WL 4987465, at *3 (N.D. Ill. 2016) (dismissing false arrest claim under *Heck* because the plaintiff's conviction was premised on the same facts that led to his arrest). As *Heck* instructs, when the Court is faced with a section 1983 claim, it "must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487.

*Heck* doesn't necessarily foreclose all false arrest claims when there is a conviction. *See Wallace v. Kato*, 549 U.S. 384, 394 (2007); *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007); *see also Easterling v. Moeller*, 334 F. App'x 22, 24 (7th Cir. 2009). But *Heck* does apply when a defendant challenges the validity of his conviction. *See Gordon v. Miller*, 528 F. App'x 673, 674 (7th Cir. 2013) (affirming dismissal of false arrest claim on *Heck* grounds). "When a plaintiff 'makes allegations that are inconsistent with [his] conviction's having been valid, *Heck* kicks in and bars his civil suit.'" *Id.* (quoting *McCann v. Neilsen*, 466 F.3d 619, 621–22 (7th Cir. 2006) (brackets in original)).

*Gordon* is a good example. The plaintiff in *Gordon* brought a false arrest claim based on the argument that he was innocent – that is, that he never committed the crime in the first place. *Id.* at 674. He alleged that he "never drove the pickup truck at all" when challenging a conviction for intoxicated driving. *See Gordon*, 528 F. App'x at 674. The Court of Appeals ruled that Gordon's argument was inconsistent with the validity of his conviction. "[I]f he prove[d] in this case that he did not drive the pickup truck, that proof would necessarily impugn the validity of the conviction that he did drive the pickup while intoxicated." *Id.* So "'*Heck* kicks in and bars his civil suit.'" *Id.* (citation omitted).

The same logic applies here. Like in *Gordon*, Slabon alleges he was falsely arrested *because* he is innocent of any underlying crime. Indeed, he claims that he never actually attacked Nurse Benjamin, and that the evidence against him is false. *See* Sixth Am. Cplt. ¶ 47 (Dckt. No. 247). He was "falsely charged" with kicking the nurse. *Id.* That claim would "impugn the validity of his convictions." *See Gordon*, 528 F. App'x at 674; *Williams*, 2016 WL 4987465, at *3. A claim that Slabon didn't attack Nurse Benjamin is inconsistent with the jury's

28

conclusion that he did attack Nurse Benjamin. So *Heck* kicks in and bars Slabon's false arrest claim about kicking the nurse.

Slabon's false arrest claim against O'Brien and O'Donnell fails. The complaint does not allege that O'Brien or O'Donnell arrested him. And his entire allegation rests on the notion that he didn't do what the jury found that he *did* do – kick the nurse. The claim is inconsistent with the jury's finding of guilt. The false arrest claim against Defendants O'Brien and O'Donnell (Count I) is dismissed.

## II. Conspiracy to Commit Constitutional Violations (Count II)

Count II is a conspiracy claim. Slabon alleges that the Defendants conspired to interfere with his constitutional rights in violation of 42 U.S.C. § 1985. Each Defendant – including the City Defendants, the Hospital, and DiLoreto – moved to dismiss. They all make the same argument.

Section 1985 involves three subsections, but the first two don't apply here. The first subsection is about a conspiracy to prevent an officer from doing his or her duties. *See* 42 U.S.C. § 1985(1). The second subsection is about obstructing justice and intimidating a party, a witness, or a juror. *See* 42 U.S.C. § 1985(2).

But the third subsection is about a conspiracy to deprive a person of equal protection. The statute provides: "If two or more persons in any state or Territory conspire . . . for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." *See* 42 U.S.C. § 1985(3).

To state a claim under section 1985(3), a plaintiff must allege "'(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens.'" *Brokaw v. Mercer County*, 235 F.3d 1000, 1024 (7th Cir. 2000) (quoting *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996)).

To establish that the purpose of the conspiracy is to "deprive a person or class of persons of equal protection of the laws," a plaintiff must allege "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Id.* (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). "[C]lass-based" animus can be based on "sex, religion, ethnicity, or political loyalty." *Id.* (quoting *Volk v. Coler*, 845 F.2d 1422, 1434 (7th Cir. 1988)); *Thorncreek Apartments III, LLC v. Mack*, 886 F.3d 626, 634 (7th Cir. 2018) (recognizing that section 1985(3) requires a "predicate race-based or class-based equal-protection violation"). "Section 1985(3) prohibits a conspiracy to deprive another of equal protection under the law . . . but the conspiracy must be motivated by racial, or other class-based discriminatory animus." *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008).

Here, Slabon has not alleged that he was discriminated against on the basis of race or any other class-based animus. *See Kowalski v. Boliker*, 893 F.3d 987, 1001 (7th Cir. 2018) (affirming the dismissal of a claim under section 1985(3) when plaintiff failed to allege membership in a protected group). He alleges that he was mistreated, but he doesn't allege that he was mistreated because of his membership in any protected group. He thus fails to state a conspiracy claim under section 1985(3). Count II against all Defendants is dismissed.

### III.     Substantive Due Process (Count III)

Count III is a substantive due process claim.  Slabon alleges that Defendants deprived him of "bodily integrity in an unjustified intrusion of personal security."  *See* Sixth Am. Cplt. ¶ 119 (Dckt. No. 247).  He alleges that Defendants conspired to "remove Plaintiff from his home and subject him to unimaginable cruel treatment," and then conspired to cover up their misconduct.  *Id.* at ¶ 120.

"[T]he scope of substantive due process is very limited."  *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005) (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997)).  "The Supreme Court has repeatedly cautioned against expanding the contours of substantive due process." *Catinella v. County of Cook*, 881 F.3d 514, 518 (7th Cir. 2018).  Substantive due process is not a catch-all, go-to source for "constitutionalizing every tort committed by a public employee." *Geinosky v. City of Chicago*, 675 F.3d 743, 750 (7th Cir. 2012); *see also Tun*, 398 F.3d at 903 ("It is one thing to say that officials acted badly, even tortiously, but – and this is the essential point – it is quite another to say that their actions rise to the level of a constitutional violation. We have declined to impose constitutional liability in a number of situations in which we find the officials' conduct abhorrent."); *Daniels v. Williams*, 474 U.S. 327, 332 (1986) ("We have previously rejected reasoning that 'would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.'") (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

"As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–26 (1985)); *see also*

*County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) ("[W]e have 'always been reluctant to expand the concept of substantive due process . . . .'") (citation omitted). By its "nature," substantive due process is "slippery." *Campos v. Cook County*, 932 F.3d 972, 975 (7th Cir. 2019); *see also Tun*, 398 F.3d at 902 ("We know, of course, that substantive due process is a difficult concept to pin down.").[5]

The better route is to advance claims based on specific provisions firmly moored to the text of the Constitution. Claims "alleging substantive due process violations often are more appropriately analyzed under the more specific guarantees of the various provisions of the Bill of Rights." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994) (citing *Albright v. Oliver*, 510 U.S. 266, 274–75 (1994)). "Where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright*, 510 U.S. at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also Alexander v. McKinney*, 692 F.3d 553, 558 (7th Cir. 2012) ("[T]he Supreme Court has made it clear that a substantive due process claim may not be maintained where a specific constitutional provision protects the right at issue.").

Often the place to look is the Fourth Amendment's prohibition against unreasonable seizures or the Eighth Amendment's ban on cruel and unusual punishment. *Graham*, 490 U.S. at 394. Claims "covered by a specific constitutional provision, such as the Fourth or Eighth Amendment . . . must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7

---

[5] *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("Our Nation's history, legal traditions, and practices thus provide the crucial 'guideposts for responsible decisionmaking' . . . that direct and restrain our exposition of the Due Process Clause.") (internal citation omitted).

(1997). Substantive due process is "unchartered" territory, *Collins*, 503 U.S. at 125, but the Fourth and Eighth Amendments are guideposts firmly planted in the text of the Constitution.

For example, in *Albright*, the petitioner claimed that he was deprived of his substantive due process right to be free from criminal prosecution except upon probable cause. *Albright*, 510 U.S. at 269. The Supreme Court evaluated his claim under the Fourth Amendment, not substantive due process. *Id.* at 271. "We hold that it is the Fourth Amendment, and not substantive due process, under which petitioner Albright's claim must be judged." *Id.*

The same outcome applies to Slabon's complaint. Slabon alleges unreasonable seizure in Count I (like *Kernats*) and excessive force in Count IV (like *Graham*). He also challenges the conditions of his confinement as an arrestee in Count VII. All three claims fall "within the ambit of those activities regulated by the Fourth Amendment (even if not clearly within the ambit of the Fourth Amendment's prohibitions)." *Kernats*, 35 F.3d at 1182; *see also Currie v. Chhabra*, 728 F.3d 626, 629 (7th Cir. 2013) (applying the Fourth Amendment's "objectively unreasonable" standard to claims about conditions of confinement after arrest and before a probable cause hearing). Specific provisions in the text of the Constitution apply to those claims, so there is no need to resort to the "more generalized notion" of substantive due process. *See Graham*, 490 U.S. at 395.

A claim about the conditions of confinement can implicate the Due Process Clause, in addition to the Fourth Amendment. "Conditions of pretrial confinement, as opposed to the standards and procedures required to impose it, are subject to the Due Process Clause's prohibition on preconviction punishment." *Williams v. Dart*, 967 F.3d 625, 637 (7th Cir. 2020). If the jail conditions are so bad that they amount to punishment, then the pretrial detainee has been punished before trial without due process of law. *See Bell v. Wolfish*, 441 U.S. 520, 535–37

(1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). But that's a procedural right: trial first, punishment later. *Cf.* Lewis Carroll, *Alice's Adventures in Wonderland and Through the Looking Glass* 107 (Modern Library Paperback ed., Random House 2002) (1865) ("Sentence first – verdict afterwards.") (quoting the Queen of Hearts). There is no need for *substantive* due process to protect a *procedural* right.

And in any event, there is no need for a substantive due process claim (Count III) about his conditions of confinement when there is a freestanding conditions of confinement claim (Count VII). The substantive due process claim is duplicative, at best.

The substantive due process claim against all Defendants (Count III) covers the same terrain plowed by other claims. Count III against all Defendants is dismissed.

## IV.     Unreasonable Force (Count IV)

Count IV is an unreasonable force claim under the Fourth Amendment. The Hospital, DiLoreto, and the City Defendants moved to dismiss.

### A.     The Hospital

In Count IV, Slabon alleges that the Hospital is liable for the actions of its employees under the doctrine of *respondeat superior*. But *respondeat superior* does not apply to claims under section 1983. *See Burks v. Raemisch*, 555 F.3d 592, 593 (7th Cir. 2009) ("Section 1983 does not establish a system of vicarious responsibility.") (citations omitted); *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789–96 (7th Cir. 2014) ("*Respondeat superior* liability does not apply to private corporations under § 1983."). So, Slabon fails to allege a claim against the Hospital in Count IV.

### B.     DiLoreto

The complaint also does not state an unreasonable force claim against Defendant DiLoreto, but for a different reason.  The complaint barely mentions DiLoreto at all.

The only factual allegation about DiLoreto is his job description.  DiLoreto is the "Chief Medical Officer" of Our Lady of the Resurrection, and he "[m]anaged and directed" the Hospital.  *Id.* at ¶ 8.  Slabon also alleges that DiLoreto is the "only CMO in Illinois **not** licensed to practice medicine."  *Id.* (bold and underline in original).

The complaint does not allege that DiLoreto did anything to Slabon.  The only exceptions are boilerplate allegations that DiLoreto "deprived Slabon of his constitutional rights," used "unreasonable force," and "committed medical battery."  *See* Sixth Am. Cplt. ¶¶ 113, 125, 141 (Dckt. No. 247).  And even then, those conclusory allegations appear in the paragraphs that recite the elements of Slabon's claims.  *Id.*  Apart from the job description, there is not a whisper about DiLoreto in the 87 paragraphs of facts in the complaint.  That's not enough.

The fact that DiLoreto managed the Hospital is not a reason to find him liable under section 1983.  "The doctrine of respondeat superior does not apply to § 1983 actions; thus to be held individually liable, a defendant must be 'personally responsible for the deprivation of a constitutional right.'"  *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001)).

Section 1983 involves personal liability for "personal wrongdoing."  *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 830 (7th Cir. 2009); *see also Kuhn v. Goodlow*, 678 F.3d 552, 555–56 (7th Cir. 2012) ("That is, § 1983 liability is premised on the wrongdoer's personal responsibility."); *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998) ("'Section 1983 creates a cause of action based upon personal liability and predicated upon fault.  An *individual*

cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.'") (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)). Section 1983 requires personal involvement by the defendant. "The buck stops here," standing alone, is not a basis to impose personal liability under section 1983.

Slabon has not alleged that DiLoreto was personally involved in any constitutional violation. The Court therefore dismisses Count IV – and all section 1983 claims – against Defendant DiLoreto.

### C. The Officers

Defendants O'Brien, O'Donnell, and Sanchez also moved to dismiss the unreasonable force claim. *See* City Defs.' Mtn. to Dismiss, at 9 (Dckt. No. 287). Again, O'Brien and O'Donnell are the detectives who interviewed Slabon. Sanchez is the officer who arrived at his mother's home and ordered Slabon to be taken to the hospital. *See* Sixth Am. Cplt. ¶ 15 (Dckt. No. 247).

"All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment and its 'reasonableness' standard." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 303 (7th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Court looks at "reasonableness" from the perspective of the officer on the scene, without the benefit of hindsight. *Id.* (citing *Graham*, 490 U.S. at 396). There is no mechanical test for reasonableness; indeed, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *See Graham*, 490 U.S. at 396 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Instead, the Court should pay careful attention to the facts and circumstances, including factors like "the severity of the crime at issue, whether the suspect poses an immediate threat to the

36

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

As Defendants O'Brien and O'Donnell point out, the complaint does not allege that either of them used force against Slabon during his incarceration. *See* City Defs.' Mtn. to Dismiss, at 9 (Dckt. No. 287). In fact, Slabon doesn't allege that O'Brien or O'Donnell touched him at all. *See generally* Sixth Am. Cplt. (Dckt. No. 247). O'Brien and O'Donnell did not use unreasonable force against Slabon if they did not use any force at all. The excessive force claims against O'Brien and O'Donnell are dismissed.

On the other hand, the complaint does allege that Defendant Sanchez had physical contact with Slabon. Sanchez "detained plaintiff using handcuffs seizing him without cause or justification." *See* Sixth Am. Cplt. ¶ 13 (Dckt. No. 247). Slabon doesn't allege that Sanchez used extra force in the handcuffing – say, by fastening the handcuffs too tight – or that Sanchez hurt him in any way. Instead, he alleges that there was no legitimate reason to put him in handcuffs in the first place. *Id.* at ¶¶ 13–30.

If Slabon's allegations are true, there was no need to restrain him at the home. Placing Slabon in handcuffs could constitute excessive force if there was no need to restrain him at all. The motion to dismiss stage is not the right time to weigh the facts or decide whether the officer's actions were reasonable. At the pleadings stage, "the court cannot weigh the facts – the court must assume that plaintiff's allegations are true." *Cannon v. Burge*, 2006 WL 273544, at *21 (N.D. Ill. 2006), *aff'd*, 752 F.3d 1079 (7th Cir. 2014) (quoting *Evans v. City of Chicago*, 2001 WL 1028401, at *12 (N.D. Ill. 2001)). That's a question for a later day. For now, Slabon's claim against Officer Sanchez for use of excessive force can proceed. Defendant Sanchez's motion to dismiss Count IV is denied.

## V.      Assault and Battery (Count V)

Count V is an assault and battery claim against the police officers and the paramedics. The City Defendants moved to dismiss the assault claims against all City Defendants. *See* City Defs.' Mtn. to Dismiss, at 6 (Dckt. No. 287). As they see it, Slabon "offered no facts to suggest that City Defendants assaulted him and it is unclear what or how they assaulted him." *See* City Defs.' Mtn. to Dismiss, at 6 (Dckt. No. 287). The City Defendants also moved to dismiss the battery claims against Defendants O'Brien and O'Donnell. *Id.* at 9. They argue that the complaint does not allege that those two Defendants had any physical interaction with Slabon.

The complaint includes enough facts to state assault and battery claims against Officers Cummens, Sanchez, and Adamski. But the assault and battery claims against the remaining Chicago police and fire department personnel are dismissed.

Under Illinois law, a person commits an assault when "he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." *See* 720 ILCS 5/12-1. And a battery occurs when someone "knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." *See* 720 ILCS 5/12-3. Battery involves "offensive touching." *Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003).

An assault is a gesture, and a battery is a touch. "The common law, both civil and criminal, distinguishes between 'assault' and 'battery.' Assault is an intentional threatening gesture (such as pointing a gun at a person or trying but failing to strike him with one's fist) that does not, however, result in physical contact with the victim. Battery is an intentional, unconsented-to, injurious or otherwise offensive physical contact with the victim (a completed assault, so to speak)." *United States v. Watts*, 798 F.3d 650, 652 (7th Cir. 2015).

Defendants moved to dismiss the battery claims against O'Brien and O'Donnell because the complaint fails to allege that the officers touched Slabon. *See* City Defs.' Mtn. to Dismiss, at 9 (Dckt. No. 287). Defendants are right – battery requires bodily harm or insulting physical contact. *See* 720 ILCS 5/12-3. Slabon alleges neither. He also doesn't allege that either officer made a gesture that threatened harm or contact. At most, he alleges that they exposed him to the cold. But exposing someone to cold temperatures, without any physical contact, is not a battery. *See Shea v. Winnebago County Sheriff's Dep't*, 746 F. App'x 541, 546 (7th Cir. 2018) ("Count 21 . . . which alleges that the defendants committed battery by exposing Shea to cold temperatures, also failed to state a claim. She did not allege any physical contact that could be viewed as 'offensive touching.'"). The Court dismisses the assault and battery claims against both O'Brien and O'Donnell.

But the complaint does state an assault and battery claim against Officers Cummens and Adamski. Slabon alleges that those two Defendants pinned him down in the emergency room, and did so when Slabon was already "forcibly seated on to and handcuffed to a gurney." *See* Sixth Am. Cplt. ¶ 37 (Dckt. No. 247). Both of them grabbed Slabon by the ankles. *Id.* Cummens then "placed his left forearm on Plaintiff[']s throat preventing Plaintiff from breathing." *Id.* They used force to "fully restrain" Slabon. *Id.* at ¶ 38. That's enough to state a claim for assault and battery against Officer Cummens and Adamski.

The complaint includes other allegations against Officer Cummens, too. Slabon alleges that a "combination of drugs" rendered him unconscious when he was in the emergency room. *See* Sixth Am. Cplt. ¶ 38 (Dckt. No. 247). When he woke up, he noticed that someone had removed his clothes and inserted a catheter into his bladder. *Id.* at ¶ 39. He alleges that Cummens was standing over him, holding the catheter tube, and began "tugging and pulling this

39

tube deliberately causing excruciating pain and suffering." *Id.* at ¶ 40. As he pulled on the catheter tube, Cummens allegedly asked Slabon, "[H]ow does this feel tough guy[?]" *Id.*

Slabon alleges that Cummens stood over him, used physical force to cause him pain, and did so deliberately. *Id.* Unlike other parts of the complaint, the allegations about his physical interactions with Officer Cummens are detailed and specific. The complaint contains enough facts to state a claim for assault and battery against Defendant Cummens.

The Sixth Amended Complaint alleges that only one other City Defendant physically touched him (or created reasonable apprehension of a battery): Defendant Sanchez. As explained above, Slabon alleges that Sanchez handcuffed him "without cause or justification." *Id.* at ¶ 13. He basically alleges that there was no reason to put him in handcuffs in the first place.

Handcuffing is often covered by public official immunity. *See Jones v. Vill. of Villa Park*, 815 F. Supp. 249, 254 (N.D. Ill. 1993). But immunity is a defense, *Jacobs v. City of Chicago*, 215 F.3d 758, 774 (7th Cir. 2000) (Easterbrook, J., concurring), and a complaint states a claim "whether or not some defense is potentially available." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004). Slabon did not need to negate an affirmative defense in his complaint. *See Gomez v. Toledo*, 446 U.S. 635, 640–41 (1980). So, for now, Count V survives against Officer Sanchez.

The complaint does not allege that any of the other Defendants from the Chicago Police Department or Fire Department touched Slabon, or put him in reasonable apprehension of a battery. Slabon did not have a physical interaction with any of the officers or paramedics, other than Officers Cummens, Adamski, and Sanchez.

40

The Court denies the motion to dismiss the assault and battery claims against Defendants Cummens, Adamski, and Sanchez. The Court grants the motion to dismiss the assault and battery claims against Officers O'Brien, O'Donnell, and the remaining City Defendants.[6]

## VI. Medical Battery (Count VI)

In Count VI, Slabon also alleges a medical battery claim against the paramedics (Defendants Bishop and Strong) and the medical personnel at the Hospital (Defendants Barrick, Benjamin, and DiLoreto). He alleges that they "forcible [sic] transport[ed] Plaintiff to [the] hospital and physically and chemically restrain[ed] Slabon without his consent or medical justification." *See* Sixth Am. Cplt. ¶ 141 (Dckt. No. 247).

By way of reminder, Bishop and Strong are the paramedics who arrived on the scene when Slabon's mother died, escorted Slabon to the Hospital, and allegedly filed a false report that Slabon had a spinal injury. *Id.* at ¶¶ 28–29. Barrick was a doctor at the Hospital. *Id.* at ¶ 6. Benjamin is the nurse (who Slabon kicked). *Id.* at ¶ 7. DiLoreto is the Chief Medical Officer of the Hospital. *Id.* at ¶ 8.

Defendants Bishop and Strong moved to dismiss, and so did Defendant DiLoreto.[7] *See* City Defs.' Mtn. to Dismiss, at 7 (Dckt. No. 287); DiLoreto Mtn. to Dismiss (Dckt. No. 290). Before diving in, there is need for some housekeeping.

---

[6] The City Defendants did not move to dismiss the battery claims against any of the City Defendants except Officers O'Brien and O'Donnell. But based on the Court's independent reading, the Sixth Amended Complaint does not contain facts that give rise to a battery claim against any of the City Defendants, except Officers Cummens, Adamski, and Sanchez.

[7] The Hospital also moved to dismiss the medical battery claim, even though this claim is not pending against the Hospital itself. *See* Our Lady of the Resurrection Mtn. to Dismiss, at ¶¶ 68–73 (Dckt. No. 288). The Hospital acknowledges that the claim is not directed at the Hospital, but rather is aimed at its employees. The Hospital challenged the claim to avoid potential liability under the theory of *respondeat superior*. The Court will address *respondeat superior* in the discussion of Count IX, *infra*.

Defendant Barrick did not respond to the Fourth Amended Complaint (Dckt. No. 65), so Judge Kendall granted a motion for default judgment against him. *See* 8/18/17 Order (Dckt. No. 95). But the Order did not grant any relief, and was not a judgment per se. *Id.*; *see also* Fed. R. Civ. P. 58(a) (requiring a judgment in a separate document). So judgment was not entered against Barrick after all. Slabon later filed a Fifth Amended Complaint (twice) (Dckt. Nos. 152, 173) and a Sixth Amended Complaint (twice) (Dckt. Nos. 235, 247). An amended pleading supersedes an earlier pleading, so the Sixth Amended Complaint governs. *See Shea v. Winnebago County Sheriff's Dep't*, 746 F. App'x 541, 545 (7th Cir. 2018). Slabon filed the Sixth Amended Complaint against Barrick before obtaining judgment against him on the Fourth Amended Complaint. Simply put, the claims against Barrick are live (for the moment). *But see* Section XIII, *infra*.

The Court dismissed Nurse Benjamin in February 2018 based on a lack of service of process. *See* 2/26/18 Order (Dckt. No. 138); 7/2/19 Order (Dckt. No. 233) ("The reality is that the Court went out of its way to accommodate Slabon's attempt to serve Benjamin by appointing the U.S. Marshal to serve her on five separate occasions."); 11/12/19 Order (Dckt. No. 271). To this day, Slabon has never served Benjamin, so she is not a party in this case.

After that trimming, Count VI includes live claims against Defendants DiLoreto, Bishop, and Strong. All of them moved to dismiss.

## A.      DiLoreto

DiLoreto moved to dismiss because Slabon failed to attach an affidavit required for a medical malpractice claim under 735 ILCS 5/2-622. *See* DiLoreto Mtn. to Dismiss, at 13–15 (Dckt. No. 290). That Illinois statute requires a plaintiff to attach an affidavit to his complaint to state a claim for healing art malpractice. *See* 735 ILCS 5/2-622(a) (stating that the "plaintiff's

attorney or the plaintiff, if the plaintiff is proceeding pro se, *shall file an affidavit*, attached to the original and all copies of the complaint") (emphasis added). The affiant must declare that he consulted with a health professional and that there is a "reasonable and meritorious" case based on the medical records. *Id.*; *see also Hahn v. Walsh*, 762 F.3d 617, 628 (7th Cir. 2014). Otherwise, the affidavit must state that the plaintiff was unable to obtain a consultation for an acceptable reason, or that the medical records are unavailable. *Id.*

The statute has the feel of a procedural requirement – it addresses what a plaintiff must "file" and "attach[]" to a complaint. *See* 735 ILCS 5/2-622(a). And federal procedure, not state procedure, governs in federal court. *See Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). Rule 8 sets the requirements for complaints in federal court, and it does not require attachments.

In *Hahn*, the Seventh Circuit held that "there is no conflict between section 2-622 and either Rule 8 or Rule 11," and that they "may be enforced simultaneously in diversity cases." *Hahn*, 762 F.3d at 630–34 (finding that federal district court properly dismissed plaintiff's state law claim for failure to comply with Section 2-622). But the Seventh Circuit revisited that holding in *Young v. United States*, 942 F.3d 349 (7th Cir. 2019), a case that Defendants failed to cite. After giving the "matter some thought," the Seventh Circuit concluded that a "complaint in federal court cannot properly be dismissed because it lacks an affidavit and report under § 5/2-622." *Id.* at 351.

DiLoreto's motion to dismiss Count VI is denied to the extent that he relies on the Illinois statute. The Federal Rules of Civil Procedure, not state law, govern the procedural requirements in federal court. So the Illinois statute does not govern at the motion to dismiss stage.

DiLoreto's better argument is that the complaint does not allege that he committed a medical battery at all. A medical battery claim requires that a defendant "committed an intentional, unconsented-to act resulting in offensive contact with the plaintiff's body." *Johnson v. Tinwalla*, 855 F.3d 747, 750–51 (7th Cir. 2017); *see also Sekerez*, 2011 IL App (1st) 090889, ¶ 43, 352 Ill. Dec. 523, 954 N.E.2d 383 (2011). It requires an "act" by the defendant, and resulting "contact" with plaintiff's body. *Johnson*, 855 F.3d at 750–51.

But Slabon alleges next to nothing against DiLoreto. Again, the complaint alleges that DiLoreto is the Chief Medical Officer of Our Lady of the Resurrection. *See* Sixth Am. Cplt. ¶ 8 (Dckt. No. 247). Slabon doesn't allege that DiLoreto took any action whatsoever, let alone had an "offensive contact" with Slabon. He never alleges that DiLoreto laid a finger on him. Or even *pointed* a finger *at* him.

DiLoreto's status as the Chief Medical Officer of the Hospital, without more, is not enough to give rise to a medical battery claim. The Court therefore dismisses Slabon's medical battery claim against DiLoreto.

### B.    City Defendants

Bishop and Strong also moved to dismiss the medical battery claim. Recall that Bishop and Strong were the paramedics who transported Slabon from his home to the Hospital. *Id.* at ¶ 28. The medical battery claim does not apply to any of the other City Defendants. *See* Sixth Am. Cplt. ¶¶ 141–142.

Bishop and Strong argue that the complaint does not state a medical battery claim against them because it does not allege that they performed any medical treatment on Slabon in the first place. *See* City Defs.' Mtn. to Dismiss, at 7 (Dckt. No. 287). The complaint alleges that Slabon was "forcibly placed" (again, note the passive voice) into an ambulance, and he was then

44

"escorted by" Strong and Bishop to the Hospital. *See* Sixth Am. Cplt. ¶ 28 (Dckt No. 247). The complaint reads: "Plaintiff was taken from his home and forcibly placed into emergency CFD vehicle ambulance co #82 escorted by CUMMENS, ADAMSKI, STRONF [sic] and BISHOP." *Id.* (all caps in original). But the complaint does not allege that Bishop and Strong gave Slabon any medical care. They were the "escort[]." *Id.*

A medical battery claim requires the existence of medical treatment. *Parker v. United States,* 721 F. App'x 531, 532–33 (7th Cir. 2018) ("A plaintiff claiming medical battery in Illinois may recover if he shows 'a total lack of consent to the procedure performed, that the treatment was contrary to the patient's will, or that the treatment was at substantial variance with the consent granted.'") (quoting *Fiala v. Bickford Senior Living Group, LLC*, 2015 IL App (2d) 150067, ¶ 20, 398 Ill. Dec. 324, 43 N.E.3d 1234). Transportation in an ambulance, without more, is not enough.

More importantly, the complaint does not allege that Bishop and Strong touched Slabon, let alone that they had offensive physical contact with him. The complaint simply alleges that Slabon was "forcibly placed" into an ambulance, without alleging *who* exerted the force. *See* Sixth Am. Cplt. ¶ 28. If anything, the use of the word "escort[]" suggests that Bishop and Strong were along for the ride. *Id.* Without an allegation of offensive touching, there is no claim.

The medical battery claims against Bishop and Strong are dismissed.

## VII.    Unlawful Conditions of Confinement (Count VII)

Slabon also brings a claim about his conditions of confinement under the Fourth Amendment. *See* Sixth Am. Cplt., Count VII ("Unconstitutional Conditions for Treatment During Warrantless Detention") (Dckt. No. 247). Count VII itself does not specify what conditions are at issue. But the facts section of the complaint alleges that he was detained in the

cold in only a hospital gown, and that he was transported in a police vehicle without adequate restraints.

The Hospital, DiLoreto, and the City Defendants moved to dismiss.

### A.     The Hospital

Once again, Slabon attempts to hold the Hospital responsible for the actions of its employees under the doctrine of *respondeat superior*.  But *respondeat superior* does not apply to claims under section 1983.  *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789–96 (7th Cir. 2014).  So, Slabon fails to allege a claim against the Hospital in Count VII.

### B.     DiLoreto

Slabon's claim against DiLoreto about his conditions of confinement fails for the same reason that his unreasonable force claim (Count IV) against DiLoreto failed.  The complaint does not allege that DiLoreto played any role in Slabon's confinement.  Again, *respondeat superior* does not count under section 1983.  *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). So the complaint fails to state a claim against him.

### C.     The City Defendants

The City Defendants moved to dismiss on the grounds that the complaint does not allege that any of the named Defendants did anything to contribute to the conditions of his confinement. As they see it, the complaint alleges that "unknown transport officers" shipped him in a vehicle without adequate clothes and without securing him inside the vehicle.  *See* City Defs.' Mtn. to Dismiss, at 7–8 (Dckt. No. 287).  But when describing the transportation, the complaint does not point fingers at anyone in particular.

It's true that the transport officers were responsible for many of Slabon's uncomfortable conditions.  For example, paragraph 59 alleges that Slabon "was then transported" (note the

passive voice – it does not allege *who* transported him) by unnamed officers, and that an "unknown officer" laughed at him for suffering in the cold. *See* Sixth Am. Cplt. ¶ 59 (Dckt. No. 247). And "Defendants, transport officers YET UNKNOWN" never secured him in the vehicle, causing injuries. *Id.* at ¶ 61 (all caps in original). He "was transported once again several hours later" and "was not secured" in the vehicle (again, note the passive voice). *Id.* at ¶ 66.

Those unnamed officers are not Defendants. On December 20, 2016, Judge Kendall dismissed the transport officers (referred to as "Unknown Officers") from the case. *See* 12/20/16 Order (Dckt. No. 64). The Sixth Amended Complaint attempted to bring them back into the fold, by including "other AS-YET-UNKNOWN POLICE OFFICERS" in the case caption. *See* Sixth Am. Cplt. (Dckt. No. 247). Once again, the John Doe Defendants are dismissed. Slabon has had more than enough time – almost five years – to identify any additional parties.

But the unnamed transport officers weren't the only ones responsible for Slabon's treatment. Slabon alleges that some of the individual City Defendants were involved in unconstitutional treatment and conditions, including extreme cold during his interrogation. Indeed, Slabon alleges that "at all times" during police custody, "it was obvious Plaintiff was in need of additional protection from the extreme cold." *Id.* at ¶ 70. And he specifically alleges that he was in "extreme anguish from the extreme cold and sleep depravation [sic]" during his interview with O'Brien and O'Donnell. *Id.* at ¶ 65. He also alleges that the conditions were so extreme that, after 48 hours, he was transported to a hospital and treated for "cold and malnourishment." *Id.* at ¶ 75.

The Court analyzes Slabon's conditions of confinement claims against those two Defendants under the Fourth Amendment. *See Currie v. Chhabra*, 728 F.3d 626, 629–30 (7th Cir. 2013) (holding that the Fourth Amendment governs "the period of confinement between

arrest without a warrant and the [probable cause determination]") (quoting *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir.1992)). Under the Fourth Amendment, the standard is whether the conduct was "objectively unreasonable." *Id.* at 629 (applying the Fourth Amendment "objectively unreasonable" standard to claims about conditions of confinement after arrest and before a probable cause hearing). The Seventh Circuit applies the "Fourth Amendment's 'objectively unreasonable' standard to both 'conditions of confinement' and 'medical care' claims brought by arrestees who have not yet had their *Gerstein* hearing [*i.e.,* a probable cause hearing for a warrantless arrest]." *Id.* at 629–30 (collecting cases).

The objective reasonableness standard is "less demanding" than the Eighth Amendment's "deliberate indifference" standard. *Estate of Perry v. Wenzel*, 872 F.3d 439, 453 (7th Cir. 2017). Indeed, the objective rule is "easier for a plaintiff to meet" than the Eighth Amendment's subjective standard. *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020). To determine whether the detectives' conduct was objectively unreasonable, the Court looks at four factors, including (1) whether the detectives had notice of the conditions; (2) the seriousness of the conditions; (3) the scope of the requested solution; and (4) police interests, including "administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011) (applying these four factors to an arrestee's Fourth Amendment inadequate medical care claim).

The complaint states a claim against detectives O'Brien and O'Donnell about Slabon's exposure to the extreme cold. Slabon alleges that it was obvious that he needed treatment for exposure to freezing temperatures during his interview. *See* Sixth Am. Cplt. ¶¶ 65, 75. It was so cold that he eventually needed hospital treatment for the exposure. *Id.* Courts have found similar allegations sufficient, even under the more stringent "deliberate indifference" standard.

48

*See Hopkins v. Klindworth*, 556 F. App'x 497, 499 (7th Cir. 2014) (citation omitted) (holding that claims about extremely cold air seeping through an unrepaired window stated an Eighth Amendment claim); *Antonelli v. Sheehan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (holding that plaintiff stated a claim based on allegations that he faced extremely cold temperatures and that the staff failed to provide him blankets, as "[p]risoners have a right to protection from extreme cold") (quoting *Murphy v. Walker*, 51 F.3d 714, 720–21 (7th Cir.1995) (per curiam)). Slabon's claims survive against O'Brien and O'Donnell (only).

But Slabon doesn't allege that any other named City Defendant exposed him to extreme cold. Indeed, he alleges that he was first exposed to the extreme cold when he was released from the Hospital. And O'Brien and O'Donnell are the only named City Defendants that he allegedly encountered after he left Our Lady of the Resurrection. *Id.* at ¶¶ 57–73.

The motion to dismiss Count VII against Defendants O'Brien and O'Donnell is denied. The motion to dismiss Count VII against the remaining City Defendants is granted.

## VIII. *Monell* Claim (Count VIII)

Count VIII is a *Monell* claim against the City of Chicago. Again, to bring a section 1983 claim for damages against a municipality, a plaintiff must allege a constitutional violation caused by "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)) (other citations omitted).

The City "must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.* (citing *Gable v. City of*

*Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). But the mere existence of a risky practice is not enough. The City has no liability under *Monell* unless its policy or practice was the "*moving force behind the constitutional violation.*" *Id.* at 306 (citations omitted) (emphasis in original).

Count VIII is thin and conclusory. The complaint alleges that the City "developed, implemented, enforced, encouraged, authorized, empowered, and sanctioned de facto policies, practices, and/or customs, through its inaction and/or otherwise, exhibiting deliberate indifference to the Plaintiff's constitutional rights which caused the violation of such rights." *See* Sixth Am. Cplt. ¶ 158 (Dckt. No. 247).

The preceding paragraphs include similar off-the-shelf allegations. The City "has absolutely no incentive" to prevent police misconduct. *Id.* at ¶ 84. The Chicago Police Department has a "widespread policy of using felony charges and falsely arresting persons to cover up their officers [sic] wrong doing." *Id.* at ¶ 85. There is a "widespread policy of routinely torturing disfavored persons" in police custody, including holding them in "cold temperatures." *Id.* at ¶ 86. And there is no effective way to complain about police misconduct. *Id.* at ¶ 87.

Count I (the Fourth Amendment claim) includes additional allegations about the policies and practices of the Chicago Police Department. But again, the allegations are at a high level of generality. For example, the complaint alleges that, as a "matter of policy and practice," the City fails to "adequately train, manage, supervise and control its officers such that its failure to do so manifest [sic] deliberate indifference." *Id.* at ¶ 94(a). Other generic allegations follow:

- "As a matter of policy and practice, the CITY OF CHICAGO Police Department facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct." *Id.* at ¶ 94(b).

- "Generally, as a matter of widespread practice so prevalent as to appear officially as municipal policy, officers of the CITY OF CHICAGO Police Department

abuse citizens in a manner similar to that alleged by Plaintiff in this Count on a frequent basis." *Id.* at ¶ 94(c).

- "As a matter of policy and practice, the CITY OF CHICAGO Police [D]epartment makes its officers aware that if there are no corroborating witnesses or evidence which support a complaint's version of the events in question, a complaint of misconduct will never be sustained against them[.]" *Id.* at ¶ 94(d).

- "Municipal policy makers are well aware of and condone and facilitate by their inaction a 'code of silence' 'code of honer' [sic] 'retaliation' 'retaliatory transfer' 'retaliatory arrests' in the CITY OF CHICAGO Police Department." *Id.* at ¶ 94(e).

Slabon basically alleges that his unreasonable seizure was part of a custom or practice followed by the Chicago Police Department. An incantation of magic words follows. The complaint alleges that the City's policy or practice was the "moving force" behind his unreasonable seizure. *Id.* at ¶ 94(a) (noting that the City's policy "directly encourages and is therefore the moving force behind the type of misconduct at issue here").

Raw conclusions carry no weight. Conclusory allegations that merely recite the elements of the claim are not entitled to a presumption of truth. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). A generic allegation that could be cut and pasted into another section 1983 case – without knowing what the case is about – is too conclusory to add anything of value. After setting aside the conclusory allegations, the Court must decide whether the complaint has alleged enough facts to "plausibly suggest an entitlement to relief." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)).

In *McCauley*, for example, the Seventh Circuit excised the plaintiff's conclusory allegations, like allegations that the City of Chicago "has an unwritten custom, practice and policy to afford lesser protection or none at all to victims of domestic violence" and that "[t]here is no rational basis" for this purported policy. *Id.* at 617. The Court of Appeals concluded that the complaint recited the legal elements of the claims, but did not offer fact-laden allegations.

51

*Id.* at 617–18. Repeating the elements of the claim, without more, does not satisfy the plausibility analysis required by *Twombly* and *Iqbal*. *Id.* After trimming the conclusions and focusing on the facts, the Seventh Circuit concluded that the complaint failed to state a *Monell* claim. *Id.*

Slabon's complaint fares no better. Like the allegations in *McCauley*, many of Slabon's allegations merely recite the legal elements of a *Monell* claim. The descriptions of the policy or practice are at a high-level of generality, too, giving them an all-encompassing, non-specific feel. For example, the complaint alleges that there is a practice of "abus[ing] citizens." *See* Sixth Am. Cplt. ¶ 94(c) (Dckt No. 247). Slabon alleges that the Chicago Police Department does not adequately discipline its officers, too, and follows a "code of silence." *Id.* at ¶¶ 94(b), (d), (e). After setting aside the conclusions and generalities, few factual allegations remain. The facts are so few and far between that the complaint fails to state a *Monell* claim against the City.

There is no "heightened pleadings standard" for *Monell* claims, as the Seventh Circuit has reminded lower courts. *See Garcia v. City of Chicago*, 2018 WL 3546742, at *2 (N.D. Ill. 2018) (citing *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016)); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993). But *Monell* does not require courts to lower the bar, either.

A good example of allegations that pass muster is *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016). The Seventh Circuit confirmed that, at the pleadings stage, a plaintiff does not need to allege every – or even one – other individual who was subject to the unconstitutional policy. *Id.*; *see also Garcia*, 2018 WL 3546742, at *2 ("This means that a plaintiff need not identify other examples of the complained of practice in order to state a *Monell* claim but rather may rely solely on his own experience.").

At the same time, the *White* plaintiff didn't just lodge conclusory words like "policy" or "widespread practice." Instead, the plaintiff alleged that the Chicago Police Department had a widespread practice of seeking an arrest warrant based on unsupported accusations. *White*, 829 F.3d at 844. He alleged that this process led to his own arrest, and that the officer who orchestrated his arrest never presented the judge with an affidavit offering affirmative facts that would justify his arrest. *Id.*

The plaintiff in *White* gave a concrete, fact-based reason to support the notion that there was a widespread practice. That complaint included the application, a "standard printed form" that officers used whenever they sought an arrest warrant. *Id.* Using that form was a widespread practice – after all, that's the whole point of a form. And the form supported White's allegations. It did not require the officers to provide any specific factual allegations to justify the warrant. *Id.* The Court of Appeals found that the widespread use of the form was sufficient to state a claim. *Id.*

Slabon does not come forward with anything similar. He makes allegations about his treatment, and then complains generally about the Chicago Police Department. He offers no concrete facts about a widespread practice. And he fails to tie any of his allegations about the City's failings to his own alleged unreasonable seizure. Instead, he alleges that he was mistreated, and then alleges that the Chicago Police Department mistreats other people, too.

Slabon alleges even less on the other section 1983 claims (Counts IV and VII). He fails to allege with specificity that there was a policy, pattern, or practice that was the moving force behind the alleged violations. *See* Sixth Am. Cplt. Indeed, he doesn't even allege that any policy, pattern, or practice led to the use of excessive force (Count IV) or the conditions of his confinement (Count VII), except in conclusory fashion. The closest he gets is a blanket

statement in his *Monell* claim (Count VIII) that the City "developed, implemented, enforced, encouraged, authorized, empowered, and sanctioned de facto policies, practices, and/or customs, through its inaction and/or otherwise, exhibiting deliberate indifference to the Plaintiff's constitutional rights which caused the violation of such rights." *See* Sixth Am. Cplt. ¶ 158. Paying lip service to the elements of a *Monell* claim is not enough.

Plaintiff's *Monell* claim against the City of Chicago (Count VIII) is dismissed.

## IX.     *Respondeat Superior* **(Count IX)**

Slabon brings a *respondeat superior* claim against the Hospital. *See* Sixth Am. Cplt., Count IX (Dckt. No. 247). He brings the claim as a separate Count, instead of including it in each tort claim against a Hospital employee.

Under Illinois law, a *respondeat superior* claim requires a showing that: (1) an employer/employee relationship existed; (2) the principal controlled or had the right to control the conduct of the alleged employee; and (3) the alleged conduct fell within the scope of the employee's employment. *See Wilson v. Edward Hosp.*, 2012 IL 112898, ¶ 18, 367 Ill. Dec. 243, 981 N.E.2d 971 (2012).

"The doctrine of respondeat superior does not apply to § 1983 actions." *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001); *see also Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789–96 (7th Cir. 2014). Count IX is dismissed to the extent that it is a *respondeat superior* claim against the Hospital for constitutional violations by its employees.

But *respondeat superior* does apply to the state law claims. The *respondeat superior* claim can survive against the Hospital if there are state law claims against its employees for actions taken within the scope of their employment.

*Respondeat superior* is derivative liability, meaning that it requires wrongdoing by an employee. The Hospital can't be liable under *respondeat superior* if no employee engaged in wrongdoing. *See Gaston v. Ghosh*, 920 F.3d 493, 495 (7th Cir. 2019) ("[T]he employee 'is not liable, so – even if the theory of *respondeat superior* were available – neither is his employer.'") (citation omitted); *Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 721 (7th Cir. 2012) ("Respondeat superior liability is derivative ('vicarious'); liability for an employer's negligence is direct."); *McGreal v. AT&T Corp.*, 892 F. Supp. 2d 996, 1017–18 (N.D. Ill. 2012) ("Because the doctrine is based on a transfer of liability, 'the employer cannot be held liable under a *respondeat superior* theory where the employee is free of responsibility.'") (citation omitted). "With vicarious liability, one person is liable for another's wrong . . . . The wrongdoer need not be a defendant, but there must be an actionable wrong, by a person whose conduct is imputed to the employer." *Gaston*, 920 F.3d at 497.

If there is no actionable wrong by a Hospital employee, there is no *respondeat superior* claim against the Hospital itself. Without an actionable wrong by a Hospital employee, "[t]here's nothing to be vicariously liable *for*." *Id.* (emphasis in original).

Only a sliver of the *respondeat superior* claim survives. Slabon doesn't state a claim against Chief Medical Officer DiLoreto because the complaint merely alleges his job title. And as explained below (*see* Section XIII, *infra*), the complaint does not state a claim against Dr. Barrick. The complaint doesn't allege that DiLoreto or Dr. Barrick did anything wrong, so there is no *respondeat superior* claim against the Hospital based on those two Defendants.

That leaves Nurse Benjamin. The complaint alleges that Benjamin entered the hospital room and "announced that Plaintiff would need to be fully restrained." *See* Sixth Am. Cplt. ¶ 36 (Dckt. No. 247). She took part in the melee that followed. She restrained Slabon by the ankles

while others piled on. *Id.* at ¶ 37. Benjamin then injected Slabon with drugs, knocking him unconscious. *Id.* at ¶ 38. Later, Benjamin denied the request for security. *Id.* at ¶ 43.

Slabon never served Nurse Benjamin with process, so she isn't a party. Still, an employee does not need to be a party to give rise to *respondeat superior* liability for the employer. *Gaston*, 920 F.3d at 497. In that scenario, a plaintiff presumably would need to prove the claim against the employee – even though the employee isn't a party – and then would need to prove the elements of *respondeat superior*.

Maybe the complaint alleges a claim (say, battery) against Nurse Benjamin, but the parties didn't brief it. The parties also didn't address whether a *respondeat superior* claim could exist against the Hospital based on Benjamin's conduct, even though Benjamin was never served with process. Illinois law appears to be that "dismissal for failure to achieve timely service on a servant after the expiration of the applicable statute of limitation" is "deemed a bar to the continuation of an action against the master." *Bachenski v. Malnati*, 11 F.3d 1371, 1379 (7th Cir. 1993); *see also Towns v. Yellow Cab Co.*, 73 Ill. 2d 113, 22 Ill. Dec. 519, 382 N.E.2d 1217 (1978) (establishing the "*Towns* doctrine"). But the parties haven't briefed it. So, for now, the *respondeat superior* claim against the Hospital survives to the extent that it involves Nurse Benjamin (only).

The motion to dismiss the *respondeat superior* claim against the Hospital (Count IX) is granted on the claims under section 1983 because section 1983 does not permit vicarious liability. The motion to dismiss the *respondeat superior* claim against the Hospital is granted on the state law claims involving DiLoreto and Dr. Barrick. The motion to dismiss the *respondeat superior* claim against the Hospital is denied on the state law claims involving Benjamin.

56

### X.     Indemnification (Count X)

No party moved to dismiss the indemnification claim.  So, for now, it survives.

### XI.     False Imprisonment (Count XI)

Four Defendants – detectives O'Brien and O'Donnell, the Hospital, and DiLoreto – also moved to dismiss the false imprisonment claim.

To state a claim for false imprisonment under Illinois law, "the plaintiff must allege that his personal liberty was unreasonably or unlawfully restrained against his will and that defendant(s) caused or procured the restraint."  *Rusinowski v. Vill. of Hillside*, 19 F. Supp. 3d 798, 813 (N.D. Ill. 2014) (quoting *Arthur v. Lutheran Gen. Hosp.*, 295 Ill. App. 3d 818, 825–26, 230 Ill. Dec. 72, 692 N.E.2d 1238 (1998)).  "Probable cause is an absolute bar to a claim for false imprisonment."  *Makowski v. United States*, 27 F. Supp. 3d 901, 917 (N.D. Ill. 2014) (quoting *Poris v. Lake Holiday Prop. Owners Ass'n*, 2013 IL 113907, ¶ 63, 368 Ill. Dec. 189, 983 N.E.2d 993).

The two officers who interrogated Slabon (detectives O'Brien and O'Donnell) argue that Slabon doesn't state a false imprisonment claim because there was probable cause for his arrest.  *See* City Defs.' Mtn. to Dismiss, at 10 (Dckt. No. 287).  O'Brien and O'Donnell are right that probable cause is an absolute defense.  *See Makowski*, 27 F. Supp. 3d at 917.

Slabon attached exhibits to the complaint that support a probable cause finding.  But he also calls those documents false.  *See* Sixth Am. Cplt. ¶¶ 29, 51–52 (Dckt. No. 247).  He did not adopt the exhibits lock, stock, and barrel by attaching them to his complaint.  *See Powers v. Snyder*, 484 F.3d 929, 932 (7th Cir. 2007) ("A plaintiff does not, simply by attaching documents to his complaint, make them a part of the complaint and therefore a basis for finding that he has pleaded himself out of court."); *see also Carroll v. Yates*, 362 F.3d 984, 986 (7th Cir. 2004); *N.*

*Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455 (7th Cir. 1998) (noting that "[w]hen the exhibit [in question] is not the subject of the claim," the rules do "not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached").

Still, the false imprisonment claim against detectives O'Brien and O'Donnell (Count XI) is barred by *Heck*, for the same reason that the false arrest claim against the detectives (Count I) is barred by *Heck*. "The rule set forth in *Heck* [] applies with equal force to state law claims." *Johnson v. Chibicki*, 2011 WL 5868010, at *2 (N.D. Ill. 2011) (citing *Lieberman v. Liberty Healthcare*, 408 Ill. App. 3d 1102, 1111–12, 350 Ill. Dec. 593, 948 N.E.2d 1100 (2011)); *see also Jordan v. Klamenrus*, 2020 WL 4547879, at *4 (N.D. Ill. 2020) (citations omitted).

Slabon alleges that he was "falsely charged" with assaulting Nurse Benjamin. *See* Sixth Am. Cplt. ¶ 47. But he cannot bring a false imprisonment claim that is inconsistent with his criminal conviction. A claim that there was no reason to detain Slabon for kicking Nurse Benjamin – because he *didn't* kick Nurse Benjamin – is inconsistent with the jury's finding that he *did* kick Nurse Benjamin. Slabon's false imprisonment claims against detectives O'Brien and O'Donnell are dismissed.

Defendant DiLoreto (the Chief Medical Officer) also moved to dismiss. Again, a false imprisonment claim requires an allegation that the defendant "caused or procured the restraint." *Arthur v. Lutheran Gen. Hosp., Inc.*, 295 Ill. App. 3d 818, 825–26, 230 Ill. Dec. 72, 692 N.E.2d 1238 (1998) (quoting *Vincent v. Williams*, 279 Ill. App. 3d 1, 5–6, 216 Ill. Dec. 13, 664 N.E.2d 650 (1996)). Here, Slabon does not allege that DiLoreto "caused or procured" his restraint. *Id.* In fact, he doesn't allege that DiLoreto did anything. The false imprisonment claim against DiLoreto is dismissed.

The Hospital moved to dismiss the false imprisonment claim on the ground that Slabon did not file the medical affidavit required by Illinois law. But again, a "complaint in federal court cannot properly be dismissed because it lacks an affidavit and report under § 5/2-622." *Young v. United States*, 942 F.3d 349, 351 (7th Cir. 2019).

The Hospital also argues that Slabon consented to the medical treatment. The Hospital relies on testimony from Slabon's criminal trial, which he attached as an exhibit to the complaint. *See* Our Lady of the Resurrection Mtn. to Dismiss, at ¶¶ 68–69 (Dckt. No. 288). But the complaint itself alleges the opposite. Slabon alleges that he did not need medical treatment. *See* Sixth Am. Cplt. ¶ 35 (Dckt. No. 247). Even though he needed no care, the Hospital employees admitted him involuntarily, pinned him down, drugged him, inserted a catheter, and wouldn't let him leave. *Id.* at ¶¶ 35–53. Whether Slabon consented is a question of fact that this Court can't and won't answer at the motion to dismiss stage.

The Hospital's motion to dismiss the false imprisonment claim is denied.

## XII. Intentional Infliction of Emotional Distress (Count XII)

The docket on the last remaining claim, intentional infliction of emotional distress, is a bit of a tangled knot. On November 12, 2019, this Court granted Slabon leave to file a Seventh Amended Complaint that contained a claim for intentional infliction of emotional distress. *See* 11/12/20 Order (Dckt. No. 271). The Court also made clear that if Slabon failed to file a Seventh Amended Complaint by the deadline, then the later-filed version of the Sixth Amended Complaint would be the operative complaint, and "there will be no claim in this case for the intentional infliction of emotional distress." *Id.*

The Court issued that Order in the "interest of clarity," with the hope of tightening and clarifying the docket. There were two versions of the Sixth Amended Complaint (*see* Dckt. Nos. 235, 247), which created "too much risk of confusion." *See* 11/12/20 Order (Dckt. No. 271).

The Order was well-intentioned, but may have created confusion in its own right. Unbeknownst to the Court, the second-filed version of the Sixth Amended Complaint already included a claim for intentional infliction of emotional distress. *See* Dckt. No. 247. That version of the complaint is the operative complaint in this case. *See* 11/27/19 Order (Dckt. No. 279). So, a claim for intentional infliction of emotional distress is, in fact, in the case.

The Hospital did not move to dismiss the claim for intentional infliction of emotional distress, presumably relying on this Court's minute order that the claim is out of the case. Still, there is no harm done. The Hospital can file a motion for summary judgment on the claim if it so chooses. But in the meantime, the Sixth Amended Complaint includes a claim for intentional infliction of emotional distress against the Hospital.

The Court does dismiss this claim against Defendant DiLoreto. Under Illinois law, an intentional infliction of emotional distress claim has four elements: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant intended or recklessly disregarded the probability that such conduct would cause emotional distress; (3) the plaintiff suffered severe emotional distress; and (4) the defendant's conduct caused the plaintiff's distress. *Ulm v. Mem. Med. Ctr.*, 2012 IL App (4th) 110421, ¶ 39, 357 Ill. Dec. 953, 964 N.E.2d 632 (2012). Slabon never alleges that DiLoreto did anything to him. Indeed, Slabon alleges zero facts about DiLoreto, except his job title. Nothing in the complaint supports an intentional infliction of emotional distress claim against DiLoreto, so the claim is dismissed.

The City Defendants, for their part, did move to dismiss the intentional infliction of emotional distress claim. *See* City Defs.' Mtn. to Dismiss, at 14–15 (Dckt. No. 287). As they see it, Slabon failed to allege elements 1, 2, and 4. *See* City Defs.' Mtn. to Dismiss, at 14–15 (Dckt. No. 287). Perhaps because of the cloudy docket on this issue, however, Slabon did not muster much of a response. So the Court denies the City's motion to dismiss. Like the Hospital, the City Defendants can file a motion for summary judgment if they so choose.

## XIII. Defendant Barrick

One final loose end. As a reminder, Dr. Barrick was served with process in June 2017, more than three years ago. *See* Dckt. No. 89. He never responded to the complaint. Judge Kendall granted a motion for default judgment against him (Dckt. No. 95), but Slabon filed the Sixth Amended Complaint before the Court entered judgment against Dr. Barrick.

Ordinarily, the Court would entertain another motion for default judgment. And in fact, Slabon filed a renewed motion for default judgment (Dckt. Nos. 295, 306), which this Court denied because the requested relief was untethered to allegations of the complaint (Dckt. No. 319). Among other things, Slabon asked to recover damages for water damage to his home while he was in prison. *See* Dckt. No. 306.

On its own, the Court took a close look at the allegations against Dr. Barrick. After review, the Court concludes that the complaint fails to state a claim – *any* claim – against Dr. Barrick. In a nutshell, the complaint alleges that Dr. Barrick was a witness to the events. But it does not allege a plausible claim that Dr. Barrick himself engaged in actionable conduct.

The complaint alleges that Dr. Barrick was a physician at the Hospital. *See* Sixth Am. Cplt. ¶ 6 (Dckt. No. 247). Slabon "met briefly" with Dr. Barrick after he arrived in the ambulance. *Id.* at ¶ 32. Dr. Barrick did not give Slabon a psychological examination. *Id.* at

¶ 33.  He also "ignored" Slabon's statements that he did not need treatment and didn't want to be there.  *Id.* at ¶ 35 ("Plaintiff informed Defendant Barrick that there was no medical emergency, that he was not injured in any way, refused [sic] medical treatment and requested to be released repeatedly stating 'I don't want to be here' but was ignored.").

There isn't much else.  Many of the allegations about Dr. Barrick merely summarize his testimony at Slabon's criminal trial.  *Id.* at ¶¶ 20, 24, 33, 54, 55.  But those allegations establish that Dr. Barrick is a witness, not a wrongdoer.

The complaint does not allege that Dr. Barrick gave Slabon a physical exam or provided any medical treatment.  Slabon does not allege that Dr. Barrick injected him with drugs (Nurse Benjamin did that – *see id.* at ¶ 38), restrained him (Cummens, Adamski, and Benjamin did that – *see id.* at ¶ 37), or touched him at all.  In fact, Dr. Barrick is noticeably missing from the section of the complaint that tells the story about how Slabon was grabbed and drugged.  *Id.* at ¶¶ 36–55.  The only exception is a conclusory sentence in the conspiracy claim (Count II) that alleges in blanket fashion that the entire laundry list of Defendants restrained him.  *Id.* at ¶ 116.

A court can dismiss claims on its own motion, and for good reason.  *See Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 588 n.3 (7th Cir. 2016) ("The Court dismisses a claim *sua sponte* under Federal Rule 12(b)(6), using the same standards applied as if it had been a motion to dismiss from the opposing party."); *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987) ("[T]his circuit permits *sua sponte* dismissals based on Rule 12(b)(6), so long as a sufficient basis for the court's action is apparent from the plaintiff's pleading.") (internal quotations omitted); *Indus. Packaging Supplies, Inc. v. Channell*, 2018 WL 2560993, at *3 (N.D. Ill. 2018) ("[A] district court may dismiss a claim sua sponte so long as there is a sufficient basis for the court's action apparent from the pleadings."); *Lockhart v. HSBC Fin. Corp.*, 2014 WL

4922356, at *2 n.1 (N.D. Ill. 2014) ("[T]he Court has the power at any time to *sua sponte* dismiss a claim under Federal Rule [] 12(b)(6)."). That power is consistent with the overriding objective of the Federal Rules: the "just, speedy, and inexpensive" determination of every case. *See* Fed. R. Civ. P. 1.

After five years, Slabon had more than enough time to put some meat on the bone, and allege facts that give rise to a plausible claim against Dr. Barrick. Instead, the complaint is "unadorned" with facts. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Slabon offers nothing more than a "the-defendant-unlawfully-harmed-me accusation." *Id.* The Federal Rules require "more than a sheer possibility that a defendant acted unlawfully." *Id.* Despite years of discovery, Slabon comes up short and comes up empty.

Slabon's claims against Defendant Barrick are dismissed for failure to state a claim.

### Conclusion

The Court grants in part and denies in part the three pending motions to dismiss. The Court rules as follows:

1. The Court grants Our Lady of the Resurrection's motion to dismiss the unreasonable seizure claim (Count I). The Court denies the City Defendants' motion to dismiss the unreasonable seizure claims (Count I) against Defendants O'Brien and O'Donnell about the seizure of money from Slabon's home. The Court grants the City Defendants' motion to dismiss the unreasonable seizure claims against Defendants O'Brien and O'Donnell about the seizure of Slabon's person.

2. The Court grants the motions to dismiss the claims of a conspiracy to commit constitutional violations under 42 U.S.C. § 1985 (Count II) against all Defendants.

3.      The Court grants the motions to dismiss the substantive due process claims (Count III) against all Defendants.

4.      The Court grants the motions to dismiss the unreasonable force claims (Count IV) against Our Lady of the Resurrection and Defendant DiLoreto.  The Court grants the City Defendants' motion to dismiss the excessive force claims against Defendants O'Brien and O'Donnell.  The Court denies the City Defendants' motion to dismiss the excessive force claim (Count IV) against Defendant Sanchez.

5.      The Court denies the City Defendants' motion to dismiss the assault and battery claims (Count V) against Defendants Cummens, Adamski, and Sanchez.  The Court grants the City Defendants' motion to dismiss the assault and battery claims against all other City Defendants, including Defendants O'Brien and O'Donnell.

6.      The Court grants Defendant DiLoreto's motion to dismiss the medical battery claim (Count VI).  The Court denies the motion to dismiss the medical battery claim (Count VI) against Our Lady of the Resurrection to the extent that it may be responsible for claims against other Defendants under *respondeat superior*.  The Court grants the City Defendants' motion to dismiss the medical battery claims (Count VI) against Defendants Bishop and Strong.

7.      The Court grants the motions to dismiss the unconstitutional conditions of confinement claims (Count VII) against Our Lady of the Resurrection and Defendant DiLoreto. The Court denies the City Defendants' motion to dismiss the unconstitutional conditions of confinement claims (Count VII) against Defendants O'Brien and O'Donnell.  The Court grants the motion to dismiss the unconstitutional conditions of confinement claims (Count VII) against all other City Defendants.

8. The Court grants the motion to dismiss the *Monell* claims against the City of Chicago (Count VIII).

9. The Court grants the motion to dismiss the *respondeat superior* claim (Count IX) against Our Lady of the Resurrection to the extent that it involves claims under section 1983. The Court grants the motion to dismiss the *respondeat superior* claim against Our Lady of the Resurrection to the extent that it involves state law claims against Defendants DiLoreto and Dr. Barrick. The Court denies the motion to dismiss the *respondeat superior* claim against Our Lady of the Resurrection to the extent that it involves state law claims against Defendant Benjamin.

10. The Court grants the City Defendants' motion to dismiss the false imprisonment claims (Count XI) against Defendants O'Brien and O'Donnell. The Court grants the motion to dismiss the false imprisonment claim (Count XI) against Defendant DiLoreto. The Court denies the motion to dismiss the false imprisonment claim (Count XI) against Our Lady of the Resurrection.

11. The Court dismisses the intentional infliction of emotional distress claim against Defendant DiLoreto (Count XII). The Court denies the motion to dismiss the intentional infliction of emotional distress claims against the City Defendants and the Hospital.

12. Defendant DiLoreto is dismissed. The Court instructs the Clerk to terminate Defendant DiLoreto from the docket.

13. Defendant Barrick is dismissed. The Court instructs the Clerk to terminate Defendant Barrick from the docket.

14. Defendants Gonzalez, Mullany, Delderfield, Oppedisano, and Gregory are dismissed. The Court instructs the Clerk to terminate them from the docket.

15.     Any remaining John Doe Defendants are dismissed.  The Court instructs the Clerk to terminate them from the docket.


Date:    September 28, 2020                    _____
                                              Steven C. Seeger
                                              United States District Judge