**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANDREW SLABON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-8965 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ANGELO R. SANCHEZ, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Andrew Slabon called 911 after he arrived home and discovered his mother on the floor, unresponsive. The police and paramedics answered the call, and did what they could. But they could not revive her.

Slabon, meanwhile, was having a hard time. While the paramedics attempted to resuscitate his mother, Slabon was flailing around, screaming uncontrollably. A police officer had to place him in handcuffs and remove him from the room because he was getting in the way. When he heard the news of his mother's passing, he started talking about killing himself. The police decided that Slabon posed a risk of self harm, so they took him to the hospital involuntarily.

After arriving in the emergency room, things went from bad to worse. He continued to make suicidal comments, asking to be euthanized. He wouldn't lay down. He threatened to spit on the nurse. And he continued to scream, yelling expletives and racial slurs at the medical staff.

Slabon then kicked the nurse. The blow sent her flying backwards, and she crashed into the cabinetry. So they arrested him. The blow landed Slabon two years in prison.

Slabon sued the police, the paramedics, and the medical professionals, as well as the City and the hospital. The sixth amended complaint included a dozen claims against more than a dozen defendants. Years of discovery followed.

Defendants ultimately moved for summary judgment. They supported their motions with admissible evidence, but Slabon did not respond with any evidence of his own. They also pointed out that many of Slabon's claims are time barred. A personal injury claim against a state employee has a one-year statute of limitations under Illinois law, but Slabon filed suit more than 18 months after the incident.

For the reasons stated below, the motions for summary judgment are granted.

### Non-Compliance with the Rules

Before drilling down into the facts, and summarizing the evidentiary record, the Court must call attention to Slabon's failure to comply with the Rules.

Defendants filed motions for summary judgment. At the summary judgment stage, allegations no longer carry the day. The non-movant must present evidence showing that there is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). That is, in response to a properly-supported motion for summary judgment, the non-movant must come forward with evidence that demonstrates a need for a trial.

The City Defendants – the City of Chicago, plus Officer Sanchez, Officer Cummens, Officer Adamski, Detective O'Brien, Paramedic Bishop, and Paramedic Strong – supported their motion for summary judgment by filing a statement of material facts under Local Rule 56.1. *See* City Defs.' Statement of Facts (Dckt. No. 362). Defendant Presence Our Lady of Resurrection Medical Center ("the Hospital") also filed a statement of material facts as required by the Local

2

Rules. *See* Def. Presence Our Lady of Resurrection Medical Center's Statement of Facts ("Def. POLR's Statement of Facts") (Dckt. No. 355). Defendants submitted supporting evidence, too.

By filing for summary judgment, and offering admissible evidence, Defendants put the ball in Slabon's court. Slabon needed to come forward with evidence of his own, and thus demonstrate that there is a genuine issue of material fact. In other words, when Defendants offered evidence of "X," Slabon needed to offer evidence of "not-X."

In the alternative, Slabon needed to show that Defendants' evidence was inadequate. That is, Slabon needed to demonstrate why Defendants' evidence does not entitle them to summary judgment. Slabon needed to show why "X" would not entitle Defendants to judgment as a matter of law, even if "X" is true. Or, Slabon needed to show that the evidence of "X" offered by Defendants does not support "X" at all.

But an expression of disagreement is not enough. And here, that's all there is.

Slabon responded, but he did not comply with the Federal Rules or the Local Rules. Slabon filed a number of different documents in response to each motion. They are difficult to navigate.

Specifically, in response to the motion filed by the City Defendants, Slabon filed: (1) a five-page Plaintiffs' [sic][1] 56.1(b) Amended Response Brief to Defendants' City Motion for Summary Judgment; (2) a six-page Plaintiffs' 56.1(b) Amended Response Statement to Defendants' City Motion for Summary Judgment; and (3) a seven-page Plaintiffs' 56.1(b) Amended Response to Defendants' City's Motion for Summary Judgment. *See* Dckt. No. 392.

In response to the Hospital's motion for summary judgment, Slabon filed: (1) a one-page Plaintiffs' 56.1(b) Response Brief to Defendants' POLR Motion for Summary Judgment; (2) a

---

[1] For readability, the Court will not use "[sic]" in the next few paragraphs. Repeatedly inserting "[sic]" is distracting. The misplacement of apostrophes is not worth pointing out again and again.

three-page Plaintiffs' 56.1 Response Memorandum of Law to Defendants' POLR Motion for Summary Judgment; (3) a four-page Plaintiffs' 56.1(b) Response to Defendants' POLR Motion for Summary Judgment; (4) a four-page Plaintiffs' 56.1(b) Response Statement to Defendants' POLR Motion for Summary Judgment. *See* Dckt. No. 371.[2]

From the names of the documents themselves, it may not be obvious which document is the brief, and which document is the response to the statement of facts. They blur together. Figuring out what each document is – and what it responds to – takes some doing. The blurring comes from the similar names, and from the fact that Slabon filed each collection together (that is, the three responses to the City Defendants appear in one pdf file, and the same for the Hospital).

Slabon's responses to the statements of facts appear near the end of each collection. So, the document entitled "Plaintiffs' [sic] 56.1(b) Amended Response to Defendants' City's Motion for Summary Judgment" is Slabon's response to the City Defendants' statement of facts. *See* Pl.'s Resp. to City Defs.' Statement of Facts (Dckt. No. 392, at 13–19 of 19). And the document entitled "Plaintiffs' [sic] 56.1(b) Response to Defendants' POLR Motion for Summary Judgment" is Slabon's response to the Hospital's statement of facts. *See* Pl.'s Resp. to Def. POLR's Statement of Facts (Dckt. No. 371, at 5–8 of 12).

Two problems jump off the page. First, Slabon did not comply with the procedural requirements for how to respond to a statement of facts. That failure to comply is most glaring in his response to the City's statement of facts. He did not give a paragraph-by-paragraph response. *See* Pl.'s Resp. to City Defs.' Statement of Facts (Dckt No. 392, at 13–19 of 19).

---

[2] The Local Rules authorize the non-movant to file "*a* supporting memorandum of law," singular. *See* Local Rule 56.1(a)(1) (emphasis added). But Slabon filed more than one response to each motion.

The Local Rules require movants to file a statement of facts that "consist[s] of concise numbered paragraphs." *See* Local Rule 56.1(d)(1). The response by the non-movant "must consist of numbered paragraphs corresponding to the numbered paragraphs" in the movant's Rule 56.1 statement of material facts. *See* Local Rule 56.1(e)(1). Also, "[e]ach paragraph shall set forth the text of the asserted fact . . . and then shall set forth the response." *Id.* That way, it is easy for the Court and the parties to see the facts from one side, and the response from the other.

Instead of complying, Slabon went off road. The statement of facts from the City Defendants includes 68 paragraphs, which appear under six headings. *See* City Defs.' Statement of Facts (Dckt. No. 362). So, for example, the first heading is "Description of the Parties and Basis of Jurisdiction," the second is "Plaintiff's 911 Call to Police," the third is "Plaintiff's Transport to the Hospital," the fourth is "Plaintiff's Battery of Nurse Benjamin and Subsequent Arrest," and so on. *Id.* The paragraphs appear under those headings. So paragraphs one to five appear under heading one ("Description of the Parties and Basis of Jurisdiction"), paragraphs six to thirty-two appear under heading two ("Plaintiff's 911 Call to Police"), and so on. *Id.*

Slabon did not give 68 responses to those 68 paragraphs. Instead, his response includes 17 different paragraphs, or maybe 17 different headings. *See* Pl.'s Resp. to City Defs.' Statement of Facts (Dckt. No. 392, at 13–19 of 19).[3] The first four correspond to the headings of the Rule 56.1 statement by the City Defendants (*e.g.,* "Plaintiff's 911 Call to Police"). But under each heading, a stream of sentences flow, from one to another, without any paragraph numbers. The text includes no markers tying the sentences to the sentences in the Rule 56.1 statement.

---

[3] Or maybe Slabon responded in 19 paragraphs. On page 18 of the 19-page pdf file, Plaintiff included a response that ran through paragraph 17, and then the "CONCLUSION" followed. *See* Pl.'s Resp. to City Defs.' Statement of Facts (Dckt. No. 392, at 18 of 19). But the next page of the pdf file (page 19 of 19) then includes paragraphs 18 and 19. *Id.* at 19 of 19. But paragraph 19 is a restatement of the standard for a declaration under the United States Code. *Id.*

The sentences lack any mooring to the City Defendant's statement of facts. Nothing ties the response to the statements from the Defendants, so it is difficult to see what, exactly, Slabon is responding to. The sentences just float together, tied to nothing.

By the look of things, the response is incomplete, too. For example, the second section of the City Defendant's Rule 56.1 statement includes 27 paragraphs (that is, paragraphs six to thirty-two appear under heading two, entitled "Plaintiff's 911 Call to Police"). *See* City Defs.' Statement of Facts, at ¶¶ 6–32 (Dckt. No. 362). But in response, Slabon gave only eight responses to those 27 paragraphs. *See* Pl.'s Resp. to City Defs.' Statement of Facts (Dckt. No. 392, at 13–14 of 19).

So, Slabon did not respond to everything. And the responses that do appear are user-unfriendly, because the paragraph numbers do not correspond to the paragraph numbers of the City Defendants' statement of facts. It is difficult to line up the facts and the responses, and find a match. Reviewing a statement of facts under Rule 56.1 should not require a judicial version of "go fish."

Slabon's response to the Hospital's statement of facts was better, but far from perfect. The Hospital filed a statement of facts with 27 paragraphs. *See* Def. POLR's Statement of Facts (Dckt. No. 355). Slabon filed a 27-paragraph response. *See* Pl.'s Resp. to Def. POLR's Statement of Facts (Dckt. No. 371, at 5–8 of 12). So the numbers match. But Plaintiff did not restate the paragraphs from the Hospital's statement of facts, in violation of the Local Rules. *See* Local Rule 56.1(e)(1). That non-compliance required this Court flip back and forth between two documents at once, to figure what facts the Hospital put forward and what Slabon offered as a response.

The Local Rules require non-movants to restate the paragraphs of the movant's statement of facts, and then provide a paragraph-by-paragraph response. *Id.* And for good reason. The goal of the exercise is to identify any disputed issues of fact. A user-friendly format is important for the Court's review. A scrambled response that is untethered to the statement of facts interferes with the ability of the Court to see what is at issue, and what is not.

Second, Slabon did not comply with the substantive requirements, either. He did not respond by submitting admissible evidence.

At the summary judgment stage, a non-movant cannot rely on allegations. Summary judgment is the time to come forward with evidence. It is not enough for the non-movant to express disagreement with the movant's facts, or to predict the evidence that the non-movant will present someday. The non-movant must cite to evidence, here and now, and must put that evidence in the record. "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." *See* Local Rule 56.1(e)(3).

Summary judgment is the time for the parties to put their evidentiary cards on the table. "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (cleaned up).

A failure to comply has straightforward consequences. The Court may accept as true any (properly supported) fact in the movant's statement of facts if the non-movant fails to come forward with contrary evidence. *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the

fact undisputed for purposes of the motion."); Local Rule 56.1(e)(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.").

Slabon did not comply with those requirements. Instead of coming forward with admissible evidence, Slabon offers denials. Slabon denies this or that, without offering any contrary evidence. For example, Slabon "[d]enies ever at any time screaming, thrashing, jerking, kicking and saying that he didn't want to live." *See* Pl.'s Resp. to City Defs.' Statement of Facts (Dckt. No. 392, at 13 of 19). Later, Slabon "disputes that he was arrested for battering nurse Benjamin," and "denies any involvement in any attack . . . ." *Id.* at 14.

Denials are not evidence. The non-movant cannot respond to a statement of facts by denying those facts, without more. The non-movant must come forward with evidence, not expressions of disagreement. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("In addition, where a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial."); *see also Bergholz v. John Marshall L. Sch.*, 448 F. Supp. 3d 887, 893 (N.D. Ill. 2020) ("Bergholz denies this, but he fails to cite any record evidence indicating he has such personal knowledge, so the fact is deemed admitted."); *Lorillard Tobacco Co. v. Amoco & Food Shop 5, Inc.*, 360 F. Supp. 2d 882, 885 (N.D. Ill. 2005) ("To the extent that defendant's denials are not supported by citations to evidence in the record, the court agrees with plaintiff that those denials do not create a dispute of material fact.").

At other times, Slabon disagrees with the facts offered by Defendants because he doesn't find the witnesses credible. For example, the Hospital offered evidence that Slabon was in an "agitated state" and displayed "disruptive behavior" in the emergency room. *See* Def. POLR's Statement of Facts, at ¶ 10 (Dckt. No. 355). Slabon responded: "Plaintiff disputes as it is based

entirely on the credibility of defendants who have a vested interest in the outcome of this case as well as personal involvement of defendants in alleged constitutional deprivations." *See* Pl.'s Resp. to Def. POLR's Statement of Facts, at ¶ 10 (Dckt. No. 371, at 6 of 12).

A non-movant cannot create a genuine issue of material fact by calling into question the credibility of the movant's witnesses. A plaintiff cannot "defeat a defendant's properly supported motion for summary judgment . . . without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial . . . ." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986); *see also Fletcher v. Hoeppner Wager & Evans, LLP*, 775 F. App'x 240, 241 (7th Cir. 2019) ("Fletcher's evidence suggests only that a jury might disbelieve Golomb's evidence . . . . But a plaintiff cannot get to a jury simply by casting doubt on the defendant's evidence; '[i]nstead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'") (quoting *Anderson*, 477 U.S. at 257); *Trentadue v. Redmon*, 619 FL3d 648, 652 (7th Cir. 2010) ("Trentadue must show more than 'some metaphysical doubt as to the material facts,' and neither speculation nor generic challenges to a witness's credibility are sufficient to satisfy this burden.") (citation omitted); *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[W]hen challenges to witness' credibility are all that a plaintiff relies on, and he has shown no independent facts – no proof – to support his claims, summary judgment in favor of the defendant is proper."); *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998) ("[T]he prospect of challenging a witness' credibility is not alone enough to avoid summary judgment.").

And in any event, at the summary judgment stage, the Court does not make credibility determinations. The issue is whether Slabon has offered evidence at all, not whether the Defendants offered evidence from believable people.

A non-movant also cannot undermine testimony by labeling it "self-serving." *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving. As we have repeatedly emphasized over the past decade, the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.") (citation omitted); *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) ("[W]e long ago buried – or at least tried to bury – the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.'"); *Payne v. Pauley*, 337 F.3d 767, 771–72 (7th Cir. 2003).

It would shock no one to learn that a witness was self-serving. People tend to be self-serving, and so does their testimony. But that's not a reason to keep it out at the summary judgment stage.

In another document in the collection (separate and apart from the document that appears to be the response to the Rule 56.1 statement), Slabon repeatedly foreshadowed what he "will testify" to someday. For example, Slabon stated that he "will testify that he has been a victim of police misconduct and/or retaliation for decades." *See* Pl.'s Resp. to Def. POLR's Mtn. for Summ. J., at ¶ 3 (Dckt. No. 371, at 9–12 of 12). As a second example, Slabon "will testify" that the nurse "was never injured and no such attack ever occurred." *Id.* at ¶ 18. Slabon's responses are heavy-laden with predictions about what he "will testify" to someday.

But from an evidentiary standpoint, the time is now. A non-movant cannot oppose a motion for summary judgment by promising to come forward with evidence someday.

The punchline is that Slabon did not respond to the two statements of facts as required by the Federal Rules and the Local Rules. He did not follow the format. He did not respond to all of the facts. And when he did respond, he did not offer admissible evidence. Denials and predictions don't cut it.

As a result, the Court strikes his responses. *See Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) ("The obligation set forth in Local Rule 56.1 'is not a mere formality.'") (citation omitted); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994) ("[Local Rule 56.1] substantially facilitates the district court's task in deciding whether a trial is indeed necessary. Ms. Waldridge's failure to comply with the local rule was, accordingly, not a harmless technicality, but a mistake that our precedents (for good reason) have deemed fatal.").

The Court accepts Defendants' facts as true for purposes of the motions for summary judgment. *See Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 411 (7th Cir. 2019) ("According to well-established Seventh Circuit law, [the nonmovant's] noncompliance [with Local Rule 56.1(b)(3)(B)] meant that the district court could exercise its discretion to accept [the movant's] statements of fact as undisputed."); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.") (internal quotation marks omitted); *Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 F. App'x 607, 607 (7th Cir. 2017) ("The district court treated most of the [movant's] factual submissions as unopposed, because the [nonmovant] failed to contest them in the form required by Local Rule 56.1(b). We have held that the district court is entitled

to enforce that rule in precisely the way it enforced the rule in this litigation.") (collecting cases); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880, 884 (7th Cir. 2012).

Slabon's failure to comply did not come from a failure to know the rules. Each of the parties notified Slabon about the requirements under the Local Rules. *See* Notice (Dckt. No. 358); Notice (Dckt. No. 364). This Court did too – twice. *See* 11/23/20 Order (Dckt. No. 366); 12/11/20 Order (Dckt. No. 370). This Court also gave Slabon extra time – twice. *See* 12/11/20 Order; 12/29/20 Order (Dckt. No. 375).

It is true the Slabon is *pro se*. But even *pro se* litigants must comply with the rules. *See Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[T]he Supreme Court has made clear that even *pro se* litigants must follow rules of civil procedure.") (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)); *Jones v. Phipps*, 39 F.3d 158, 163 (7th Cir. 1994) ("[P]ro se litigants are not entitled to general dispensation from the rules of procedure or court imposed deadlines."); *Harris v. Coppes*, 2019 WL 2435847, at *1 (N.D. Ill. 2019) ("Harris's *pro se* status does not excuse him from complying with Local Rule 56.1.") (collecting cases). The Court must have procedures for an orderly resolution of litigation.

Good fences make good neighbors, and the same can be said of the Federal Rules. Without boundaries, there is confusion, conflict, and chaos. *Pro se* litigants must respect those boundaries, too. *Pro se* litigants have no right to make their own rules.

The bottom line is that this Court will accept Defendants' facts as true for purposes of their motions for summary judgment. With that long wind-up, the Court now turns to the facts of the case.

**Facts**

On the evening of January 27, 2014, Andrew Slabon returned home from the liquor store. *See* City Defs.' Statement of Facts, at ¶ 6 (Dckt. No. 362). He had been drinking "a lot" of alcohol that day, and was "pretty drunk." *Id.* at ¶ 7.

When he arrived home, he made a terrible discovery. His mother was unresponsive on the living room floor of the house that they shared. *Id.* at ¶ 6. Slabon called 911. *Id.*

Paramedics from the Chicago Fire Department were the first to arrive on the scene. *Id.* at ¶ 8. Slabon let them in. *Id.*

The paramedics called the Chicago Police Department for assistance. *Id.* at ¶ 9. They called because it was a possible death investigation, and because Slabon was unruly. *Id.*

Two police officers, Defendant Angelo Sanchez and his partner, Officer James Mackin (a non-party), answered that call, dressed in full police uniform. *Id.* When he arrived at the scene, Officer Sanchez entered the home and went into the living room. *Id.* at ¶ 10. He saw Slabon's mother lying on the floor, with paramedics attending to her. *Id.*

Slabon was not well. He was sitting on a nearby couch, screaming hysterically. *Id.* at ¶ 11. He was flailing his arms to the point of knocking an item off of a nearby table. *Id.* Slabon was moving from a sitting to partially standing position, in an apparent attempt to reach his mother, but a firefighter blocked his way. *Id.* at ¶ 12. Slabon does not recall if he was disobeying the firefighter's commands or attempting to reach his mother. *Id.* ¶ 13.

Officer Sanchez stepped in. He switched places with the firefighter who was blocking Slabon from interfering with the paramedics. *Id.* at ¶ 14. Officer Sanchez attempted to calm Slabon down, and instructed him to stay on the couch and stay away from the paramedics. *Id.* at ¶ 15.

Slabon continued to have a hard time. He continued to flail, scream hysterically, and get up from the couch. *Id.* at ¶ 16. Based on his observations, Officer Sanchez believed that Slabon was intoxicated and under the influence of an unknown substance. *Id.* at ¶ 17.

It became apparent that Slabon was not going to calm down. *Id.* at ¶ 18. So Officers Sanchez and Mackin attempted to lift him off the couch by his arms and move him to another room. *Id.* But Slabon did not cooperate. *Id.* He pulled away and became deadweight. *Id.*

At that point, Officers Sanchez and Mackin handcuffed Plaintiff's arms behind his back. *Id.* at ¶ 19. They did so in light of his behavior, and for the safety of Slabon and everyone else. *Id.* The handcuffing did not injure Slabon. *Id.*

Once Slabon was handcuffed, the two officers were able to lift him by his arms and escort him to a back bedroom, where he sat on a bed. *Id.* at ¶ 20. That's the first moment that Slabon recalls. He does not remember anything between the paramedics first arriving and finding himself on the bed in the bedroom. *Id.* at ¶ 21.

Officer Sanchez continued speaking with Slabon, trying to calm him down. *Id.* at ¶ 22. The officer instructed Slabon to remain on the bed. *Id.* But Slabon continued screaming, and kept trying to get up in an apparent attempt to leave the room. *Id.* Slabon doesn't recall what Officer Sanchez said to him at the time. *Id.* at ¶ 23.

In light of Slabon's unruly behavior, Officer Sanchez called for more police assistance. *Id.* at ¶ 24. At that point, both Officer Sanchez and Officer Mackin were with Slabon in the bedroom. *Id.* They called for backup so that one of them could check on the paramedics, without leaving one officer in the room by himself with Slabon. *Id.*

Two officers, Defendants Jerry Adamski and David Cummens,[4] answered that call. *Id.* at ¶ 25. They arrived on the scene in full police uniform. *Id.*

They entered the home and joined Officer Sanchez and Slabon in the bedroom. *Id.* at ¶ 26. Officer Mackin then went to check with the paramedics in the living room. *Id.*

Officers Sanchez, Adamski, and Cummens continued to try to calm Slabon down. *Id.* at ¶ 27. They instructed Slabon to remain on the bed and to stop trying to leave the room. *Id.* Slabon did not cooperate. He continued screaming, and he kept trying to get off the bed. *Id.*

The officers kept Slabon in the bedroom to prevent him from re-entering the living room and interfering with the paramedics. *Id.* at ¶ 28. At that point, Officer Mackin returned to the bedroom and delivered terrible news. *Id.* at ¶ 29. The woman – Slabon's mother – was dead. *Id.*

Slabon's behavior took a turn for the worse. *Id.* at ¶ 30. He began making suicidal comments, such as "kill me" and "I don't want to live." *Id.*

At that point, the officer still didn't know who Slabon was. *Id.* at ¶ 31. He hadn't given them his name, or answered any questions. *Id.* None of the officers knew that the woman was his mother. *Id.*

The officers decided that Slabon posed a risk of self-harm. *Id.* at ¶ 32. They called an ambulance to transport Slabon to a local hospital for a mental health evaluation. *Id.*

---

[4] The City Defendants went back and forth on the spelling of the defendant's name. David "Cummens" appears on the docket 56 times, but David "Cummins" does not appear once. So the minute entries say "Cummens." But the filings themselves often say "Cummins." So, example, the minute entry for the motion for summary judgment says "David J. Cummens" (*see* Dckt. No. 361), but the text of the motion itself says "David Cummins" (*id.*). The Court assumes that filings are more likely to be correct than minute entries. The pleadings are inconsistent, too. Slabon sued "David J. Cummens" in the Sixth Amended Complaint, and "David Cummins" filed an answer. *See* Sixth Am. Cplt. (Dckt. No. 247); Amended Answer (Dckt. No. 322). The Court will stick to what is in the complaint, but maybe there is some cleanup work to do. If that spelling is incorrect, Defendants should file a motion so that the docket is correct.

Officer Cummens, along with Paramedic Bishop and Paramedic Strong, entered the ambulance with Slabon. *Id.* at ¶ 37. Officers Sanchez and Mackin stayed outside the vehicle, but remained on the scene. *Id.*

One of the paramedics (Strong) tried to take Slabon's vitals, but he couldn't. *Id.* at ¶ 38. Slabon kept screaming and thrashing. *Id*

Paramedic Strong drove the ambulance to a local hospital, Our Lady of Resurrection Medical Center, while Paramedic Bishop and Officer Cummens remained in the back with Slabon. *Id.* at ¶ 39. While en route, Slabon refused to answer any questions about his medical history. *Id.* at ¶ 40. He remained combative, and continued to scream, jerk, and kick. *Id.* But Slabon was not injured during the ride. *Id.* at ¶ 41.

Once at the hospital, they placed Slabon in a wheelchair and took him to the intake desk in the emergency room. *Id.* at ¶ 42. At that point, the hospital staff took custody of Slabon. *Id.* at ¶ 43. He arrived at around 6:50 p.m., and was in handcuffs. *See* Def. POLR's Statement of Facts, at ¶ 4 (Dckt. No. 355).

At that point, Slabon was not under arrest for committing any crime. *See* City Defs.' Statement of Facts, at ¶ 44 (Dckt. No. 362). But Slabon was in distress. He continued to make suicidal comments, asking to be euthanized. *Id.* at ¶ 45.

Dr. Kenneth Barrick was one of the physicians working in the emergency room that night. *See* Def. POLR's Statement of Facts, at ¶ 6 (Dckt. No. 355). He had eight years of experience as a physician in emergency rooms. *Id.* A large part of his practice involved dealing with people with acute psychiatric issues or acute issues that may involve psychiatric diagnoses. *Id.*

16

Based on his observation, Dr. Barrick believed that Slabon was emotionally distraught. *Id.* He was rocking back and forth, weeping, and cursing. *Id.* He seemed agitated. *Id.* at ¶ 7.

Dr. Barrick approached, and put his hand on Slabon's shoulder. *Id.* He asked him if he was all right, and he asked what had happened and what he was doing at the hospital. *Id.*

Slabon, still rocking back and forth, responded with expletives. *Id.* at ¶ 8. He said that his mother had passed away. *Id.*

Defendant Lauren Benjamin, a registered nurse, approached Slabon and gave him some water, holding the cup as he drank (because he was in handcuffs). *Id.* at ¶ 9.

Nurse Benjamin had Slabon moved to a hospital room. *See* City Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 362). The staff moved him to an exam room because it had a door, and Slabon was agitated and disruptive. *See* Def. POLR's Statement of Facts, at ¶ 10 (Dckt. No. 355).

Officer Cummens, Officer Adamski, and other hospital staff accompanied Nurse Benjamin, as did at least one security guard. *See* City Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 362). Slabon entered the room with Dr. Barrick, Nurse Benjamin, a hospital security guard, and two police officers. *See* Def. POLR's Statement of Facts, at ¶ 13 (Dckt. No. 355).

Things continued to unravel. Slabon sat on a hospital bed, but refused to lay down. *See* City Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 362).

Nurse Benjamin introduced herself as the nurse who would be taking care of him, and said that she was going to take his vitals. *See* Def. POLR's Statement of Facts, at ¶ 14 (Dckt. No. 355). Slabon responded with expletives and racial slurs. *Id.* He said his name was John Doe. *Id.*

The nurse asked him about his medical history, and asked if he was taking any medications. *Id.* at ¶ 15. Slabon refused to answer. *Id.* He responded with "more expletives and profanities." *Id.*

They transferred Slabon from the wheelchair to the gurney, and then to the bed. *Id.* at ¶¶ 15–16.

Nurse Benjamin attempted to take Slabon's vital signs. *See* City Defs.' Statement of Facts, at ¶ 47 (Dckt. No. 362). But he was still handcuffed, so she asked Officers Cummens and Adamski to remove them. *Id.* They removed the handcuffs, in part. They removed the cuffs from behind his back, but they cuffed each hand separately to a rail on each side of the bed. *Id.*

Meanwhile, Slabon looked directly at Nurse Benjamin and made more vulgar and profane comments. *See* Def. POLR's Statement of Facts, at ¶ 16 (Dckt. No. 355). Slabon continued to move around, so Nurse Benjamin could not get his vital signs, except his pulse. *Id.* at ¶ 17; City Defs.' Statement of Facts, at ¶ 48 (Dckt. No. 362).

Things continued to deteriorate. Slabon became more combative, and threatened to start spitting on her. *See* City Defs.' Statement of Facts, at ¶ 48 (Dckt. No. 362).[5]

Dr. Barrick determined that de-escalation tactics had failed. He ordered chemical and physical restraints in light of Slabon's agitated and combative demeanor. *See id.* at ¶ 18. The chemical restraints included 2 mg of Ativan, a benzodiazepine, 5 mg of Haldol, an anti-psychotic, and 50 mg of Benadryl. *Id.* He ordered physical restraints because chemical restraints take some time, and he was concerned about Slabon's behavior. *Id.* Those orders were

---

[5] The Hospital's statement of facts includes a paragraph saying that Slabon actually spat on her. *See* Def. POLR's Statement of Facts, at ¶ 17 (Dckt. No. 355). But the cited testimony says that Slabon *threatened* to spit on her, not that he actually spat on her. Whether a person spits on someone – or only *threatens* to spit on someone – makes a big difference to the person on the receiving end. But it doesn't make much difference here. Either way, Slabon was threatening the people in the room.

consistent with the standard of care for treating a patient in an emergency room that presents an agitated state. *Id.*

Nurse Benjamin left the room and returned with "soft restraints," which are straps made from a nylon-like material. *See* City Defs.' Statement of Facts, at ¶ 49 (Dckt. No. 362). She brought the medication, too. *See* Def. POLR's Statement of Facts, at ¶ 19 (Dckt. No. 355). She injected the medication into Slabon's left thigh. *Id.* Slabon responded by telling the nurse to do it again, using expletives. *Id.*

The hospital staff then strapped Slabon's arms to the bed rails with the soft restraints. *See* City Defs.' Statement of Facts, at ¶ 50 (Dckt. No. 362). But Slabon resisted and remained aggressive, so the police officers, the security guard, and Dr. Barrick pitched in. *See* Def. POLR's Statement of Facts, at ¶ 20 (Dckt. No. 355). According to Slabon, Officer Cummens put his arm on his neck when they applied the soft restraints, restricting his airway. *See* City Defs.' Statement of Facts, at ¶ 52. At that point, they removed the handcuffs. *Id.* at ¶ 50.

Nurse Benjamin put soft restraints on his ankles as well, but did not secure those restraints to the bed. *Id.* at ¶ 51. So Slabon was still able to move his legs. *Id.*

At that point, Nurse Benjamin noticed that his oxygen saturation levels started to drop. *See* Def. POLR's Statement of Facts, at ¶ 21 (Dckt. No. 355). So she told Slabon that she was going to place an oxygen mask on his face, and Slabon responded "OK." *Id.* at ¶ 22; *see also* City Defs.' Statement of Facts, at ¶ 55 (Dckt. No. 362).

That's when Slabon attacked her. Slabon reared his legs back and kicked Nurse Benjamin in the chest, sending her flying. *See* City Defs.' Statement of Facts, at ¶ 55 (Dckt. No. 362); Def. POLR's Statement of Facts, at ¶ 22 (Dckt. No. 355).

The City Defendants and the Hospital offer different estimates about how far the nurse flew. The City Defendants claim that she flew about 12 feet backwards, and the Hospital says that it was more like eight to ten feet. The distance is less important than the act itself. Slabon kicked, and the nurse flew.

The nurse struck the cabinets by the wall, and left the room to compose herself. *See* Def. POLR's Statement of Facts, at ¶ 22 (Dckt. No. 355).

At that point, the officers put Slabon under arrest for battery. *See* City Defs.' Statement of Facts, at ¶ 56 (Dckt. No. 362). They re-attached the handcuffs to each arm, and secured them to the bed rails. *Id.* When the nurse returned, the police had secured both of Slabon's feet, and she was able to get his vitals. *See* Def. POLR's Statement of Facts, at ¶ 23 (Dckt. No. 355).

Before Slabon left the hospital, Dr. Barrick ordered a catheter for a urinalysis. *Id.* at ¶ 24. A urine test can show elevated levels of chemicals that cause acute psychosis. *Id.* It can show other chemicals that cause aggressive behavior, like cocaine and amphetamines. *Id.* Nurse Benjamin inserted the catheter. *Id.*

Slabon left the hospital in police custody at 9:50 p.m. *Id.* at ¶ 25. After the police placed him under arrest, non-party officers transported Slabon to the local police station. *See* City Defs.' Statement of Facts, at ¶ 57 (Dckt. No. 362).

In his complaint, Slabon alleged that he was wearing only a nightgown at the time, and he was cold and hungry. *Id.* at ¶ 58. Slabon claims that he was not given any clothes or food by the officers, and that they saw him convulsing and unable to walk. *Id.* at ¶ 59.

After his arrest, Slabon interacted with only two of the City Defendants: Detectives Michael O'Donnell and Timothy O'Brien. *Id.* at ¶ 60. They investigated his mother's death, and they interviewed Slabon at the police station about what had happened. *Id.*

Slabon did not answer the officers' questions. *Id.* at ¶ 61. He also did not convulse from apparent exposure to cold, or make any comment that he was cold or needed medical care. *Id.*

Slabon later went to the Cook County Jail. *Id.* at ¶ 62. Before going there, Slabon went to West Suburban Hospital. *Id.* The "heat was turned on to make him more comfortable." *Id.*

Slabon was not diagnosed with or treated for hypothermia. *Id.* at ¶ 63. He suffered no lasting effects from being cold during police transport and processing. *Id.*

The state criminally charged Slabon with battery for striking Nurse Benjamin. *Id.* at ¶ 64. He was convicted. *Id.*; *see People v. Slabon*, 2018 IL App (1st) 150149, 425 Ill. Dec. 354, 112 N.E.3d 1019 (2018); *see also* Sixth Am. Cplt., at ¶ 76 (Dckt. No. 247) (acknowledging Slabon's conviction of aggravated battery).

The state court sentenced Slabon to 50-months' imprisonment and one year of mandatory supervised release. *See Slabon*, 112 N.E.3d at 1027. Slabon was released from prison roughly 25 months after his arrest. *See* City Defs.' Statement of Facts, at ¶ 66 (Dckt. No. 362).

Slabon testified that, after returning home, he found that $700 was missing from his keyboard at his home. *Id.* Slabon believes that Officers O'Donnell and O'Brien took it. *Id.* at ¶ 67. But that claim rests on nothing more than an assumption, based on the notion that those officers were the last people in his home before the incarceration.

Officers O'Donnell and O'Brien did enter the home as part of their investigation into the death of Slabon's mother. *Id.* at ¶ 68. But they did not take any money. *Id.*

**Procedural History**

This case has a long and winding procedural history. This Court summarized that history in its ruling on the motion to dismiss. *See* 9/28/20 Mem. Opin. and Order, at 8–11 (Dckt. No. 339). The case has over 400 docket entries, and counting.

21

Suffice it to say that Slabon filed this lawsuit in 2015. He brought claims against a number of different police officers and firefighters, as well as medical staff at Presence Our Lady of Resurrection Medical Center (again, the "Hospital"). He also sued the Hospital, the City of Chicago, the Chicago Police Department, and the Independent Police Review Authority. *See* Cplt. (Dckt. No. 1).

Years of discovery followed. So did waves of amendments to the complaint. Judge Kendall presided over the case for most of its history, and carried most of the load. When the case was reassigned in September 2019, there were already 259 docket entries. By that point, Slabon had already filed a sixth amended complaint (two of them, actually).

After reassignment, this Court gave Plaintiff a chance to file a seventh amended complaint, because there were two different versions of the sixth amended complaint on the docket. *See* 11/12/19 Order (Dckt. No. 271). Plaintiff did not do so. As result, this Court confirmed that the later-filed version of the sixth amended complaint is the operative complaint. *See* Sixth Am. Cplt. (Dckt. No. 247); 11/27/19 Order (Dckt. No. 279); 12/2/19 Order (Dckt. No. 282).

The sixth amended complaint advanced 12 claims against 11 (or possibly 13 or 15)[6] named individuals, plus "John Doe" police officers, the City of Chicago, and Our Lady of the Resurrection Hospital. *See* Sixth Am. Cplt. (Dckt. No. 247). Pinning down what claims are pending against which Defendants takes a bit of work. Some claims are against some Defendants, and some claims are against all Defendants. *Id.* at ¶¶ 88–174. Oftentimes, Slabon

---

[6] The list of Defendants in the case caption did not match the list of Defendants in the first paragraph of the complaint. For a summary, *see* 9/28/20 Mem. Opin. and Order, at 12 n.4 (Dckt. No. 339).

asserts claims against "Defendants," without more, which the Court construes as claims against all Defendants.

Specifically, Slabon filed eight claims against the Hospital, including claims for unreasonable seizure under the Fourth Amendment (Count I), conspiracy to violate constitutional rights (Count II), substantive due process (Count III), excessive force (Count IV), unconstitutional conditions of confinement (Count VII), *respondeat superior* (Count IX), false imprisonment (Count XI), and intentional infliction of emotional distress (Count XII). The Hospital moved to dismiss all of the claims except Count XII.

Slabon also filed six claims against Defendant DiLoreto (the Chief Medical Officer), including conspiracy to violate constitutional rights (Count II), substantive due process (Count III), assault and battery (Count VI), unconstitutional conditions of confinement (Count VII), false imprisonment (Count XI), and intentional infliction of emotional distress (Count XII). DiLoreto moved to dismiss all of the claims except Count XII.

Finally, Slabon advanced 11 claims against the City of Chicago and various police officers and paramedics, including unreasonable seizure under the Fourth Amendment (Count I), conspiracy to commit constitutional violations (Count II), substantive due process (Count III), excessive force (Count IV), assault and battery (Count V), medical battery (Count VI), unconstitutional conditions of confinement (Count VII), a *Monell* claim (Count VIII), indemnification (Count X), false imprisonment (Count XI), and intentional infliction of emotional distress (Count XII).

This Court later ruled on motions to dismiss, which it granted in part and denied in part. *See* 9/28/20 Mem. Opin. and Order (Dckt. No. 339). That ruling trimmed the case, but a number

of claims remained. The last few pages of that Opinion summarized what claims this Court granted, and what this Court denied. *Id.* at 63–66.

In the interest of clarity, this Court ordered the parties to work together cooperatively, and prepare a chart of the claims that remained pending. *See* 9/29/20 Order (Dckt. No. 340). Slabon filed lots of claims against lots of people, and this Court dismissed some of them in its 66-page Opinion. So, this Court thought it would help everyone to have a definitive chart, as a quick-reference guide.

Defendants complied, but Slabon did not. On the due date, Defendants filed the Court-ordered chart. But Defendants reported that Slabon had refused to participate. *See* Statement of Pending Claims (Dckt. No. 343). Defendants attached emails where Slabon stated that he had "limited time." *See* Emails (Dckt. No. 343-1). "As a Pro Se litigant, Im [sic] sure you are well aware of the limited time I have at my disposal, I cant [sic] focus on drawing charts with brian wilson or playing make believe with the U.S [sic] District Court." *Id.*

Slabon's non-participation was unacceptable, as this Court explained in a subsequent Order. *See* 10/13/20 Order (Dckt. No. 344).

As things stand, the following claims remain pending: (1) an unreasonable seizure claim (Count I) against Officer Sanchez, Officer Cummens, Officer Adamski, Detective O'Brien, Paramedic Bishop, and Paramedic Strong; (2) an excessive force claim (Count IV) against Officer Sanchez, Officer Cummens, Officer Adamski, Paramedic Bishop, and Paramedic Strong; (3) an assault and battery claim (Count V) against Officer Sanchez, Officer Cummens, and Officer Adamski, plus the City (under *respondeat superior*); (4) a medical battery claim (Count VI) against the Hospital (under *respondeat superior*); (5) an unconstitutional conditions of confinement claim (Count VII) against Detective O'Brien; (6) an *respondeat superior* claim

24

(Count IX) against the Hospital for the actions of Nurse Benjamin; (7) an indemnification claim (Count X) against the City and the Hospital; (8) a false imprisonment claim (Count XI) against Officer Sanchez, Officer Cummens, Officer Adamski, Paramedic Bishop, and Paramedic Strong, plus the Hospital; and (9) an intentional infliction of emotional distress claim (Count XII) against Officer Sanchez, Officer Cummens, Officer Adamski, Detective O'Brien, Paramedic Bishop, and Paramedic Strong, plus the Hospital.

To make things easy for the reader, the Court will re-sort that list, and summarize the pending claims by *party*. The following claims remain pending against the City Defendants: (1) an unreasonable seizure claim (Count I) against Officer Sanchez, Officer Cummens, Officer Adamski, Detective O'Brien, Paramedic Bishop, and Paramedic Strong; (2) an excessive force claim (Count IV) against Officer Sanchez, Officer Cummens, Officer Adamski, Paramedic Bishop, and Paramedic Strong; (3) an assault and battery claim (Count V) against Officer Sanchez, Officer Cummens, and Officer Adamski, plus the City (under *respondeat superior*); (4) an unconstitutional conditions of confinement claim (Count VII) against Detective O'Brien; (5) an indemnification claim (Count X) against the City; (6) a false imprisonment claim (Count XI) against Officer Sanchez, Officer Cummens, Officer Adamski, Paramedic Bishop, and Paramedic Strong; and (7) an intentional infliction of emotional distress claim (Count XII) against Officer Sanchez, Officer Cummens, Officer Adamski, Detective O'Brien, Paramedic Bishop, and Paramedic Strong.

The following claims remain pending against the Hospital: (1) a medical battery claim (Count VI) (under *respondeat superior*); (2) an *respondeat superior* claim (Count IX) for the actions of Nurse Benjamin; (3) an indemnification claim (Count X); (4) a false imprisonment claim (Count XI); and (5) an intentional infliction of emotional distress claim (Count XII).

25

Detective O'Donnell is not a defendant. He passed away after the filing of the lawsuit, but Slabon did not substitute the estate in a timely manner. So this Court dismissed him. *See* 11/12/20 Suggestion of Death (Dckt. No. 351); 11/16/20 Order (Dckt. No. 353); 3/1/21 Order (Dckt. No. 388).

Dr. Barrick is not a defendant. Slabon asserted claims against him in the sixth amended complaint, alleging that he witnessed the conduct of others. This Court dismissed those claims at the motion-to-dismiss stage. *See* 9/28/20 Mem. Opinion and Order, at 61–63 (Dckt. No. 339).

Nurse Benjamin is not a defendant. Slabon named her in the complaints, but never served her with process. So the Court dismissed her. *See* 2/26/18 Order (Dckt. No. 138); 7/2/19 Order (Dckt. No. 233); 11/12/19 Order (Dckt. No. 271).

Defendant DiLoreto is not a defendant. He was the Chief Medical Officer of the Hospital. But the complaint did not allege that he played any role in the events in question. So the Court dismissed him. *See* 9/28/20 Mem. Opinion and Order, at 35–36, 42–44 (Dckt. No. 339).

To make things easy to follow, the Court will address the claims against the City Defendants, and then will turn to the claim against the Hospital.

In recent months, Slabon has filed repeated motions, accusing the Clerk's Office of deliberately altering his electronic filings. He also accused this Court's Courtroom Deputy of "gaslighting" him.[7]

---

[7] *See* Mtn., at ¶¶ 7–10 (Dckt. No. 391) (stating that Dckt. No. 381 "is not the original filing," that it was somehow "damaged and/or deliberately altered," and that "[i]t is impossible for [Slabon] to have committed such an error"); Mtn. (Dckt. No. 401) (stating that Slabon "discovered that once again his electronic filing had been altered," and that the "incident was the second consecutive alternation" to his "electrically [sic] filed response[s]"); 5/14/21 Order (Dckt. No. 396); 6/8/21 Order (Dckt. No. 402); 7/16/21 Order (Dckt. No. 411); *see also* 7/16/21 Order (Dckt. No. 411) ("Plaintiff has surrendered the privilege of communicating by email with the Courtroom Deputy.").

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Once a party has made a properly-supported motion for summary judgment, the nonmoving party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'") (quoting Fed. R. Civ. P. 56(e)).

Summary judgment is the time for evidence, not allegations. "At summary judgment, the nonmovant plaintiff must provide evidence that when viewed in the light most favorable to him, suffices to prove every element of his claim for which he bears the burden of proof." *Pulera v. Sarzant*, 966 F.3d 540, 549 (7th Cir. 2020). A district court will enter summary judgment for the defendants "[i]f the plaintiff fails to show at least a triable issue on each element." *Id.*; *see also Burton v. Kohn Law Firm. S.C.*, 934 F.3d 572, 578–79 (7th Cir. 2019)

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather

determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## I.    The Claims Against the City Defendants.

In response to the City Defendants' motion for summary judgment, Slabon lobbed all sorts of complaints about the Chicago Police Department. He called the police "profiteers of crime." *See* Pl's. 56.1(b) Am. Resp. Statement, at 1 (Dckt. No. 392, at 7 of 19). He complained about the failure of the police to wear body cams. *Id.* at 2. He added that the police "routinely torture suspects into false confessions," and follow a "code of silence." *Id.* at 1–2. He pointed to the DOJ's civil rights investigation into the Chicago Police Department, and submitted a copy of the DOJ report. *Id.* at 1; *see also* Dep't of Justice, *Investigation of the Chicago Police Department* (Dckt. No. 392-4); Pl.'s 56.1(b) Am. Resp. Brf., at 1 (Dckt. No. 392, at 1 of 19).

That's not the issue. The issue here is whether Slabon has come forward with evidence sufficient to support a verdict in his favor by a reasonable jury. The topic at hand is the sufficiency of the evidence in the record before this Court, not reasonableness of the conduct of the Chicago Police Department more generally.

The question is whether there is any need for a trial, based on the record before this Court. After reviewing the evidence submitted by Defendants, and the lack of evidence submitted by Plaintiff, the answer is straightforward. There is no genuine issue about any material facts, so there is no need for a trial.

28

A.    **Unlawful Seizure (Count I).**

The first remaining claim against the City Defendants is unlawful seizure. Slabon brings an unreasonable seizure claim under the Fourth Amendment (Count I) against Officer Sanchez, Officer Cummens, Officer Adamski, Detective O'Brien, Paramedic Bishop, and Paramedic Strong. *See* Sixth Am. Cplt., at ¶¶ 88–109 (Dckt. No. 247).

Part of the claim involves a seizure of property. And part of the claim involves a seizure of Slabon himself.

The claim about the seizure of property cannot survive. In the sixth amended complaint, Slabon alleged that Detective O'Brien entered his home and "removed $2,100 in hidden cash without any justification." *Id.* at ¶ 72. He complained about missing keys, too. *Id.* at ¶ 73.

At deposition, Slabon testified that he came home after 25 months in prison, and found money missing. *See* Slabon Dep., at 166:22 – 171:8 (Dckt. No. 362-1). Slabon admitted that he was simply making an assumption about who took it. *Id.* at 170:13 – 171:8. "But, yes, I would say that's an assumption because there's no proof of it." *Id.* at 170:24 – 171:1.

Detective O'Brien submitted a declaration, and he stated that he did not take any money or other property from Slabon's home. *See* O'Brien Decl., at ¶¶ 5–9 (Dckt. No. 362-9). Slabon did not respond to that fact, and did not offer any facts of his own. So it is deemed admitted.

The only evidence in the record is that Detective O'Brien did not take any money or belongings from Slabon's home. So the Court grants summary judgment to Detective O'Brien on the claim about the alleged seizure of funds.

The other part of the seizure claim involves Slabon himself. The exact parameters of the claim are not perfectly clear. The sixth amended complaint includes a factual narrative that

outlines what happened.  Count I is the unlawful seizure claim, and it refers obliquely to the "conduct" and "actions" of the defendants, without pinning down what Slabon was referring to.

Reading the complaint in Slabon's favor, the seizure claim appears to involve removing Slabon from the living room, taking him to the hospital, and placing him under arrest at the hospital.  So the claim involves three alleged seizures:  (1) in the house; (2) out of the house; (3) off to jail.

The first part of the seizure claim involves removing Slabon from the living room and taking him to the bedroom.  The undisputed facts show that Slabon has no claim.  The paramedics were attending to Slabon's mother, who was laying the floor, unresponsive.  Slabon was screaming hysterically, and flailing his arms.  *See* City Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 362).

He attempted to reach his mother, and a firefighter had to block him.  *Id.* at ¶ 12.  And then, Officer Sanchez had to step in and block Slabon from interfering with the paramedics.  *Id.* at ¶ 14.  Officer Sanchez attempted to calm Slabon down, and instructed him to stay on the couch and stay away from the paramedics.  *Id.* at ¶ 15.  But Slabon continued to flail, scream hysterically, and get up from the couch.  *Id.* at ¶ 16.  He seemed intoxicated.  *Id.* at ¶ 17.  Slabon did not follow directives to calm down, and he did not cooperate when officers attempted to move him.  *Id.* at ¶ 18.  At that point, Officers Sanchez and Mackin placed him in cuffs and took him to another room.  *Id.* at ¶ 19.

Nothing about that encounter could give rise to a claim.  Paramedics were attempting to revive a woman, and Slabon was interfering with that effort.  So officers removed him from the area.  Officer Cummens set the scene during his testimony in the criminal case:  "What I do believe is that you were, for some reason, trying to get to the victim, okay, but, at that point, the

fire personnel needed to do their job. They needed that area to work on the victim. And by you trying to get into that area, they weren't able to do that, okay?" *See* 9/30/14 Tr., at 49:23 – 50:4 (Dckt. No. 392-3, at 49–50 of 55).

The failure to follow directions – by getting in the way, getting off the couch, failing to cooperate, and requiring a firefighter and then an officer to restrain him – obstructed the ability of the team to provide care. *See* 720 ILCS 5/31-1(A) (providing that a party commits obstruction when he "knowingly resists or obstructs the performance by one known to the person to be a peace officer [or] firefighter . . . of any authorized act within his or her official capacity"). Based on the undisputed facts, no reasonable jury could conclude that restraining Slabon and removing him from the room was unreasonable.

The second part of the seizure claim involves removing Slabon from the home and taking him to the hospital. The undisputed facts preclude that claim, too.

The Fourth Amendment governs seizures, including civil seizures. "[S]eizures made to effectuate an involuntary mental health commitment are analyzed under the Fourth Amendment's 'probable cause' standard." *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013). Probable cause exists where there are "reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Villanova v. Abrams*, 972 F.2d 792, 795 (7th Cir. 1992).

The police can take a person into custody for mental health treatment when the officer has "reasonable grounds to believe that the person is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization to protect such person or others from physical harm." *See* 405 ILCS 5/3-606. "The probable cause inquiry is an *objective* one; the subjective motivations of the officer do not invalidate a [Fourth Amendment action] otherwise

31

supported by probable cause." *Carmichael v. Vill. of Palatine,* 605 F.3d 451, 457 (7th Cir. 2010) (emphasis in original).

Based on the undisputed facts, the police had more than ample reason to take Slabon to the hospital. Slabon continued to scream uncontrollably after he left the living room. *See* City Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 362). Slabon appeared to be under the influence of some unknown substance. *Id.* at ¶ 17. When he heard the news that his mother had died, Slabon made suicidal comments, such as "kill me" and "I don't want to live." *Id.* at ¶ 30. The officers decided that Slabon posed a risk of self-harm. *Id.* at ¶ 32. Based on the record – uncontrollable screaming, a failure to cooperate, apparent intoxication, and statements about killing himself – the police had an objectively reasonable basis for sending him to the hospital.

The third part of the seizure claim involves placing Slabon under arrest. That claim cannot survive, either. The undisputed facts reveal that the police arrested Slabon after he kicked a nurse. *Id.* at ¶ 55; Def. POLR's Statement of Facts, at ¶ 22 (Dckt. No. 355). Slabon was later charged and convicted of battery. The conviction stands, and he cannot bring a civil claim that challenges the facts underlying that conviction. *See Heck v. Humphrey*, 512 U.S. 477, 489 (1994).

Slabon argues that he was "arrested for a crime he did not commit." *See* Pl.'s 56.1(b) Am. Resp., at 1 (Dckt. No. 392, at 13 of 19). That ship has sailed. He was found guilty in the criminal case, and this civil case is not a forum to challenge that state court judgment.

The Court grants summary judgment to Officer Sanchez, Officer Cummens, Officer Adamski, Detective O'Brien, Paramedic Bishop, and Paramedic Strong on the unreasonable seizure claim (Count I).

### B. Excessive Force (Count IV)

The second remaining claim against the City Defendants is excessive force.  Slabon brings an excessive force claim (Count IV) against Officer Sanchez, Officer Cummens, Officer Adamski, Paramedic Bishop, and Paramedic Strong.  *See* Sixth Am. Cplt., at ¶¶ 121–33 (Dckt. No. 247).

The Fourth Amendment governs excessive force claims leading up to an arrest.  *See Graham v. Connor*, 490 U.S. 386, 388 (1989).  A "claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard."  *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014); *Taylor v. City of Milford*, 2021 WL 3673235, at *3 (7th Cir. Aug. 19, 2021).  To bring an excessive force claim, a plaintiff must show that (1) there was a seizure; and (2) the seizure was objectively unreasonable.  *See Campbell v. White*, 916 F.2d 421, 423 (7th Cir. 1990).

When evaluating objective unreasonableness, courts look from the "perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Plumhoff*, 572 U.S. at 775 (quoting *Graham*, 490 U.S. at 396–97).

 "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (cleaned up).  The test is "not capable of precise definition or mechanical application," but "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." *Id.* (cleaned up); *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015).

Viewing the facts in the light most favorable to Slabon (as the non-movant), the Court concludes that no reasonable jury could conclude that the officers and paramedics used excessive force against him.

The record is simply barren of any evidence that the force was unreasonable and thus crossed a constitutional line. The officers did place Slabon in handcuffs. In certain circumstances, the act of placing a person in handcuffs can give rise to a claim (for example, if they are too tight, and cause an injury). *See Payne v. Pauley*, 337 F.3d 767, 779–80 (7th Cir. 2003). But that's not this case. The undisputed evidence confirms that Slabon was not injured in that process. *See* City Defs.' Statement of Facts, at ¶ 19 (Dckt. No. 362).

The police did remove him from the home, and the paramedics took him to the hospital. But there is no evidence that Slabon was injured when he was *en route*. *Id.* at ¶ 41; *see also* Sixth Am. Cplt., at ¶ 15 (Dckt. No. 247) (admitting that he was "not . . . injured" when the police took him to the hospital); *id.* at ¶ 35 (admitting that he told Dr. Barrick that "he was not injured in any way"). The police did place him in handcuffs after he kicked the nurse, but there is no evidence that that force was excessive, either.

In sum, there is no evidence that the police and the paramedics used excessive force. They did restrain him, but that's not enough. To bring a claim, Slabon needed to come forward with evidence that Defendants used force against him that was objectively unreasonable. He offered no such evidence, so he cannot get to a jury.

Slabon also brought a claim against Officer Cummens for conduct that allegedly took place when Slabon was in the hospital. According to the sixth amended complaint, Officer

Cummens pulled on the catheter tube, and did so to inflict pain. "Plaintiff observed Defendant CUMMENS was holding in his hand a tube that lead into Plaintiffs [sic] bladder, Defendant CUMMENS began tugging and pulling this tube deliberately causing excruciating pain and suffering while asking 'how does this feel tough guy.'" *See* Sixth Am. Cplt., at ¶ 40 (Dckt. No. 247).

That claim is a personal injury claim against a state employee, which means that a one-year statute of limitations applies. *See* 745 ILCS 10/8-101(a); *see also Herrera v. Cleveland*, 8 F.4th 493, 495 n.2 (7th Cir. 2021) ("Section 1983 provides a federal cause of action, but the forum state's personal injury law determines the length of the statute of limitations."). Slabon was hospitalized on January 27, 2014. *See* City Defs.' Statement of Facts, at ¶ 6 (Dckt. No. 362). He filed the complaint on October 8, 2015, more than one year later. So his claim is time barred.

It is true that Illinois applies a two-year statute of limitations, not a one-year statute of limitations, for injuries "arising out of patient care." *See* 745 ILCS 10/8-101(b). That provision basically ensures that a medical malpractice claim has a two-year limitations period, regardless of whether the medical care takes place in a private or public facility. *See Kaufmann v. Schroeder*, 241 Ill. 2d 194, 349 Ill. Dec. 151, 946 N.E.2d 345, 349 (2011) ("[B]y adding subsection (b), a person who suffers injuries arising out of patient care would not be disadvantaged by a shortened limitations period simply because he or she happened to obtain treatment at a public facility rather than a private one.").

It is true that the catheter incident took place while Slabon was receiving medical care. But the claim does not "aris[e] out of patient care." *See* 745 ILCS 10/8-101(b). Officer

35

Cummens is not a doctor. He's a police officer. And he wasn't providing patient care. The claim does not involve an allegation that Officer Cummens botched medical care.

The claim involves an allegation that Officer Cummens inflicted gratuitous pain while Slabon was in the hospital. That's a personal injury claim, but not a claim about patient care. So a one-year statute of limitations applies. *See Kaufmann*, 946 N.E.2d at 349–50 (holding that a sexual abuse claim did not arise from patient care, and thus the one-year statute of limitations applied); *Holliman v. Cook County*, 2016 WL 4678312, at *2-3 (N.D. Ill. 2016) ("As in *Kaufmann*, plaintiff does not allege that he suffered harm from any medical treatment he received. Instead, plaintiff alleges that his damages arise from the sexual abuse that he suffered at the hands of Thompson.") (concluding that the one-year statute of limitations applied).

The same conclusion applies to the related allegation that Officer Cummens put his elbow on Slabon's throat when he was restrained in the hospital. *See* Sixth Am. Cplt., at ¶ 37 (Dckt. No. 247). An elbow to the throat may be an injury, but it isn't medical care. So it's time barred.[8]

The Court grants summary judgment to Officer Sanchez, Officer Cummens, Officer Adamski, Paramedic Bishop, and Paramedic Strong on the excessive force claim (Count IV).

## C.     Assault and Battery (Count V)

The third remaining claim against the City Defendants is assault and battery. Slabon brings an assault and battery claim (Count V) against Officer Sanchez, Officer Cummens, and Officer Adamski, plus the City (under *respondeat superior*). *Id.* at ¶¶ 134–39.

Under Illinois law, a person commits an assault when "he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." *See* 720 ILCS

---

[8] In the alternative, in this particular incident, Slabon offers no evidence that it took place, let alone that the force was excessive.

5/12-1.  And a battery occurs when someone "knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual."  *See* 720 ILCS 5/12-3.  Battery involves "offensive touching."  *Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003).

An assault is a gesture, and a battery is a touch.  "The common law, both civil and criminal, distinguishes between 'assault' and 'battery.'  Assault is an intentional threatening gesture (such as pointing a gun at a person or trying but failing to strike him with one's fist) that does not, however, result in physical contact with the victim.  Battery is an intentional, unconsented-to, injurious or otherwise offensive physical contact with the victim (a completed assault, so to speak)."  *United States v. Watts*, 798 F.3d 650, 652 (7th Cir. 2015).

The complaint alleges a different theory of assault and battery for the three defendants.  Officer Sanchez put Slabon in handcuffs.  *See* Sixth Am. Cplt., at ¶ 13 (Dckt. No. 247).  Officer Cummens and Officer Adamski physically restrained him in the hospital room.  *Id.* at ¶ 37.

Slabon's claim of assault and battery is time barred.  "Under Illinois law, a plaintiff may sue a defendant for assault and battery within two years of the occurrence of the alleged injury."  *See Thompson v. Vill. of Monee*, 2013 WL 3337801, at *24 (N.D. Ill. 2013) (citing 735 ILCS 5/13-202).  But when the defendant is a public employee, the statute of limitations is cut in half – a plaintiff must "bring the suit . . . within one year of the occurrence of the alleged assault or battery."  *Id.* (citing 745 ILCS 10/8-101); *see also Hudson v. Ne. Illinois Regional R.R. Corp.*, 2019 WL 4261581, at *5 (N.D. Ill. 2019) ("Although Illinois generally applies a two-year statute of limitations to personal injury claims, *see* 735 ILCS 5/13-202, a personal injury suit against a government entity . . . must be brought within one year.").

The statute in question applies to government entities themselves, as well as their employees. *See* 745 ILCS 10/8-101(a) ("No civil action other than an action described in subsection (b) may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued."); *see also Holliman*, 2016 WL 4678312, at *2 ("Illinois law generally requires a civil action against a local entity or any of its employees for an injury to be filed within one year from the date of the injury.").

In sum, assault and battery claims against a state employee have a one-year statute of limitations. *See, e.g.*, *Holliman*, 2016 WL 4678312, at *3; *Moore v. Phillips*, 2018 WL 1071717, at *5 (S.D. Ill. 2018) (holding that the "applicable statute of limitations is 1 year under the Illinois Local Government Employees Tort Immunity Act" for an assault and battery claim against police officers); *Thompson*, 2013 WL 3337801, at *24; *Grzanecki v. Cook Cty. Sheriffs Police Dep't*, 2011 WL 3610087, at *2 (N.D. Ill. 2011).

Under Illinois law, a cause of action for assault and battery accrues on the day that the injury occurred. *See, e.g., Atwater v. Bd. of Educ. of City of Chicago*, 2012 WL 13059088, at *3 (N.D. Ill. 2012) ("Under Illinois law, a cause of action 'for assault and battery accrues at the moment of injury.'") (citation omitted); *see also Vandenburgh v. Bannockburn Police Officer Robert Ogden*, 2016 WL 403663, at *3 (N.D. Ill. 2016) ("VanDenburgh's negligence and assault and battery claims accrued on the date of the incident . . . ."); *Thompson*, 2013 WL 3337801, at *24; *Grzanecki*, 2011 WL 3610087, at *2 ("Plaintiff's claim for 'assault and battery' is an Illinois state-law claim against a state employee; therefore it is governed by the Tort Immunity Act. That claim accrued on November 15, 2008 – the day of the incident.").

Here, incident in question took place on January 27, 2014. *See* City Defs.' Statement of Facts, at ¶ 6 (Dckt. No. 362). Slabon filed the original complaint on October 8, 2015, more than one year later. *See* Cplt. (Dckt. No. 1). He makes no argument for the application of any tolling doctrine. Slabon filed suit more than one year after the incident, so he filed too late to bring a claim for assault and battery.

The Court grants summary judgment to Officer Sanchez, Officer Cummens, Officer Adamski, and the City on the assault and battery claim (Count V).[9]

### D. Conditions of Confinement (Count VII)

The fourth remaining claim against the City Defendants is about his conditions of confinement. Slabon brings an unconstitutional conditions of confinement claim under the Fourth Amendment (Count VII) against Detective O'Brien. *See* Sixth Am. Cplt., at ¶¶ 144–56 (Dckt. No. 247).

Count VII involves the treatment of Slabon after his arrest (for kicking the nurse), but before he had a probable cause hearing. So he was an arrestee, not a pretrial detainee. As a result, the Court analyzes Slabon's claim under the Fourth Amendment. *See Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020) ("Before a finding of probable cause, the Fourth Amendment protects an arrestee; after such a finding, the Fourteenth Amendment protects a pretrial detainee."); *Currie v. Chhabra*, 728 F.3d 626, 629–30 (7th Cir. 2013) (holding that the Fourth Amendment governs "the period of confinement between arrest without a warrant and the [probable cause determination]") (quoting *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992)).

---

[9]  In addition, the Illinois Tort Immunity Act requires proof of willful and wanton conduct when the claim is against a public employee for an "act or omission in the execution or enforcement of any law." *See* 745 ILCS 10/2-202. Slabon provided no such evidence. That failure of proof is an independent ground for summary judgment on all of the state law claims against the City Defendants.

There are two possible theories of liability for an arrestee in this situation: a claim about a failure to provide medical care, and a claim about conditions of confinement. *See Currie*, 728 F.3d at 629–30 (collecting cases); *Bradford v. City of Chicago*, 2021 WL 1208958, at \*4 (N.D. Ill. 2021); *Alcorn v. City of Chicago*, 2018 WL 3614010, at \*12 (N.D. Ill. 2018); *Saucedo v. City of Chicago*, 2015 WL 3643417, at \*4 (N.D. Ill. 2015). The same "objective reasonableness" standard under the Fourth Amendment applies to each theory. But when courts articulate each standard, they put it a bit differently.

It is unclear which theory Slabon asserts. The claim against Detective O'Brien involves exposure to the cold, but Slabon doesn't specify if he is alleging an unconstitutional failure to provide medical care or unconstitutional conditions of confinement.[10] The sixth amended complaint alleges that Slabon suffered from "extreme cold" and sleep deprivation. *See* Sixth Am. Cplt., at ¶ 65 (Dckt. No. 247) ("After transport, a [sic] interview followed conducted by O'DONNELL AND O'BRIEN, Plaintiff was in extreme anguish from the extreme cold and sleep depravation [sic]."); *id.* at ¶ 75 ("Plaintiff was transported to hospital after 48 hours in police custody en route to county jail at which time Plaintiff was taken to a near by [sic] hospital and was treated for exposure to cold and malnourishment."); *see also id.* at ¶ 70 (alleging that Slabon needed "additional protection from the extreme cold" at "all times" during police

---

[10] Slabon's heading for Count VII is "Unconstitutional Conditions and Treatment During Warrantless Detention." *See* Sixth Am. Cplt., at ¶ 144 (Dckt. No. 247). As discussed, though, the core of his claim is that Detective O'Brien ignored his pain from extreme cold and sleep deprivation. *Id.* at ¶ 65. The line between a claim about a failure to provide medical care (on the one hand) and a claim about conditions of confinement (on the other) is blurry here. At what point does the temperature of an arrestee's confinement create a medical need, and not merely involve the conditions of confinement? A cold cell is uncomfortable, but at some point, as temperatures continue to fall, the situation presumably would change from a condition of confinement to a medical need (for warmth). The City Defendants didn't interpret Slabon's claim under either theory, relying on older case law before the distinction arose. *See* Mem. in Supp. of Defs.' Mtn. for Summ. J., at 14–15 (Dckt. No. 363). This Court's prior ruling also didn't take a position on which theory applied. *See* 9/28/20 Mem. Opin. and Order, at 47–49 (Dckt. No. 339).

custody). But in the end, it does not matter. Slabon does not present enough evidence to support either theory.

This Court starts by viewing the claim as alleging a failure to provide medical care. To determine whether Detective O'Brien's response to Slabon's medical need was objectively unreasonable, the Court looks at four factors: (1) whether the detective had notice of the conditions; (2) the seriousness of the conditions; (3) the scope of the requested solution; and (4) police interests, including "administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011).

The case is now at the summary judgment stage, which means that Slabon needed to come forward with evidence in response to a properly supported motion for summary judgment. And here, Slabon has not offered evidence that could support a jury verdict in his favor.

Indeed, Slabon's claim fails at step one. He has not come forward with any evidence that the police exposed him to cold, let alone that Detective O'Brien knew about it. *See Saucedo*, 2015 WL 3643417, at *4 ("Objective reasonableness is not, however, measured by whether an officer *should* have had notice of a medical condition, but whether an officer having *actual* notice of an arrestee's medical condition acted reasonably."). Based on the facts in the record, Slabon did not make any comment that he was cold or needed medical care. *See* City Defs.' Statement of Facts, at ¶ 61 (Dckt. No. 362). He did not convulse from apparent exposure to cold, either. *Id.* Slabon was not diagnosed with or treated for hypothermia, and he suffered no lasting effects from being cold during police transport and processing. *Id.* at ¶ 63.

Slabon has failed to provide evidence that Detective O'Brien had notice of his condition, which is enough to grant summary judgment against him. *See Bradford*, 2021 WL 1208958, at *4 (granting summary judgement because "[t]here is no evidence that [Plaintiff] suffered from

mental health issues, threatened or engaged in self-harm in the past, or had suicidal ideations prior to his suicide, let alone that any of the Individual Defendants knew that he had"); *Alcorn*, 2018 WL 3614010, at *12 (dismissing the complaint because it "simply fails to allege sufficient notice [of medical need] as to several of the Individual CPD").

Slabon fails on the other prongs, too. He provides no evidence that his condition was serious, or that he requested a solution. So, viewing Count VII as a claim about the failure to provide medical care, Slabon has failed to come forward with evidence in his favor.

In the alternative, if the Court views Count VII as alleging a claim about the conditions of confinement, a separate test applies (or, at least, courts phrase it differently). To succeed under that standard (which is, again, the same Fourth Amendment "objective reasonableness" analysis), Slabon needed to show that "the totality of the defendant's conduct in detaining the arrestee was objectively unreasonable under the circumstances." *Bradford*, 2021 WL 1208958, at *7 (cleaned up).

"Unlike a medical care claim, a conditions of confinement claim does not require that the defendant have notice of the arrestee's medical need." *Id.* Rather, "[i]n assessing the totality of a defendant's conduct, courts consider several factors, including the duration of confinement, the nature and seriousness of the alleged constitutional violation, and the police rationale for the alleged deprivation of an arrestee's rights." *Alcorn*, 2018 WL 3614010, at *13 (citation omitted). The Court utilizes "common sense and ordinary human experience" in evaluating whether the detention was unreasonable. *Saucedo*, 2015 WL 3643417, at *5.

A different standard applies, but it ends in the same place. It is undisputed that Slabon was not harmed during his confinement, and he made no comments that he needed medical care. There is no evidence in the record about the extent of the cold, or the length of the exposure. A

reasonable jury, applying common sense and ordinary human experience, could not conclude that his confinement was unreasonable. *See Bradford*, 2021 WL 1208958, at \*8 (granting summary judgment after Plaintiff committed suicide in his cell, despite officers not removing harmful clothing, because officers abided by the required 15-minute cell checks and provided him with food and water). Applying a more wholistic analysis of the facts, Slabon's claim still fails.

The Court grants summary judgment to Detective O'Brien on Count VII.

### E. Indemnification (Count X)

The fifth remaining claim is an indemnification claim (Count X) against the City. *See* Sixth Am. Cplt., at ¶¶ 165–66 (Dckt. No. 247). But this Court is granting summary judgment to the City Defendants on all of Slabon's claims, so there is nothing to indemnify them *for*. The Court grants summary judgment to the City on the indemnification claim.

### F. False Imprisonment (Count XI)

The sixth remaining claim against the City Defendants is false imprisonment. Slabon brings a false imprisonment claim (Count XI) against Officer Sanchez, Officer Cummens, Officer Adamski, Paramedic Bishop, and Paramedic Strong. *See* Sixth Am. Cplt., at ¶¶ 167–70 (Dckt. No. 247).

To state a claim for false imprisonment under Illinois law, "the plaintiff must allege that his personal liberty was unreasonably or unlawfully restrained against his will and that defendant(s) caused or procured the restraint." *Rusinowski v. Vill. of Hillside*, 19 F. Supp. 3d 798, 813 (N.D. Ill. 2014) (quoting *Arthur v. Lutheran Gen. Hosp.*, 295 Ill. App. 3d 818, 230 Ill. Dec. 72, 692 N.E.2d 1238, 1243 (1998)). "Probable cause is an absolute bar to a claim for false imprisonment." *Makowski v. United States*, 27 F. Supp. 3d 901, 917 (N.D. Ill. 2014) (quoting

*Poris v. Lake Holiday Prop. Owners Ass'n*, 2013 IL 113907, 368 Ill. Dec. 189, 983 N.E.2d 993, 1007 (2013)).

"[I]mprisonment under legal authority is not false imprisonment." *Mayorov v. United States*, 84 F. Supp. 3d 678, 704 (N.D. Ill. 2015) (quoting *Arthur*, 692 N.E.2d at 1243). "False imprisonment claims do not lie for a detention made by virtue of legal process issued by a court or an official with jurisdiction to issue such process." *Id.*; *see also Brown v. Dart*, 876 F.3d 939, 941 (7th Cir. 2017) ("False imprisonment, for purposes of a § 1983 claim, is defined as detention without legal process.").

This Court previously dismissed the false imprisonment claim against Detective O'Brien and Detective O'Donnell. *See* 9/28/20 Mem. Opin. and Order, at 58 (Dckt. No. 339). Slabon cannot challenge his detention after kicking the nurse, because he was found guilty of kicking the nurse in the criminal case. The remaining part of the claim involves the individuals who arrived at Slabon's house – Officer Sanchez, Officer Cummens, Officer Adamski, Paramedic Bishop, and Paramedic Strong.

Slabon's claim fails, for two reasons. First, it is time barred. Under Illinois law, a false imprisonment claim against a state employee has a one-year statute of limitations. *See* 745 ILCS 10/8-101(a); *Brown v. Dart*, 2016 WL 6948382, at *2 (N.D. Ill. 2016). A threshold question is when a false imprisonment claim accrues. At common law, the tort of false imprisonment accrued "when the plaintiff was brought before a judge at the start of legal process . . . ." *Smith v. City of Chicago*, 3 F.4th 332, 337 (7th Cir. 2021).

Some cases suggest that a false imprisonment claim accrues when the party is released on bond. *See, e.g., Harrell v. Sheahan*, 937 F. Supp. 754, 758 (N.D. Ill. 1996). Others suggest that a false imprisonment claim accrues when the plaintiff was first imprisoned. *See, e.g., Kitchen v.*

*Burge*, 781 F. Supp. 2d 721, 739 (N.D. Ill. 2011) (providing that a state-law false imprisonment claim accrued when the plaintiff "knew that he had been falsely imprisoned" – that is, "when he was first imprisoned"); *Pierce v. Pawelski*, 2000 WL 1847778, at *2 (N.D. Ill. 2000); *see generally Brown*, 2016 WL 6948382, at *4 (discussing the accrual of a false imprisonment claim).

This case includes an added wrinkle. Slabon was detained civilly (at his home) and then criminally (at the hospital, for kicking the nurse). The remaining claim involves his civil detention (only), not his criminal detention. Appearing before a judge cannot be the starting point for the accrual of the claim about civil detention, because he didn't appear before a judge for the acts that gave rise to civil detention. The "start of legal process" cannot start the clock ticking for a false imprisonment claim about civil detention when there *is no* legal process about the civil detention. *See Smith*, 3 F.4th at 337.

Put another way, Slabon was detained for his civil conduct until he was arrested for kicking the nurse. At that point, he was detained for his criminal conduct. The moment of his transformation from civil detention to criminal detention is the last possible moment when a claim for *civil* detention can accrue. From that moment forward, he was detained criminally, not civilly, so the clock on any claim for his civil detention was ticking.

This Court concludes that a false imprisonment claim for civil detention accrues when the plaintiff knows about the detention (that is, on the day it happens). Here, Slabon knew that the police took him to another room in his home, and then took him to the hospital, on the day that it happened. That's January 27, 2014. He filed suit on October 8, 2015, more than a year later, so he filed suit too late.

Second, the undisputed facts demonstrate that Slabon's civil detention was justified. As discussed above, the record shows that the officers removed Slabon from the living room, and placed him in a bedroom, because he was causing commotion and disruption while paramedics attempted to revive his mother. And the officers detained him and took him to the hospital after he talked about killing himself. In light of those undisputed facts, no reasonable jury could return a verdict of false imprisonment.

The Court grants summary judgment to Officer Sanchez, Officer Cummens, Officer Adamski, Paramedic Bishop, and Paramedic Strong on the false imprisonment claim (Count XI).

### G.      Intentional Infliction of Emotional Distress (Count XII)

The seventh and final remaining claim against the City Defendants is an intentional infliction of emotional distress claim (Count XII) against Officer Sanchez, Officer Cummens, Officer Adamski, Detective O'Brien, Paramedic Bishop, and Paramedic Strong. *See* Sixth Am. Cplt., at ¶¶ 171–74 (Dckt. No. 247).

"Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress only if she establishes that (1) the defendant's conduct was truly extreme and outrageous; (2) the defendant intended to inflict severe emotional distress (or knew that there was at least a high probability that its conduct would cause severe emotional distress); and (3) the defendant's conduct did in fact cause severe emotional distress." *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017) (citing *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 278 Ill. Dec. 228, 798 N.E.2d 75, 80 (2003)); *see also Ulm v. Mem'l Med. Ctr.*, 2012 IL App (4th) 110421, 357 Ill. Dec. 953, 964 N.E.2d 632, 641 (2012).

"[T]o qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized

46

community." *Feltmeier*, 798 N.E.2d at 83. Courts conduct an objective, fact-based inquiry and "often consider the degree of power or authority which a defendant has over a plaintiff; whether the defendant reasonably believed that his objective was legitimate; and whether the plaintiff is particularly susceptible to emotional distress." *Gross v. Chapman*, 475 F. Supp. 3d 858, 864 (N.D. Ill. 2020) (cleaned up).

Slabon's claim fails, for two now-familiar reasons. First, he filed it too late. A claim of intentional infliction of emotional distress against a public employee has a one-year statute of limitations. *See Davenport v. Dovgin*, 545 F. App'x 535, 538–39 (7th Cir. 2013); *Stoller v. Costco Wholesale Corp.*, 2020 WL 247459, at *5 (N.D. Ill. 2020); 745 ILCS 10/8-101(a). Slabon's claim is about the conduct of the three officers and the two paramedics at his home, and the claim accrued on the day of the incident. *See Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013); *Stoller*, 2020 WL 247459, at *5; *Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 747 (N.D. Ill. 2016). Slabon filed suit more than a year after the incident, so he filed suit too late.

Second, there is nothing in the record that could support a jury verdict in favor of Plaintiff. The undisputed facts reveal that Slabon was disruptive when the officers and paramedics responded to a medical emergency. They moved him to another room, and then took him to the hospital when he threatened suicide.

The record does not include any evidence of any extreme or outrageous conduct (by the Defendants, anyway). And there is no evidence that the officers and paramedics intended to inflict any emotional distress, let alone severe emotional distress.

The Court grants summary judgment to Officer Sanchez, Officer Cummens, Officer Adamski, Detective O'Brien, Paramedic Bishop, and Paramedic Strong on the intentional infliction of emotional distress claim (Count XII).

## II.        The Claims Against the Hospital.

The other defendant, Presence Our Lady Resurrection Medical Center, filed for summary

judgment as well.  There are five remaining claim against the Hospital:  (1) medical battery

(Count VI); (2) *respondeat superior* (Count IX) for the actions of Nurse Benjamin;        (3)

indemnification (Count X); (4) false imprisonment (Count XI); and (5) intentional infliction of

emotional distress (Count XII).

### A.        Medical Battery (Count VI)

The first remaining claim against the Hospital is medical battery (Count VI).  *See* Sixth

Am. Cplt., at ¶¶ 140–43 (Dckt. No. 247).  The sixth amended complaint alleges that Dr. Barrick

and Nurse Benjamin "committed medical battery by . . . physically and chemically restraining

Slabon [] without his consent or medical justification."  *Id.* at ¶ 141.  He further alleges that they

committed medical battery "by providing medical treatment, without consent, and despite

specific and clear communication of refusal, thus intentionally creating an unwanted and

offensive touching of Slabon."  *Id.* at ¶ 142.

The medical treatment includes the chemical restraints, as well as the catheter.  *Id.* at

¶¶ 38–39.  Slabon attempts to hold the Hospital responsible for the unwanted medical treatment

under the doctrine of *respondeat superior*.

Again, a battery "is the unauthorized touching of the person of another."  *Fiala v.

Bickford Senior Living Grp., LLC*, 2015 IL App (2d) 150067, 398 Ill. Dec. 324, 43 N.E.3d 1234,

1240 (2015).  "The gist of an action for battery is the absence of consent on the plaintiff's part."

*Seibert v. Lee*, 2015 IL App (2d) 140945-U, ¶ 34 (2015) (citation omitted).

"The elements of a medical battery claim are:  (1) an intentional act on the part of the

defendant; (2) a resulting offensive contact with the plaintiff's person; and (3) a lack of consent

48

to the defendant's conduct." *See Sekerez v. Rush Univ. Med. Ctr.*, 2011 Ill App (1st) 090889,

¶ 43, 352 Ill. Dec. 523, 954 N.E.2d 383, 394 (2011). "A plaintiff claiming medical battery in

Illinois may recover if he shows 'a total lack of consent to the procedure performed, that the

treatment was contrary to the patient's will, or that the treatment was at substantial variance with

the consent granted.'" *See Parker v. United States*, 721 F. App'x 531, 532 (7th Cir. 2018)

(quoting *Fiala*, 43 N.E.3d at 1240).

But there is an exception for emergencies. The Mental Health and Developmental

Disabilities Code authorizes medical care – even if there is no consent – to prevent serious,

imminent harm when there is no other option: "If such [generally accepted mental health or

developmental disability] services are refused, they shall not be given unless such services are

necessary to prevent the recipient from causing serious and imminent physical harm to the

recipient or others and no less restrictive alternative is available." *See* 405 ILCS 5/2-107(a). An

exception for emergencies existed under the common law, too. *See Pantaleo v. Hayes*, 2013 WL

5311450, at *18 (N.D. Ill. 2013) ("Both common law and statutory exceptions to the need for

consent exist."); *Sekerez*, 954 N.E.2d at 395–96 (discussing the emergency exception under the

common law); Restatement (Second) of Torts § 892D (1979) (discussing emergency action

without consent); *see also Riggins v Nevada*, 504 U.S. 127, 134–35 (1992) ("[D]ue process

allows a mentally ill inmate to be treated involuntarily with antipsychotic drugs where there is a

determination that 'the inmate is dangerous to himself or others and the treatment is in the

inmate's medical interest.'") (citation omitted).

The existence of a medical emergency under the statute is an affirmative defense, so the

Hospital bears the burden of proof. *See Pantaleo*, 2013 WL 5311450, at *18. The statute sets a

high bar. Not any physical harm will do. The physical harm must be "serious and imminent."

*See* 405 ILCS 5/2-107(a). And the medical treatment must be a last resort, meaning that "no less restrictive alternative is available." *Id.* To make that showing, a defendant must offer testimony from a medical professional with knowledge of the standard of care. *See Pantaleo*, 2013 WL 5311450, at *18; *In re Estate of Allen*, 365 Ill. App. 3d 378, 302 Ill. Dec. 202, 848 N.E.2d 202, 212 (2006) ("The existence of a medical emergency involves the assessment of the patient's medical condition and, therefore, must be established by expert testimony.").

Based on the undisputed evidence, the Hospital has satisfied the elements for the affirmative defense.

Slabon arrived at the Hospital in handcuffs, and he was not well. In the criminal trial, Nurse Benjamin testified about how Slabon appeared when he arrived in the emergency room: "He appeared extremely agitated. He was screaming, yelling profanities. Was just yelling at everyone, being very disruptive to the emergency department." *See* 9/30/14 Tr., at 42:24 – 43:3 (Dckt. No. 235-6) (testimony of Nurse Benjamin).

Dr. Barrick saw Slabon rocking back and forth, weeping, and cursing. *See* Def. POLR's Statement of Facts, at ¶ 6 (Dckt. No. 355). He seemed agitated and emotionally distraught. *Id.* at ¶¶ 6–7.

Dr. Barrick had significant expertise dealing with patients with psychiatric issues. *Id.* at ¶ 6. He stepped in to lend a hand. *Id.* at ¶ 7. When the doctor asked Slabon why he was there, Slabon responded with expletives, and told him that his mother had passed away. *Id.* at ¶ 8. The staff moved Slabon to a hospital room because he was agitated and disruptive. *Id.* at ¶ 10.

At the criminal trial, Nurse Benjamin testified about the commotion that Slabon was causing: "The defendant was being extremely disruptive and screaming and yelling, so we wanted to put him somewhere where he would not be disruptive to other patients in the

emergency department." *See* 9/30/14 Tr., at 45:9-12 (Dckt. No. 235-6) (testimony of Nurse

Benjamin). Dr. Barrick also testified about their concerns that Slabon was a threat to everyone's

safety: "With the language that he was speaking and the curse words and the – how loud he was

and how aggressive he was acting, our concern was both for his safety, the safety of our staff, as

well as to keep that kind of isolated and away from other patients." *See* 10/1/14 Tr., at 13:7-12

(Dckt. No. 235-8) (testimony of Dr. Barrick).

Things continued to go downhill. Slabon refused to lay down. *See* City Defs.' Statement

of Facts, at ¶ 46 (Dckt. No. 362). When Nurse Benjamin told him that she was going to take his

vital signs, Slabon responded with expletives and racial slurs. *See* Def. POLR's Statement of

Facts, at ¶ 14 (Dckt. No. 355). He refused to answer questions, responding with "more

expletives and profanities." *Id.* at ¶ 15.

The word "profanities" probably doesn't do it justice. *See* 9/30/14 Tr., at 46:24 – 47:1

(Dckt. No. 235-6) (testimony of Nurse Benjamin) ("He responded by calling me a stupid Jew

and a dirty b**ch."); *id.* at 47:12-13 (testimony of Nurse Benjamin) ("He called me a f***ing fat

b**ch and that nobody would ever want to f*** me.").

The police cuffed Slabon to the bed while the nurse attempted to take his vital signs. *See*

City Defs.' Statement of Facts, at ¶ 47 (Dckt. No. 362). But he continued to move around, so the

nurse could only take his pulse. *See* Def. POLR's Statement of Facts, at ¶ 17 (Dckt. No. 355);

*see also* City Defs.' Statement of Facts, at ¶ 48. "He was fighting. He was moving his arm

around. He was refusing to enable her to do just about anything." *See* 10/1/14 Tr., at 20:14-16

(Dckt. No. 235-8) (testimony of Dr. Barrick).

Dr. Barrick tried to defuse the situation, without success. *Id.* at 12:4-11, 21:8 – 22:15.

"As we were transferring him over, I kept say, hey, listen. We need to think about your mom

right now. How would your mom be if she was standing right here? What would she think about? I was trying to identify with him so he can hopefully prioritize his actions a little different than what he was doing." *Id.* at 22:2-8. Instead of calming down, Slabon "target[ed] his aggressions" toward the nurse. *Id.* at 22:12.

Slabon looked directly at Nurse Benjamin and made more vulgar and profane comments. *See* Def. POLR's Statement of Facts, at ¶ 16 (Dckt. No. 355); *see also* 9/30/14 Tr., at 48:6-7 (Dckt. No. 235-6) (testimony of Nurse Benjamin) ("Continued to yell profanities at me saying f*** you, you stupid b**ch, you fat whore."); *id.* at 49:2-4 ("He looked at me and said don't touch me you dirty Jew. You're a f***ing Jew. I know you're a Jew because your eyes are close together."); *id.* at 50:5-8 ("He continued to use verbal assault against me. He told me I was a fat c**t whore and that nobody would ever love me, nobody would ever f**k me and he called me a dirty k*ke.").

In the criminal trial, Dr. Barrick described Slabon as "agitated, angered. He was moving around, didn't want us to touch him, didn't want us to move him into the bed. Very aggressive." *See* 10/1/14 Tr., at 17:8-10 (Dckt. No. 235-8) (testimony of Dr. Barrick). "He told us to go f*** off." *Id.* at 18:2. "Get your f***ing hands off me. Don't touch me, you c**t b**ch, type of thing." *Id.* at 18:20-21.

Slabon became increasingly combative, and threatened to start spitting on Nurse Benjamin.[11] *See* City Defs.' Statement of Facts, at ¶ 48 (Dckt. No. 362).

---

[11] Slabon may have *actually* spit on Nurse Benjamin, too. But the record is not perfectly clear on this point. In its statement of facts, the Hospital included the following statement: "Plaintiff then started spitting at Nurse Benjamin." *See* Def. POLR's Statement of Facts, at ¶ 17 (Dckt. No. 355). The Hospital cited page 50 of the transcript from the criminal trial. *Id.* But in the passage in question, Nurse Benjamin testified that he *threatened* to spit at everyone, not that he actually *did* spit at everyone. *See* 9/30/14 Tr., at 50:16-8 (Dckt. No. 235-6) (testimony of Nurse Benjamin) ("At that time he was starting to make spitting sounds and threating to spit at everyone in the room."). For purposes of this ruling, the Court finds that there is evidence that Slabon threatened to spit on everyone, not that he actually did so. Still,

That's when Dr. Barrick determined that de-escalation tactics had failed. He ordered chemical and physical restraints in light of Slabon's agitated and combative demeanor. *See* Def. POLR's Statement of Facts, at ¶ 18 (Dckt. No. 355). He ordered both forms of restraint, for safety reasons. *See* 10/1/14 Tr., at 22:9 – 28:24 (Dckt. No. 235-8) (testimony of Dr. Barrick). After Nurse Benjamin injected Slabon with medication, he responded: "do it again, b**ch." *See* 9/30/14 Tr., at 54:4 (Dckt. No. 235-6) (testimony of Nurse Benjamin).

The decision to restrain Slabon proved prescient. But it did not prevent an attack. Not much later, Slabon kicked Nurse Benjamin, sending her flying across the room.

Based on the undisputed facts, the Hospital has satisfied the requirements for the emergency aid exception under the statute. Slabon was highly disruptive, and refused to cooperate. He didn't lay down. He didn't answer questions. When he did respond, he spewed profanities and racial slurs. He used highly threatening speech. Everything about his behavior was threatening, in word and deed.

He threatened to spit at the nurse. Spitting on someone is a threatening act, and is a reliable predictor of future violence. In fact, "deliberately spitting in a person's face" is "criminal assault." *See Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 676 (7th Cir. 2003); *see also id.* (observing the connection between spitting and violence). Threatening to spit on someone is an unmistakable sign that things are spinning out of control.

The Hospital carried its burden by presenting evidence satisfying all of the elements of the defense. The record shows a dangerous situation. And all other attempts to calm Slabon and defuse the situation had failed. Put yourself in their position. What else were they supposed to do?

---

threatening to spit on everyone – including medical professionals, police officers, and paramedics – is a good sign that things are trending in a bad direction.

On the flipside, Slabon offers nothing. He did not offer any evidence that he was not posing a danger to anyone. He also does not offer any evidence that the hospital staff had other alternatives. *Cf. Pantaleo*, 2013 WL 5311450, at *19 (denying summary judgment on the emergency exception to medical battery because the plaintiff offered testimony from a medical professional about other alternatives).

In sum, the Hospital gave medical treatment (an injection, and later a catheter) to Slabon without his consent. But based on the undisputed facts, this case fits comfortably within the emergency aid exception, so Slabon has no claim for medical battery. *See Mims v. Hoffman*, 2013 WL 5423851, at *7 (N.D. Ill. 2013) (granting summary judgment to a doctor on a medical battery claim based on the emergency aid exception when the patient was "suffering from some sort of psychosis and needed to be stabilized so that she could be evaluated"); *see also Banks v. Mills*, 2013 WL 1438104, at *9 (N.D. Ill. 2013) (granting summary judgment to a doctor on an Eighth Amendment claim about the involuntary use of anti-psychotic drugs, given the inmate's aggressive behavior, and given the lack of "evidence of any alternative treatment plan"). No reasonable jury could conclude otherwise.

The Court grants summary judgment to the Hospital on the medical battery claim (Count VI).

### B. *Respondeat Superior* (Count IX)

The second remaining claim against the Hospital is *respondeat superior* (Count IX). *See* Sixth Am. Cplt., at ¶¶ 161–64 (Dckt. No. 247). Slabon seeks to hold the Hospital responsible for the actions of Dr. Barrick and Nurse Benjamin.

*Respondeat superior* is not an independent cause of action. *See Simon v. Northwestern Univ.*, 183 F. Supp. 3d 908, 919 (N.D. Ill. 2016) ("[R]espondeat superior is not an independent

54

cause of action, and must be predicated on an underlying tortious act by the accused's employee or agent . . . ."); *Ross v. Univ. of Chi.*, 2018 WL 6448464, at \*10 (N.D. Ill. 2018); *Cole v. Meeks*, 2018 WL 4682297, at \*9 (C.D. Ill. 2018); *Wilson v. Edward Hosp.*, 2012 IL 112898, 367 Ill. Dec. 243, 981 N.E.2d 971, 980 (2012) ("[V]icarious liability is not itself a claim or cause of action."). That is, *respondeat superior* is not a claim that can stand on its own two feet. It is a theory of vicarious liability. *Respondeat superior* is a basis for holding one person responsible for someone else's acts.

Without a surviving claim, there is nothing to hold the Hospital vicariously liable *for*. There is no liability by the servants, so there is no vicarious liability for the master. *See Bachenski v. Malnati*, 11 F.3d 1371, 1377–78 (7th Cir. 1993) ("[W]hen *respondeat superior* is the sole asserted basis of liability against a master for the tort of his servant an adjudication on the merits in favor of either the master or servant precludes suit against the other . . . . If the master is vicariously liable, the servant must be directly liable (and vice versa); if the master is not vicariously liable, the servant cannot be directly liable (and vice versa)."); *Moy v. County of Cook*, 159 Ill. 2d 519, 203 Ill. Dec. 776, 640 N.E.2d 926, 928 (1994) ("When an action is brought against a master based on allegedly negligent acts of the servant and no independent wrong is charged on behalf of the master, liability is entirely derivative, being founded upon the doctrine of *respondeat superior*.").

The Court grants summary judgment to the Hospital on the *respondeat superior* claim (Count IX).

## C.     Indemnification (Count X)

The third remaining claim against the Hospital is an indemnification claim (Count X). *See* Sixth Am. Cplt., at ¶¶ 165–66 (Dckt. No. 247). This Court is granting summary judgment to

the Hospital on the other claims, so the indemnification claim falls by the wayside, too. The Court grants summary judgment to the Hospital on the indemnification claim.

### D.    False Imprisonment (Count XI)

The fourth remaining claim against the Hospital is false imprisonment. *See* Sixth Am. Cplt., at ¶¶ 167–70 (Dckt. No. 247). Slabon alleges that the Hospital "unlawfully restrained" him, and did so "without Slabon's consent." *Id.* at ¶¶ 168–69.

Again, under Illinois law, "'[t]he elements of a cause of action for false imprisonment are that the plaintiff was restrained or arrested by the defendant, and the defendant acted without reasonable grounds to believe that an offense was committed by the plaintiff.'" *Molina v. Latronico*, 430 F. Supp. 3d 420, 438 (N.D. Ill. 2019) (quoting *Poris v. Lake Holiday Prop. Owners Ass'n*, 2013 IL 113907, 368 Ill. Dec. 189, 983 N.E.2d 993, 1007 (2013)). That phraseology fits when the claim is against police officers, but is ill-fitting when the claim is against a medical provider. The reference to "an offense" suggests that a criminal setting is the norm for this type of claim. *See Mims v. Hoffman*, 2013 WL 5423851, at *7 (N.D. Ill. 2013) ("These elements, and the fact that 'probable cause is an absolute bar to a claim of false imprisonment,' . . . suggest that despite its assertion against all defendants, Count IV is most aptly directed at the police officers  . . . not the Masonic Hospital defendants.") (citation omitted).

Slabon's complaint fails, for two reasons.

First, Slabon did not come forward with an affidavit from a medical professional to support his claim. "In any action, whether in tort, contract, or otherwise, in which the plaintiff seeks damages for injuries or death by reason of medical, hospital, or other healing art

malpractice," the plaintiff must "file an affidavit" from a medial professional showing that there is a "reasonable and meritorious cause for filing of such action." *See* 735 ILCS 5/2-622(a)(1).

Illinois courts give a broad reading to the statutory phrase "healing art malpractice." *See Woodard v. Krans*, 234 Ill. App. 3d 690, 175 Ill. Dec. 546, 600 N.E.2d 477, 486 (1992). The statute applies if the claim involves the exercise of medical *judgment*, even if it is not a medical malpractice *claim*. *See Campolattara v. Feliciano*, 2016 IL App (3d) 141005-U, ¶ 20 (2016) ("Here, plaintiff's amended complaint alleged claims of false imprisonment against each of the defendants. Although he does not allege medical malpractice, his claims concern issues of medical judgment, and therefore, fall under the purview of section 2-622(a) of the Code."); *McDonald v. Obaisi*, 2018 WL 1156243, at *2 (N.D. Ill. 2018) ("If the conduct at issue 'is inherently one of medical judgment,' then a Section 2-622 report is required.") (citation omitted); *Thomas ex rel. Smith v. Cook Cty. Sheriff*, 401 F. Supp. 2d 867, 877 (N.D. Ill. 2005) ("An affidavit may be required under the Healing Art Malpractice Act even where a complaint does not allege medical malpractice on its face, if the determination at issue 'is inherently one of medical judgment.'") (quoting *Lyon v. Hasbro Indus., Inc.*, 156 Ill. App. 3d 649, 109 Ill. Dec. 41, 509 N.E.2d 702, 706 (1987)).

That rule applies to the decision to restrain a patient. "Whether a hospital patient should be restrained involves the exercise of medical judgment." *Heastie v. Roberts*, 226 Ill. 2d 515, 315 Ill. Dec. 735, 877 N.E.2d 1064, 1087 (2007); *see also Eads v. Heritage Enters., Inc.*, 204 Ill. 2d 92, 272 Ill. Dec. 585, 787 N.E.2d 771, 776 (2003) ("There is no question that the decision to physically restrain a hospital patient requires the exercise of medical judgment.").

Faced with an unruly patient in an emergency room, Dr. Barrick made the judgment call that there was a need to restrain Slabon. Under Illinois law, that decision involved medical

judgment, so Slabon needed to come forward with an affidavit from a medical professional supporting his claim. He didn't. He has no evidence, so he has no claim.

Second, no reasonable jury could conclude that the decision to restrain Slabon was unreasonable. Slabon was screaming, yelling, and spewing profanities. Threats rained down on the medical staff, and spit almost did, too. He was out of control, and the doctor decided to put restraints on him to get him under control. Based on the undisputed facts, that decision was not only reasonable – it was unavoidable.

The Court grants summary judgment to the Hospital on the false imprisonment claim (Count XI).

### E.    Intentional Infliction of Emotional Distress (Count XII)

The fifth and final remaining claim against the Hospital is intentional infliction of emotional distress (Count XII). *See* Sixth Am. Cplt., at ¶¶ 171–74 (Dckt. No. 247).

Again, a claim of intentional infliction of emotional distress requires a showing that "(1) the defendant's conduct was truly extreme and outrageous; (2) the defendant intended to inflict severe emotional distress (or knew that there was at least a high probability that its conduct would cause severe emotional distress); and (3) the defendant's conduct did in fact cause severe emotional distress." *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017)

There is plenty of evidence in the record about extreme and outrageous conduct. But all of it was by Slabon. He was on the *delivering* end, not the receiving end. Based on the undisputed facts, no reasonable jury could conclude that the Hospital or any of its employees engaged in extreme and outrageous conduct, let alone did so intentionally.

The Court grants summary judgment to the Hospital on the claim of intentional infliction of emotional distress (Count XII).

\*　　\*　　\*

Slabon has pursued this case with vigor for over five years.  He has actively participated from day one.  He sincerely believes that he was mistreated by the police, the fire department, and medical professionals on that cold wintry day in 2014.

But there comes a time, in every case, when a party must put its evidentiary cards on the table, and show that there is evidence to back up a claim.  That time is summary judgment. Evidence that creates a genuine issue of material fact is the ticket to trial – without it, the courtroom's doors are closed.  There is no need to impanel a jury if there is no factual dispute for them to decide.

Here, Defendants moved for summary judgment and supported their motions with admissible evidence.  At that point, Slabon needed to come forward with evidence of his own, meaning sufficient evidence that could support a verdict in his favor.  He didn't, so this case has – at long last – reached the end of the line.

## Conclusion

For the reasons stated above, the motion for summary judgment by the City Defendants is hereby granted.  The Court grants summary judgment to the City Defendants on all remaining claims.  The motion for summary judgment by the Hospital is hereby granted.  The Court grants summary judgment to the Hospital on all remaining claims.

Date:　September 13, 2021　　　　　　_____

Steven C. Seeger
United States District Judge

59